ROB BONTA
Attorney General of California
LAURA FAER (SBN: 233846)
DARRELL SPENCE (SBN: 248011)
Supervising Deputy Attorneys General
EDWARD NUGENT (SBN: 330479)
ANTHONY PINGGERA (SBN: 320206)
JENNIFER BUNSHOFT (SBN: 197306)
KATHERINE BRUCK (SBN: 342536)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102
  Telephone:  (415) 229-0113
  Fax:  (415) 703-5480
  E-mail:  Edward.Nugent@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, IN HER OFFICIAL CAPACITY AS U.S. SECRETARY OF EDUCATION; FRANK E. MILLER, JR., IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STUDENT PRIVACY POLICY OFFICE OF THE U.S. DEPARTMENT OF EDUCATION; AND UNITED STATES OF AMERICA,**<br><br>Defendants. | No. 3:26-cv-01259<br><br>**PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date:<br>Time:<br>Courtroom:  3<br>Judge:         Noël Wise (Duty Judge)<br>Trial Date:   Not Set<br>Action Filed: February 11, 2026 |

**PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**

PLEASE TAKE NOTICE that Plaintiff the STATE OF CALIFORNIA hereby moves the Court pursuant to Federal Rule of Civil Procedure 65 for a temporary restraining order (TRO) and order to show cause why a preliminary injunction should not issue against Defendants U.S.

DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of the Department of Education; FRANK E. MILLER, JR., in his official capacity as Director of the Student Privacy Policy Office of the U.S. Department of Education; and the UNITED STATES OF AMERICA (collectively, Defendants), and their officers, agents, servants, employees, and any other persons who are in active concert or participation with them.

Plaintiff respectfully moves the Court to enter a temporary restraining order and preliminary injunction prohibiting Defendants from taking any of the actions described in Plaintiff's contemporaneously filed Proposed Order and Order to Show Cause.

This motion is based on this Ex Parte Motion, the Complaint for Declaratory and Injunctive Relief (Dkt. No. 1), the accompanying Memorandum of Points and Authorities, the proposed Temporary Restraining Order, the supporting declarations, and the papers, evidence, and records on file in this action, as well as any other written or oral evidence or argument presented at or before the time this motion is heard by the Court.

As set forth in the accompanying Memorandum of Points and Authorities, a TRO is necessary by 12:00 p.m. on February 12, 2026, to prevent immediate and irreparable harm to Plaintiff. Absent immediate injunctive relief, Defendants' attempts to unlawfully expand the requirements of FERPA and control the administration and personnel of California schools threaten to imminently harm Plaintiff's sovereignty and deprive Plaintiff of vital resources. Accordingly, Plaintiff seeks a TRO and preliminary injunction to preserve the status quo.

Pursuant to N.D. Cal. Civil L.R. 65-1 and Fed. R. Civ. P. 65, Plaintiff's counsel emailed notice of the instant ex parte application to counsel for Defendants, the U.S. Department of Justice. Specifically, notice was emailed to Brad Rosenberg, Special Counsel for the Federal Programs Branch, at brad.rosenberg@usdoj.gov, and Pamela Johann, Chief of the Civil Division for the Northern District of California, at pamela.johann@usdoj.gov, today, February 11, 2026, prior to this filing. Nugent Decl. ¶ 3.

Dated:  February 11, 2026                    Respectfully submitted,

ROB BONTA
Attorney General of California
LAURA FAER
DARRELL SPENCE
Supervising Deputy Attorneys General
KATHERINE BRUCK
JENNIFER BUNSHOFT
ANTHONY PINGGERA
Deputy Attorneys General

*/s/ Edward Nugent*
EDWARD NUGENT
Deputy Attorney General
*Attorneys for Plaintiff State of California*

PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................. 1

Statement of Facts ...................................................................................................... 1

    I.    Federal Education Funding Is Critical for California Public Schools.................... 1

    II.    Federal Education Funding Is Conditioned on Substantial Compliance with FERPA ...................................................................................................... 2

    III.    Defendants Investigate Plaintiff's FERPA Compliance ........................................ 2

    IV.    California Cooperates with the Investigation and Reaffirms Compliance with FERPA ........................................................................................... 4

    V.    Defendants Issue a Findings Letter Threatening to Withdraw Funding ................ 6

Legal Standard ........................................................................................................... 8

Argument .................................................................................................................... 9

    I.    Plaintiff Is Likely to Succeed on the Merits............................................................ 9

        A.    Plaintiff Will Likely Win a Declaratory Judgment Under FERPA............. 9

        B.    Defendants' Actions Are Likely Ultra Vires .............................................. 12

        C.    The Findings Letter Likely Violates the Spending Clause ....................... 14

        D.    The Findings Letter Likely Violates the Administrative Procedure Act ................................................................................................ 15

    II.    Plaintiff Faces a Grave Risk of Imminent, Irreparable Harm ............................... 15

    III.    The Public Interest and Balance of Equities Tip Sharply in Favor of a TRO....... 17

Conclusion ............................................................................................................... 18

PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

**TABLE OF AUTHORITIES**

**Page**

CASES

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
  901 F.3d 1166 (9th Cir. 2018)................................................................................. 8

*Ariz. Dream Act. Coal. v. Brewer*
  757 F.3d 1053 (9th Cir. 2014)................................................................................ 17

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
  548 U.S. 291 (2006)............................................................................................... 14

*Chino Valley Unified Sch. Dist. v. Newsom*
  2025 WL 1151004 (E.D. Cal. Apr. 17, 2025) ........................................................ 10

*Citizens to Pres. Overton Park, Inc. v. Volpe*
  401 U.S. 402 (1971)............................................................................................... 14

*City and County of San Francisco v. U.S. Citizenship and Immigr. Servs.*
  408 F. Supp. 3d 1057 (N.D. Cal. 2019) ................................................................. 15

*City of Los Angeles v. Barr*
  929 F.3d 1163 (9th Cir. 2019)................................................................................ 14

*Cummings v. Premier Rehab Keller, P.L.L.C.*
  596 U.S. 212 (2020)............................................................................................... 14

*E. Bay Sanctuary Covenant v. Biden*
  993 F.3d 640 (9th Cir. 2021)................................................................................... 8

*Gonzaga Univ. v. Doe*
  536 U.S. 273 (2022).......................................................................................... 2, 12

*M.R. v. Dreyfus*
  697 F.3d 706 (9th Cir. 2015)................................................................................. 15

*Michigan v. U.S. Army Corps of Eng'rs*
  667 F.3d 765 (7th Cir. 2011)................................................................................. 15

*Murphy Co. v. Biden*
  65 F.4th 1122 (9th Cir. 2023)................................................................................ 12

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
  886 F.3d 803 (9th Cir. 2018)................................................................................. 15

*Nken v. Holder*
  556 U.S. 418 (2009)................................................................................................ 8

# TABLE OF AUTHORITIES
### (continued)

Page

*Owasso Indep. Sch. Dist. No. I-011 v. Falvo*
   534 U.S. 426 (2002) ..................................................................................... 14

*Perfect 10, Inc. v. Google, Inc.*
   653 F.3d 976 (9th Cir. 2015) ........................................................................ 15

*R.I.L-R v. Johnson*
   80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................... 17

*Rodriguez v. Robbins*
   715 F.3d 1127 (9th Cir. 2013) ...................................................................... 17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
   240 F.3d 832 (9th Cir. 2001) .......................................................................... 8

*Trump v. Int'l Refugee Assistance Project*
   582 U.S. 571 (2017) ................................................................................. 8, 17

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) .................................................................................... 8, 15

**STATUTES**

5 U.S.C.
   § 704................................................................................................................ 15
   § 706................................................................................................................ 15

20 U.S.C.
   § 1232a............................................................................................................ 13
   § 1232g..................................................................................................... *passim*
   § 1234c(a)......................................................................................................... 2

California Education Code
   § 220.3........................................................................................................ 3, 10
   § 220.5........................................................................................................ 3, 10

**OTHER AUTHORITIES**

34 C.F.R. pt. 99 .................................................................................. 2, 10-11, 12, 13

Cal. Pol'y Ctr., Emily Rae, https://californiapolicycenter.org/people/emily-rae/
   (last accessed Feb. 11, 2026)............................................................................ 3

California Assembly Bill 1955 ................................................................................... *passim*

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

Cal. Dep't of Just., *Know Your Rights: LGBTQ+ Discrimination Rights*,
https://oag.ca.gov/lgbtq/rights (last accessed Feb. 11, 2026)......................................................... 9

Cal. Dep't of Just., *Legal Alert: Forced Disclosure Policies re: Transgender and
Gender Nonconforming Students*, No. OAG-2024-02 (Jan. 11, 2024),
https://oag.ca.gov/system/files/attachments/press-
docs/Legal%20Alert%20re%20Forced%20Outing%20Policies.1.10.24_0.pdf......................... 9

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

On January 28, 2026, Defendants issued a letter of findings (Findings Letter) concluding that the California Department of Education (CDE) is in violation of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, as it pertains to gender support plans and gender-identity-related education records. The Findings Letter has no reasonable basis or evidentiary support for this determination. Defendants recite various alleged instances in which school districts did not proactively share gender-identity-related information with parents, but this is not what FERPA requires. FERPA provides parents a right of access to their child's education records upon request. Defendants cite no evidence in their Findings Letter showing that Plaintiff has coerced or instructed local educational agencies (LEAs) to violate their obligations under FERPA, or that even one of California's nearly 2,000 LEAs has withheld a requested gender support plan, or gender-identity-related education records, in response to a parent's request under FERPA. Undeterred by the lack of supporting evidence in the Findings Letter—and ostensibly motivated by discriminatory animus against transgender individuals—while also ignoring all of CDE's public guidance that has reaffirmed again and again that California LEAs must follow FERPA, Defendants demand that CDE undertake six "corrective actions" to come into compliance with FERPA, in excess of Defendants' authority and in direct violation of federal law. If CDE refuses, Defendants threaten in the Findings Letter that they will withhold the $4.9 billion that California receives in federal education funding. A TRO is necessary to prevent this lawless withdrawal of federal funding and the devastating harm it would inflict upon California students, teachers, school staff, and communities.

## STATEMENT OF FACTS

### I.   FEDERAL EDUCATION FUNDING IS CRITICAL FOR CALIFORNIA PUBLIC SCHOOLS

California relies on federal funding from the U.S. Department of Education (ED) to provide public education to over 5 million preschool and school-age children. Thurmond Decl. ¶¶ 38-43. ED provides about $4.9 billion annually in support of California's public education system, which includes nearly 2,000 LEAs. *Id.* These funds aim to ensure that all children have fair and equal

1

access to education, and provide significant support to specific groups, including low-income children, children of migrant farmworkers, children with disabilities, English language learners, and homeless children. *See id.* ¶¶ 44-96. Even a temporary loss of federal funding would irreparably harm students, teachers, and school staff, and would jeopardize programs and services supporting children statewide. *Id.* ¶¶ 102-113.

## II.   FEDERAL EDUCATION FUNDING IS CONDITIONED ON SUBSTANTIAL COMPLIANCE WITH FERPA

FERPA imposes two separate duties as conditions on the receipt of federal education funding. First, LEAs must establish processes by which parents can request to inspect and review their children's education records as defined by FERPA, and LEAs must make a minor student's education records available to the student's parents within forty-five days of receiving such a request. 20 U.S.C. § 1232g(a)(1)(A). Second, LEAs must not improperly disclose those same education records to third parties without written parental consent. *Id.* § 1232g(b)(1).

Defendant U.S. Secretary of Education Linda McMahon is empowered to enforce FERPA, and her enforcement powers include (but are not limited to) the ability to withhold federal education funding to a recipient that fails to comply. *See* 20 U.S.C. § 1232g(f); 34 C.F.R. § 99.67(a) (2026; promulgated Dec. 2, 2011). However, Defendant McMahon can withhold federal education funding "only if the Secretary finds there has been a failure to comply with [FERPA], and [she] has determined that compliance cannot be secured by voluntary means." 20 U.S.C. § 1232g(f). Because FERPA controls "institutional policy and practice, not individual instances of disclosure . . . [r]ecipient institutions can . . . avoid termination of funding [under FERPA] so long as they 'comply *substantially*' with the Act's requirements." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 288 (2002) (emphasis added); *see also* 20 U.S.C. § 1234c(a).

## III.   DEFENDANTS INVESTIGATE PLAINTIFF'S FERPA COMPLIANCE

On March 27, 2025, Defendant Frank Miller informed CDE that Defendants were initiating an investigation into whether "numerous [LEAs] in California may be implementing policies and practices that violate [FERPA]" and whether "[CDE] played a role, either directly or indirectly, in the adoption of these practices in supporting the recently enacted California Assembly Bill 1955"

(AB 1955). Thurmond Decl., Ex. A at 1. Defendant Miller initiated the investigation following a complaint from the California Justice Center. The California Justice Center conducts advocacy in several areas, including education. The organization's president previously was the lead attorney in several cases seeking to defend and promote "parental notification policies." *See* Cal. Pol'y Ctr., Emily Rae, https://californiapolicycenter.org/people/emily-rae/ (last accessed Feb. 11, 2026).

AB 1955, codified in relevant part at sections 220.3 and 220.5 of the California Education Code, provides that an employee of a California LEA cannot be "required to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression . . . *unless otherwise required by state or federal law*." Cal. Educ. Code § 220.3(a) (emphasis added); *accord id.* § 220.5(a). Defendant's letter initiating the FERPA investigation explained that the California Justice Center had asserted in its complaint that AB 1955 conflicts with FERPA by allegedly exempting information related to a student's gender identity from FERPA's disclosure requirements. *See* Thurmond Decl., Ex. A at 2-3. Defendant stated that its "preliminary analysis" gave it "reasonable cause to believe that the LEAs throughout California may be violating FERPA." *Id.* at 3. The letter accordingly directed CDE to "ensure that all LEAs comply with FERPA regarding parents' rights to inspect and review any education records maintained by the LEA." *Id.*

On March 28, 2025, Defendant McMahon issued a letter to "Educators" nationwide, with an attached letter from Defendant Miller addressed to state superintendents, that alleged "pervasive indoctrination taking place in many classrooms" involving "gender ideology and critical race theory," and purported to "remind[] educational institutions receiving federal financial assistance that they are obligated to abide by FERPA . . . if they expect federal funding to continue." Thurmond Decl., Ex. B, McMahon Letter at 1-2.

Notably, Defendant Miller's attachment to that letter stated that **"FERPA does not provide an affirmative obligation for schools to inform parents about any information, even if that information is contained in a student's education records."** Thurmond Decl., Ex. B, Miller Attachment at 1 (emphasis added). That letter also "request[ed] that each [state educational agency] submit no later than April 30, 2025, documentation . . . to provide assurance that the

PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

[state educational agency] and their respective LEAs are complying with the provisions of FERPA." *Id.* at 3.

**IV.    CALIFORNIA COOPERATES WITH THE INVESTIGATION AND REAFFIRMS COMPLIANCE WITH FERPA**

On April 1, 2025, in response to Defendants' letters, CDE issued a letter to all California LEAs, emphasizing that "AB 1955 does **not** prohibit LEA staff from sharing any information with parents" and that "there is no conflict between AB 1955 and FERPA, which permits parental access to their student's education records upon request." Thurmond Decl., Ex. C at 1.

On April 11, 2025, CDE replied to Defendant Miller's March 27 letter. In its reply, CDE explained that (1) there is no conflict between FERPA and AB 1955, and (2) AB 1955 expressly states that it applies only insofar as it is consistent with other state and federal laws. *See generally* Thurmond Decl., Ex. D. CDE's reply noted Defendants' acknowledgement that "FERPA does not impose an affirmative duty on schools to disclose information about a student to parents" (citing Defendants' March 28 letter and attachment), and that AB 1955 "only prohibits schools and school districts from compelling staff to affirmatively disclose without a student's consent." *Id.* at 1. CDE provided three examples of relevant guidance and notices it had previously provided to California LEAs "to ensure [they] understand that they can comply with both FERPA and AB 1955." *Id.* at 2. That same day, CDE also sent another letter informing all California LEAs of CDE's response to ED and reiterated that "there is no conflict between the provisions of AB 1955"—which "require[s] compliance with state and federal laws"—and "a parent's right to inspect and review their children's education records . . . under FERPA." Thurmond Decl., Ex. E at 1.

On April 24, 2025, CDE responded to Defendant Miller's March 28 request for assurance of FERPA compliance. CDE's response cited numerous efforts by CDE to ensure FERPA compliance, including trainings, presentations, informational webpages, a dedicated email address for processing "privacy and FERPA-related inquiries" from "both LEAs and families," and a social media profile "used for sharing FERPA updates and resources." *See generally* Thurmond Decl., Ex. F. The response also stated that CDE had informed California LEAs that AB 1955

4

"does not mandate nondisclosure of a student's gender identity," that "AB 1955 does not prohibit LEA staff from sharing any student information with parents," and that AB 1955 does not conflict with "parents' rights to request to inspect and review their student's education records under FERPA, even if such education records contain information related to a student's sexual orientation, gender identity or gender expression." *Id.* at 3. The same day, CDE sent a letter informing all California LEAs of CDE's response to Defendant Miller's request for information. *See* Thurmond Decl., Ex. G.

On June 3, 2025, CDE received another letter from Defendant Miller, which stated that CDE's previous notices did not contain "specific reference to 'gender support plans,'" and alleged that "parental advocacy groups, such as the 'Moms for Liberty,' have expressed concern that school districts in California continue to develop [gender support plans] without parental awareness." Thurmond Decl., Ex. H at 2. Defendant Miller admitted that Defendants "have not independently validated this data," but nevertheless "have similar concerns regarding how 'gender support plans' are shared with parents at the district level." *Id.* Defendant Miller concluded by requesting that CDE issue "[a]n additional notice to superintendents and administrators, like the one issued on April 1, 2025, reminding them that 'gender support plans' are typically education records under FERPA," and provide "[a] plan of action demonstrating how CDE will ensure LEAs are complying with the provisions of FERPA . . . given the context of AB 1955." *Id.*

On June 9, 2025, CDE responded to Defendant Miller's June 3 letter. In this letter, CDE summarized its previous communications with ED and California LEAs in compliance with ED's FERPA investigation. Thurmond Decl., Ex. I at 1-2. CDE stated that it was "not aware of any legal authority" to support the demands in ED's June 3 letter, which included ensuring that gender support plan creation at a school site includes "parental awareness," and reiterated that CDE's previous letters to California LEAs "sufficiently apprise them of their obligations under FERPA" and "demonstrate CDE's support of FERPA compliance by LEAs." *Id.* at 2-3. CDE did not receive a response to that letter.

5

**V.    DEFENDANTS ISSUE A FINDINGS LETTER THREATENING TO WITHDRAW FUNDING**

On January 28, 2026, Defendants issued the Findings Letter detailing the "outcome of the investigation." Thurmond Decl., Ex. J. The Findings Letter concluded that CDE had "create[d] powerful state-directed pressure for LEAs to adopt practices that are likely to lead to—and have led to—FERPA noncompliance" and that evidence "hostility toward transparent communication with parents." *Id.* at 1-2. Specifically, the Findings Letter alleges that CDE "systematically fostered a legal environment where schools maintain, or feel obligated by law to maintain, information about a student's 'gender identity' and 'gender expression' that is actively withheld from parents," in "many cases" by "maintaining documentation, such as 'gender support plans,' not as part of the cumulative record open to inspection by parents, but as 'unofficial records' to which the school may not provide access upon a parent's request."[1] *Id.* at 2. "This practice," the Findings Letter concluded, "violates the federally recognized right of parents to inspect and review all education records related to their minor children." *Id.* Yet the Findings Letter does not identify a *single* instance in which a California LEA failed to produce education records— including "gender support plans" or otherwise—in response to a parental request for records under FERPA. *See generally id.*

Despite the lack of evidence supporting Defendants' conclusions, the Findings Letter lists six "corrective actions" that CDE and California LEAs must implement "to resolve this investigation":

> 1) Publicize a clear definition of "official" and "unofficial" education records and then specify that under Federal law all forms of education records that do not otherwise see an exception under FERPA are subject to parental inspection upon request. This includes "gender support plans," any gender-related modifications to student documents, forms, and other internal files or records related to these

---

[1] In the Findings Letter, Defendants appear to use the term "gender support plan" to mean a document developed by an LEA that a transgender student can fill out, with or without the assistance of their parents, to inform and guide LEA staff members regarding the student's social transition. *See, e.g.*, Thurmond Decl., Ex. J at 3. Social transition is a non-medical, individualized process in which a person changes various aspects of their gender expression (such as their name, pronouns, clothing, or hairstyle) to align with their gender identity.

6

changes. (This would require SPPO's review and approval prior to statewide issuance.[2])

2) Issue a new notice to superintendents and administrators informing them: that AB 1955, as well as all other CA education laws, regulations, and policies, should not be interpreted to undermine or contradict Federal law; that "gender support plans" or other related documentation that is directly related to a student and is maintained by the district or school, whether in official or unofficial files, are considered education records under FERPA, and are thus subject to review and inspection by the student's parents; and that violations of FERPA risk loss of Federal financial assistance. (This would require SPPO's review and approval prior to statewide issuance.)

3) Have LEAs submit certifications that they understand and are in compliance with corrective actions (1 and 2). Submit a report to this Office confirming which LEAs have certified and provide a list of those that have not.

4) Provide written assurance to this office that CDE will allow LEAs to enforce FERPA regarding "gender identity" and pro-parental notification approaches in a manner that aligns with the needs of the districts to ensure compliance.

5) Provide written assurance to this Office, that CDE will incorporate into its established compliance monitoring program LEA compliance with FERPA, including the specific provisions of FERPA as related to the issues addressed in this complaint, and

6) As part of the newly mandated training established on July 1, 2025, that satisfies the California Education Code (EC) Section 218.3(b)(1)'s (LGBTQ) cultural competency training for teachers and other certificated employees, the CDE must add FERPA training content that is approved by SPPO. Further, any other teacher trainings that reference privacy, "gender identity," discrimination/harassment or other similar topics will also be required to include the same FERPA training content approved by SPPO.

Thurmond Decl., Ex. J at 18-19. Defendants have threatened to terminate all federal education funding to California unless the State complies with these "corrective actions." *See id.* at 3, 9, 18-19. The Findings Letter sets a response deadline of February 11, 2026. *Id.* at 20. CDE has already (and repeatedly) reiterated to all California LEAs that AB 1955 does not conflict with "parents' rights to request to inspect and review their student's education records under FERPA, even if such education records contain information related to a student's sexual orientation, gender

---

[2] "SPPO" is Defendant Student Privacy Policy Office of the U.S. Department of Education. The current Director of SPPO is Defendant Miller.

7

identity or gender expression." Thurmond Decl., Exs. C, E, G. Today, CDE sent another letter to all California LEAs restating the same point yet again. Thurmond Decl., Ex. K.

Defendant's Findings Letter provides no evidence of any incident where any of California's nearly 2,000 LEAs have failed to provide a gender support plan or gender-identity-related education record in response to a valid parent request, and Plaintiff is in substantial compliance with FERPA. Defendants therefore have no authority to demand corrective actions or penalize California under FERPA. In addition, because Defendants' interpretation of FERPA is inconsistent with the plain language of the statute, Defendants are demanding "corrective actions" when they have no authority to do so. Plaintiff filed this complaint and TRO to prevent Defendants from enforcing FERPA on the basis of the erroneous and unlawful Findings Letter.

**LEGAL STANDARD**

The purpose of interim injunctive relief is "not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (citations omitted). The standard for a temporary restraining order is generally the same as for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of their claims and showing that the balance of hardships tips "sharply" in their favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). When the government is a party, the last two *Winter* factors (the equities and public interest) merge. *E. Bay Sanctuary Covenant,* 993 F.3d at 668 (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

8

PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

**ARGUMENT**

**I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS**

**A.    Plaintiff Will Likely Win a Declaratory Judgment Under FERPA**

Plaintiff is likely to prevail on the merits of its claim for a declaratory judgment under FERPA—and, at a minimum, presents serious questions going to the merits—for two reasons. First, the Findings Letter contains no evidence that CDE or any other state agency has coerced, directed, or required a California LEA to withhold education records that would otherwise be responsive to a parent's FERPA request. To the contrary, CDE has repeatedly communicated to California LEAs their duties under FERPA, and informed Defendants of those communications. Second, the Findings Letter contains no evidence that any California LEA withheld education records in violation of FERPA. As such, the Findings Letter fails to demonstrate that Plaintiff is not in substantial compliance with FERPA, and Defendants must be enjoined from undertaking any FERPA enforcement predicated on the Findings Letter.

**1.    CDE Has Consistently Affirmed the Proper Scope of LEAs' Duties Under FERPA**

The Findings Letter incorrectly asserts that "California's guidance and actions . . . pressure schools to disregard FERPA's requirements." Thurmond Decl., Ex. J at 15. Simply put, none of the cited evidence supports that conclusion, which is further belied by numerous communications from CDE to California LEAs over the course of Defendants' FERPA investigation.

The Findings Letter first cites a legal alert and a "Know Your Rights" document published by the California Office of the Attorney General, which discuss privacy and nondiscrimination provisions of California law. Thurmond Decl., Ex. J at 10. However, these documents nowhere suggest that California LEAs should not fully comply with FERPA or that California law supersedes LEAs' obligation to respond to a parent's FERPA request.[3]

---

[3] *See generally* Cal. Dep't of Just., *Legal Alert: Forced Disclosure Policies re: Transgender and Gender Nonconforming Students*, No. OAG-2024-02 (Jan. 11, 2024), https://oag.ca.gov/system/files/attachments/press-docs/Legal%20Alert%20re%20Forced%20Outing%20Policies.1.10.24_0.pdf; Cal. Dep't of Just.,
(continued…)

PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

The Findings Letter next cites nonbinding CDE guidance—which has since been withdrawn and replaced—and alleges that CDE's LGBTQ+ teacher competency training may contain similar content as the former guidance. Thurmond Decl., Ex. J at 10-11. Defendants claim that the guidance directed schools to "keep records that reflect a transgender student's birth name and assigned sex . . . apart from the student's school records," such as "in a locked file cabinet in the principal's or nurse's office." *Id.* at 11. But this recommendation is about protecting a transgender student's privacy *at school* by preventing unnecessary, widespread disclosure of their transgender identity to other individuals at school. The student's parents would obviously be aware of the "birth name and assigned sex" listed, e.g., on their birth certificate, and would presumably be the ones providing such "records" to the school. And the guidance and training never state that schools should withhold any education record that would otherwise be responsive to a parent's FERPA request.

The Findings Letter then discusses AB 1955—but, as the text of the law makes clear, and as CDE has repeatedly communicated to California LEAs and ED, AB 1955 does not conflict with FERPA, and indeed includes an express exception for compliance with federal law. *See, e.g.*, *Chino Valley Unified Sch. Dist. v. Newsom*, 2025 WL 1151004, at *7 (E.D. Cal. Apr. 17, 2025) (holding that "FERPA and AB 1955 do not conflict" because "AB 1955 has an explicit carveout for any conflict with federal law"). *Contrast* Thurmond Decl., Ex. J at 12, *with* Cal. Educ. Code §§ 220.3(a), 220.5(a), *and* Thurmond Decl., Exs. C-G (letters from CDE to LEAs and Defendants explaining that AB 1955 does not conflict with FERPA).

Finally, the Findings Letter discusses legal action taken by California and CDE to enjoin certain LEAs' policies mandating that school personnel affirmatively disclose transgender students' gender identity to their parents—for example, a policy "that would require educators to inform parents within three days of a student request to change name, pronouns, or use a facility that did not align with the sex listed on their official record." Thurmond Decl., Ex. J at 12; *see also id.* at 12-15. But FERPA contains no such requirement of affirmative notification, *see*

---

*Know Your Rights: LGBTQ+ Discrimination Rights*, https://oag.ca.gov/lgbtq/rights (last accessed Feb. 11, 2026) (noting that schools can disclose information about a student's sexual orientation or gender identity to parents in certain circumstances).

PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

*generally* 20 U.S.C. § 1232g; 34 C.F.R. pt. 99, as Defendants themselves have averred, Thurmond Decl., Ex. B, Miller Attachment at 1 ("FERPA does not provide an affirmative obligation for school officials to inform parents about any information, even if that information is contained in a student's education records . . . ."). These legal actions are thus entirely irrelevant to the issue of FERPA compliance.

In sum, nothing cited in the Findings Letter shows that Plaintiff has coerced or instructed LEAs to violate their obligations under FERPA or suggested that state law in any way limits LEAs' responsibility to comply with FERPA. In reality, CDE has consistently reminded LEAs of the requirements of FERPA, including repeated notice that FERPA and AB 1955 do not conflict. *E.g.*, Thurmond Decl., Exs. C, E, G (letters from CDE to LEAs regarding FERPA and AB 1955). And Defendants were well aware of these communications from CDE to LEAs throughout the FERPA investigation. *E.g.*, Thurmond Decl., Ex. H at 2 (letter from Defendant Miller acknowledging CDE's "notice to superintendents and administrators . . . explain[ing] that 'there is no conflict between AB 1955 and FERPA'"). There is thus no basis for the Finding Letter's conclusion that California has in any way induced noncompliance with FERPA.

**2.    The Findings Letter Offers No Evidence of an LEA Violating FERPA**

The Findings Letter also discusses various policies, trainings, and communications of California LEAs, alleging that "multiple LEAs have failed to comply with th[e] requirement" of disclosing education records to parents under FERPA. Thurmond Decl., Ex. J at 3-7. None of these examples, however, shows that any LEA has withheld, or would withhold, any education record responsive to a parent's FERPA request. Instead, the cited evidence at most shows that certain LEAs take steps to prevent inadvertent or overbroad disclosure of information about students' gender identity to other parties—for example, by storing such information separately or by limiting the visibility of such information in school administrative software.[4] Those practices, however, would not prevent a parent from accessing any covered education records pursuant to a

---

[4] Some of the cited policies address which documents are required to reflect a student's legal name and legal gender, and which are not. *See* Thurmond Decl., Ex. J at 6-7. However, whether a given education record must align with a student's birth certificate is obviously irrelevant to an LEA's obligation to disclose that same education record under FERPA or whether an LEA would comply with that obligation.

valid FERPA request. Indeed, they are entirely consistent with the LEAs' duty under FERPA to protect a student's education records from disclosure to other parties without parental consent. *See* 20 U.S.C. § 1232g(b)(1). Moreover, nothing in FERPA governs the way education records are stored, or how student information is entered and displayed in administrative software. *See generally* 20 U.S.C. § 1232g; 34 C.F.R. pt. 99. And there is no requirement in FERPA that gender support plans (or any other information or education record) be affirmatively disclosed to parents absent a valid FERPA request. *Contrast* Thurmond Decl., Ex. J at 3-4, *with* 20 U.S.C. § 1232g, 34 C.F.R. pt. 99, *and* Thurmond Decl., Ex. B, Miller Attachment at 1 ("FERPA does not provide an affirmative obligation for school officials to inform parents about any information, even if that information is contained in a student's education records . . . .").

Even more telling is the fact that the Findings Letter does not cite even a *single* instance in which a California LEA withheld *any* education record that the LEA was required to produce—be it a gender support plan or any other type of education record—in response to a FERPA request. Put differently, there is no evidence in the Findings Letter of even *one* FERPA violation by a California LEA. Absent any such evidence, Plaintiff cannot be said to be out of substantial compliance with FERPA. *See Gonzaga Univ.*, 536 U.S. at 288.

Because there is no basis in the Findings Letter to conclude that Plaintiff (or, for that matter, any California LEA) has violated FERPA even once, or that Plaintiff is out of substantial compliance with FERPA, Plaintiff is likely to succeed in its claim for a declaratory judgment that Plaintiff is not out of substantial compliance with FERPA and that Defendants have no basis to require corrective action or otherwise enforce FERPA, including by withholding any funding.

**B.    Defendants' Actions Are Likely Ultra Vires**

Plaintiff is likely to prevail on its ultra vires claim because the Findings Letter appears to demand "corrective action" beyond the requirements of FERPA. As the Ninth Circuit and Supreme Court have explained, "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority—*i.e.*, *ultra vires* actions—are reviewable." *Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023) (citing *Larson v. Domestic & Foreign Com. Corp.*,

PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

337 U.S. 682, 689-90 (1949)). Here, Defendants exceed their statutory authority in at least two ways.

First, the Findings Letter seeks to impose requirements beyond those contained in FERPA and its regulations. Defendants' fourth corrective action demands "that CDE will allow LEAs to enforce FERPA regarding 'gender identity' and pro-parental notification approaches." Thurmond Decl., Ex. J at 18. But FERPA has no requirements related to gender identity, and whatever Defendants mean by "pro-parental notification approaches," it is obvious that they are not required by FERPA, which, again, does not require proactive notification absent a valid FERPA request. *E.g.*, Thurmond Decl., Ex. B, Miller Attachment at 1 ("FERPA does not provide an affirmative obligation for school officials to inform parents about any information, even if that information is contained in a student's education records . . . ."). Defendants thus act ultra vires to the extent that "pro-parental notification approaches" would require CDE and LEAs to disclose education records related to a student's gender identity to a student's parents absent a FERPA request. They similarly act ultra vires to the extent they seek to require CDE and LEAs to disclose gender-identity-related information that falls outside FERPA's definition of an "education record" or to require CDE and LEAs to disclose records related to a student's gender identity in response to an inquiry that does not constitute a valid FERPA request—all of which would exceed the requirements of FERPA, and thus Defendants' statutory authority. *Contrast* Thurmond Decl., Ex. J at 3-4, 18, *with* 20 U.S.C. § 1232g, *and* 34 C.F.R. pt. 99.

Second, the Findings Letter seeks to violate statutory limits on federal control of schools. Under 20 U.S.C. § 1232a, the federal government is prohibited from "exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system." But the sixth corrective action demands changes to "training for teachers and other certificated employees," as well as editorial control over those changes. Thurmond Decl., Ex. J at 19. Defendants' attempt to exercise such control over school administration, curriculum, and personnel directly contradicts statutory limits and is thus unlawful.

### C.    The Findings Letter Likely Violates the Spending Clause

Plaintiff is likely to prevail on its Spending Clause claim because there was not, and could not have been, clear notice that federal education funding is conditioned upon the demands Defendants seek to impose. The Spending Clause requires conditions on federal funding to be imposed "unambiguously" to enable funding recipients to "exercise their choice knowingly, cognizant of the consequences of their participation." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1174 (9th Cir. 2019). Recipients must therefore have "clear notice" of a funding condition prior to accepting funds, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), and funding conditions cannot be imposed "post acceptance" or "retroactively," *Los Angeles*, 929 F.3d at 1174-75. Courts accordingly "construe the reach of Spending Clause conditions with an eye toward ensuring that the receiving entity of federal funds had notice that it will be liable." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2020) (citation modified).

To the extent that the Findings Letter suggests that CDE must adopt "pro-parental notification policies" as a condition of federal funding, neither FERPA nor its controlling regulations impose such a duty. FERPA does not require states to adopt an affirmative duty to notify parents regarding the existence of their child's gender support plan (or any education record). *E.g.*, Thurmond Decl., Ex. B, Miller Attachment at 1. Such a requirement therefore cannot be a condition on federal funding under FERPA. Nor does FERPA condition federal funding on a certification that the recipient will disclose information that does not constitute an "education record" in response to a parent's request, or that the recipient will provide "education records" in response to an inquiry that does not constitute a valid FERPA request. *See* 20 U.S.C. § 1232g(a)(4)(B)(i) ("education records" do not include notes of an individual LEA staff member "which are in the sole possession of [the staff member]"); *see also Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 433-35 (2002) ("education records" do not include individual classroom or homework assignments). Because FERPA does not establish such conditions on federal funding, Plaintiff could not have had "clear notice" thereof when accepting federal funding. Nor can the Findings Letter itself impose these conditions on funding, as this would be impermissibly retroactive. *E.g.*, *Los Angeles*, 929 F.3d at 1174-75 & n.6.

14

**D.      The Findings Letter Likely Violates the Administrative Procedure Act**

Finally, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) (noting mandatory language of § 706). The Findings Letter is reviewable as final agency action under 5 U.S.C. § 704. For the same reasons discussed above— that the Findings Letter fails to demonstrate that Plaintiff is not in substantial compliance with FERPA, that the Findings Letter is ultra vires, and that the Findings Letter violates the Spending Clause—Plaintiffs are also likely to prevail on their APA challenge.

**II.      PLAINTIFF FACES A GRAVE RISK OF IMMINENT, IRREPARABLE HARM**

Plaintiff will suffer irreparable injury in the absence of an injunction. *See Winter*, 555 U.S. at 20. Defendants' conduct need not be the exclusive cause of Plaintiff's injury. *M.R. v. Dreyfus*, 697 F.3d 706, 728-29 (9th Cir. 2015). Nor must the alleged harm be certain to occur before a court can grant a preliminary injunction. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). Plaintiff shows a "sufficient causal connection" between Defendants' conduct and Plaintiff's imminent injury that can only be addressed by an immediate injunction. *City and County of San Francisco v. U.S. Citizenship and Immigr. Servs.*, 408 F. Supp. 3d 1057, 1121 (N.D. Cal. 2019) (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018); *Perfect 10, Inc. v. Google, Inc.* 653 F.3d 976, 745 (9th Cir. 2015)). Here, this standard is undoubtedly met.

Defendants have explicitly threatened to withhold *all* federal education funding from California if the State does not accede to the six "corrective actions" listed in the Findings Letter. *See* Thurmond Decl., Ex. J at 3, 9, 18-19. The loss of federal education funding would have a catastrophic effect on California LEAs. Thurmond Decl. ¶¶ 35-38. California receives a total of $4.9 billion annually in federal education funding from ED, which is used to provide educational services to the State's 5.8 million schoolchildren across nearly 2,000 LEAs. *Id.* ¶¶ 39-44. As recipients of federal funding, California LEAs must comply with *all* federal education-related

15

laws, including the Individuals with Disabilities Education Act (IDEA) and the Elementary and Secondary Education Act, as amended by the Every Student Succeeds Act (ESSA). *Id.* ¶ 40. It would be simply impossible for California LEAs to comply with its obligations under IDEA, ESSA, and other statutory schemes without access to federal funding. *E.g.*, *id.* ¶¶ 45-97.

Almost half of the federal education funding appropriated to California annually— approximately $2.27 billion—is appropriated pursuant to Title I of ESSA. *Id.* ¶ 48. Title I funding programs are formula funds designed to meet the education needs of children who are in high-poverty or low-achieving schools, children who are housed in juvenile correctional facilities or who are attending community day programs, and children who are attending schools with low graduation rates. *Id.* ¶ 47. Title I funding is vital to ensuring that children from low-income households and living in high-poverty communities have the resources needed to overcome barriers to learning and success. *Id.* ¶ 49. Nearly all California LEAs receive some form of Title I formula funding, and it supports services for over 5.2 million of the State's 5.8 million students. *Id.* Similarly, California has been apportioned over $232 million under Title II of ESSA, which is formula funding that supports teacher recruitment, training, and retention. *Id.* ¶¶ 59-61. Withdrawing federal funding will fatally impact all of the programs these ESSA funds support, from teacher recruitment and retention programs to supplemental supports for migratory children of agricultural workers, ultimately limiting all students' academic achievement and diminishing their long-term opportunities for success. *E.g.*, *id.* ¶¶ 35-38, 49-50, 58-64.

California also relies on federal funding to provide special education services to children with disabilities in the State. *Id.* ¶¶ 78-80. For the 2025-26 school year, California received $1.48 billion in formula funding to support the varied needs of approximately 850,000 students with disabilities. *Id.* ¶ 80. Withholding IDEA funds will severely impair the delivery of special education services provided to students with disabilities, such as physical therapy, speech therapy, occupational therapy, and specialized services for deaf or blind students. *Id.* ¶¶ 81-84. Preschoolers with disabilities are especially vulnerable and developmentally sensitive, as they require early intervention services to identify and address developmental delays or disabilities at the earliest age possible, when the brain is most adaptable. *Id.* Early interventions lead to

PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

improved outcomes in brain plasticity, as well as improved skills in communication, movement, social interaction, self-help, feeding, problem solving and cognition. *Id.* ¶ 84. Early and consistent disability support services can greatly improve a child's development and reduce the need for more intensive services later in life. *Id.* Missed early intervention opportunities, on the other hand, cause permanent developmental loss, resulting in irreparable harm that cannot be undone once critical neurological windows close. *Id.* Once that happens, there is no way to restore missed progress or lost independence. Without the critical support of federal education funding, children will receive fewer services, make fewer developmental gains, and require more intensive support services. *Id.* at ¶ 85.

A sudden withdrawal of $4.9 billion simply cannot be made up for with state funds. *Id.* ¶ 105. Withdrawing funds will therefore inevitably jeopardize, limit, or destroy critical support programs, lead to layoffs of teachers and school staff, and damage the development of California schoolchildren—and especially the most vulnerable students in the State—in ways that even a subsequent restoration of funding cannot and will not cure. Therefore, even a momentary lapse in federal education funding would cause devastating and irreparable harm. Additionally, implementing the "corrective actions" that Defendants would require Plaintiff to violate state law.

III.  **THE PUBLIC INTEREST AND BALANCE OF EQUITIES TIP SHARPLY IN FAVOR OF A TRO**

Lastly, the public interest and balance of equities sharply favor the requested relief. Among other things, "by establishing a likelihood of success on the merits," a plaintiff "establish[es] that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act. Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward. *Int'l Refugee Assistance Project*, 582 U.S. at 580. Moreover, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Preserving the status quo by temporarily enjoining Defendants from withdrawing all federal education funding from the State of California as a penalty for not immediately complying with their six "corrective actions" will avoid devastating harm that cannot later be remedied. As explained above, even a temporary suspension of funding would have cascading and catastrophic repercussions in programs serving millions of schoolchildren across the State. The State will not be able to make up the sudden budgetary shortfall, and California LEAs will be unable to meet their statutory obligations under other federal education statutes, including ESSA and IDEA. By contrast, the public interest is served if the Court temporarily enjoins Defendants from jeopardizing the critical services and programs that California LEAs provide to their students, and which are made possible by federal education funding programs while this litigation proceeds. Moreover, a preliminary injunction will not harm Defendants, who can continue to ensure FERPA compliance and will merely be ordered to refrain from enforcing the erroneous and unlawful Findings Letter by withholding federal education funding from California.

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully urges the Court to enter a temporary restraining order that prevents the Defendants from enforcing their Findings Letter and its six "corrective actions" by any means, including the unlawful withholding of $4.9 billion in education funding that directly benefits the more than 5.8 million students served by California public schools as a penalty.

Dated:  February 11, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
LAURA FAER
DARRELL W. SPENCE
Supervising Deputy Attorneys General
KATHERINE BRUCK
EDWARD NUGENT
ANTHONY PINGGERA
Deputy Attorneys General

*/s/ Edward Nugent*
EDWARD NUGENT
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102
  Telephone: (415) 229-0113
  E-mail:  Edward.Nugent@doj.ca.gov

*Attorneys for Plaintiff State of California*

PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER