ROB BONTA
Attorney General of California
LAURA FAER (SBN: 233846)
DARRELL SPENCE (SBN: 248011)
Supervising Deputy Attorneys General
EDWARD NUGENT (SBN: 330479)
ANTHONY PINGGERA (SBN: 320206)
JENNIFER BUNSHOFT (SBN: 197306)
KATHERINE BRUCK (SBN: 342536)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102
  Telephone: (415) 229-0113
  E-mail: Edward.Nugent@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA,** | **No.** |
| Plaintiff, | **DECLARATION OF TONY THURMOND IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| **U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, IN HER OFFICIAL CAPACITY AS U.S. SECRETARY OF EDUCATION; FRANK E. MILLER, JR., IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STUDENT PRIVACY POLICY OFFICE OF THE U.S. DEPARTMENT OF EDUCATION; AND UNITED STATES OF AMERICA,** | Date:<br>Time:<br>Courtroom:  3<br>Judge:      Noël Wise (Duty Judge)<br>Trial Date:  Not Set<br>Action Filed: February 11, 2026 |
| Defendants. | |

I, Tony Thurmond, declare as follows:

1.    I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, based on my experience and information provided to me. If called as a witness, I could and would testify competently to the matters set forth below.

1

2.     I am the Superintendent of Public Instruction for the State of California. I have served in this role since January 2019. As the Superintendent of Public Instruction, I am the state official who oversees the California Department of Education ("CDE"), which provides leadership, assistance, oversight, and resources to local education agencies ("LEAs") in California.

3.     As the head of CDE, I am familiar with the agency's federal grant application and funding processes, both in terms of how federal grant funds are allocated and transferred from the United States Department of Education ("the Department") to the State of California and from the State of California through CDE to LEAs, and the ways in which CDE and California LEAs rely on timely disbursement of these funds, and the harms attendant on failure to timely disburse these funds.

4.     I hold dual master's degrees in Law and Social Policy and Social Work from Bryn Mawr College. Prior to becoming Superintendent of Public Instruction, I was an educator, social worker, and elected official.

5.     From 2008 to 2012, I served on the West Contra Costa School Board, where, among other things, I helped build new schools; increase funding for counseling, after-school, music, and athletic programs; reduce school suspensions by 27 percent; and bring nutrition and wellness programs to our schools.

6.     From 2014 to 2018, I served in the California State Assembly, where I championed legislation to, among other things, expand free school lunch programs, improve access for families for early education and childcare, and shift millions of dollars directly from prisons to schools.

7.     I submit this declaration in support of Plaintiff State of California's motion for a temporary restraining order. My understanding is the State's claims pertain to the Department's Findings Letter dated January 28, 2026, which alleges CDE is out of compliance with FERPA as it relates to gender support plans and gender-identity related education records covered by FERPA. As the Superintendent of Public Instruction, I have personal knowledge of the matters

2

set forth below, or with respect to the matters for which I do not have personal knowledge, I have reviewed information gathered from CDE's records by others within the organization.

8.    In California, CDE supports nearly 2,000 LEAs, including school districts, county offices of education, and charter schools. Across the State, 5.8 million students are served by our LEAs.

9.    As a condition of receiving federal funding, California provides written assurances on behalf of the State and its LEAs that they will comply with all federal educational statutes including, but not limited to, FERPA. We regularly provide assurances as required and understand that our most recent assurances remain in effect. The nearly 2,000 California LEAs that receive federal funds regularly provide assurances that programs and services are and will be in compliance with FERPA. In addition, LEA compliance with FERPA and other laws is monitored annually through the State's federal compliance monitoring process and multiple accountability mechanisms.

**Communications from Federal Government**

10.    On March 27, 2025, CDE received via email a letter from the Department's Student Privacy Policy Office ("SPPO") stating that the Department was initiating an investigation into whether "numerous [LEAs] in California may be implementing policies and practices that violate [FERPA]" and whether "[CDE] played a role, either directly or indirectly, in the adoption of these practices in supporting the recently enacted California Assembly Bill 1955 ('AB 1955')." A true and correct copy of the letter initiating the FERPA investigation is attached hereto as Exhibit A.

11.    On March 28, 2025, the Department issued a letter to "Educators," and attached a letter from the SPPO to "Chief State School Officers and Superintendents." A true and correct copy of the Department's letter, with the SPPO's attachment, is attached hereto as Exhibit B. The letter and attachment warned of "pervasive indoctrination taking place in many classrooms" involving "gender ideology and critical race theory," and purported to "remind[] educational institutions receiving federal financial assistance that they are obligated to abide by FERPA . . . if they expect federal funding to continue."

12. In these documents, the Department and the SPPO stated that "FERPA does not provide an affirmative obligation for schools to inform parents about any information, even if that information is contained in a student's education records."

13. The SPPO requested that each state educational agency submit, no later than April 30, 2025, documentation "to provide assurance that the [state educational agency] and their respective LEAs are complying with the provisions of FERPA."

14. On April 1, 2025, in response to the Department's letter initiating the FERPA investigation and the letter and attachment issued to California LEAs, CDE sent an official letter titled "Facts to Consider Regarding FERPA and AB 1955" to all California district superintendents and charter school administrators, a true and correct copy of which is attached hereto as Exhibit C. This letter emphasized that "AB 1955 does not prohibit LEA staff from sharing any information with parents" and that "there is no conflict between AB 1955 and FERPA, which permits parental access to their student's education records upon request."

15. On April 11, 2025, CDE sent an official letter in reply to the SPPO's letter initiating the FERPA investigation. A true and correct copy of CDE's reply to the investigation letter is attached hereto as Exhibit D. In its reply, CDE stated that (1) there is no conflict between FERPA and AB 1955, and (2) AB 1955 explicitly states that it applies only insofar as it is consistent with other state and federal laws. The letter notes that "FERPA does not impose an affirmative duty on schools to disclose information about a student to parents" (citing the letter and attachment issued on March 28), and that AB 1955 "only prohibits schools and school districts from compelling staff to affirmatively disclose without a student's consent."

16. Also on April 11, 2025, CDE sent an official letter titled "Further Update Regarding FERPA and AB 1955" to all California district superintendents and charter school administrators, a true and correct copy of which is attached hereto as Exhibit E. This letter informed recipients about CDE's response to the FERPA investigation letter and reiterated that "there is no conflict between the provisions of AB 1955 and a parent's right to inspect and review their children's education records . . . under FERPA," and that "AB 1955 includes language requiring compliance with state and federal laws."

4

17.    On April 24, 2025, CDE sent an official letter responding to SPPO's March 28 request for documentation of FERPA compliance. A true and correct copy of CDE's response is attached hereto as Exhibit F. CDE's response cited numerous efforts by CDE to ensure FERPA compliance, including trainings, presentations, informational webpages, a dedicated email address for processing "privacy and FERPA-related inquiries" from "both LEAs and families," and a social media profile "used for sharing FERPA updates and resources." The response also stated that CDE had informed California LEAs that AB 1955 "does not mandate nondisclosure of a student's gender identity," that "AB 1955 does not prohibit LEA staff from sharing any student information with parents," and that AB 1955 does not conflict with "parents' rights to request to inspect and review their student's education records under FERPA, even if such education records contain information related to a student's sexual orientation, gender identity or gender expression."

18.    Also on April 24, 2025, CDE sent an official letter titled "Third Update Regarding FERPA" to all California district superintendents and charter school administrators, a true and correct copy of which is attached hereto as Exhibit G. This letter informed California LEAs of CDE's response to SPPO's request for information.

19.    On June 3, 2025, CDE received another letter from the SPPO, a true and correct copy of which is attached hereto as Exhibit H. This letter stated that CDE's previous notices did not contain "specific reference to 'gender support plans,'" and alleged that "parental advocacy groups, such as the 'Moms for Liberty,' have expressed concern that school districts in California continue to develop [gender support plans] without parental awareness." The letter stated that the SPPO and Department "have not independently validated this data," but nevertheless "have similar concerns regarding how 'gender support plans' are shared with parents at the district level." The letter requested that CDE issue "[a]n additional notice to superintendents and administrators, like the one issued on April 1, 2025, reminding them that 'gender support plans' are typically education records under FERPA," and provide "[a] plan of action demonstrating how CDE will ensure LEAs are complying with the provisions of FERPA . . . given the context of AB 1955."

5

20.    On June 9, 2025, CDE responded to the SPPO's June 3 letter. A true and correct copy of CDE's response is attached hereto as Exhibit I. In this letter, CDE summarized its previous communications with the Department and California LEAs in compliance with the Department's FERPA investigation. CDE stated that it was "not aware of any legal authority" to support the demands in the Department's June 3 letter, and reiterated that CDE's previous letters to California LEAs "sufficiently apprise them of their obligations under FERPA" and "demonstrate CDE's support of FERPA compliance by LEAs."

21.    CDE did not receive a response from the Department or SPPO to CDE's June 9 letter or otherwise receive notice of any legal authority to support the SPPO's demands in its June 3 letter.

22.    On January 28, 2026, the Department and the SPPO sent the Findings Letter to CDE, which details "the outcome of the investigation" into CDE's potential violations of FERPA. A true and correct copy of the Findings Letter is attached hereto as Exhibit J.

23.    The Findings Letter concludes that CDE "create[d] powerful state-directed pressure for LEAs to adopt practices that are likely to lead to—and have led to—FERPA noncompliance" and that evidence "hostility toward transparent communication with parents."

24.    The Findings Letter alleges that CDE has "systematically fostered a legal environment where schools maintain, or feel obligated by law to maintain, information about a student's 'gender identity' and 'gender expression' that is actively withheld from parents," including "by maintaining documentation, such as 'gender support plans,' not as part of the cumulative record open to inspection by parents, but as 'unofficial records' to which the school may not provide access upon a parent's request." The Letter states that "[t]his practice violates the federally recognized right of parents to inspect and review all education records related to their minor children."

25.    The Findings Letter states that the "persistent efforts by schools across the state to hide such matters from parents cannot be squared with FERPA."

DECLARATION OF TONY THURMOND

26.    However, the Findings Letter does not identify any instance in which a California LEA failed to produce education records—including a gender support plan or otherwise—in response to a parental request for records under FERPA.

27.    The Findings Letter also states that California LEAs are using internal data management software systems to hide gender-identity-related information from parents. However, the Findings Letter does not identify any instance in which a California LEA failed to provide education records in an internal data management software system responsive to a parental request for education records under FERPA.

28.    The Findings Letter states that "simply specifying to your LEAs that 'gender support plans' are considered education records under FERPA and are therefore also subject to review and inspection by parents of students, would not be sufficient in addressing the issues laid out in this [letter]."

29.    The Findings Letter demands that CDE complete the following six "corrective actions" in order to "resolve" the investigation:

(1) Publicize a clear definition of "official" and "unofficial" education records and then specify that under Federal law all forms of education records that do not otherwise see an exception under FERPA are subject to parental inspection upon request. This includes "gender support plans," any gender-related modifications to student documents, forms, and other internal files or records related to these changes. (This would require SPPO's review and approval prior to statewide issuance.)

(2) Issue a new notice to superintendents and administrators informing them: that AB 1955, as well as all other CA education laws, regulations, and policies, should not be interpreted to undermine or contradict Federal law; that "gender support plans" or other related documentation that is directly related to a student and is maintained by the district or school, whether in official or unofficial files, are considered education records under FERPA, and are thus subject to review and inspection by the student's parents; and that violations of FERPA risk loss of Federal financial assistance. (This would require SPPO's review and approval prior to statewide issuance.)

(3) Have LEAs submit certifications that they understand and are in compliance with corrective actions (1 and 2). Submit a report to this Office confirming which LEAs have certified and provide a list of those that have not.

(4) Provide written assurance to this Office that CDE will allow LEAs to enforce FERPA regarding "gender identity" and pro-parental notification approaches in a manner that aligns with the needs of the districts to ensure compliance.

(5) Provide written assurance to this Office, that CDE will incorporate into its established compliance monitoring program LEA compliance with FERPA, including the specific provisions of FERPA as related to the issues addressed in this complaint, and

7

(6) As part of the newly mandated training established on July 1, 2025, that satisfies the California Education Code (EC) Section 218.3(b)(1)'s (LGBTQ) cultural competency training for teachers and other certificated employees, the CDE must add FERPA training content that is approved by SPPO. Further, any other teacher trainings that reference privacy, "gender identity," discrimination/harassment or other similar topics will also be required to include the same FERPA training content approved by SPPO.

30. If CDE does not voluntarily comply with these "corrective actions" as written, the Department states that it will terminate all federal education funding to the State of California. The Findings Letter gives Plaintiff until close of business on February 11, 2026, to respond.

31. Under the terms of the Findings Letter, CDE would be compelled to provide an additional assurance from CDE that it "will allow LEAs to enforce FERPA regarding 'gender identity' and pro-parental notification approaches in a manner that aligns with the needs of the districts to ensure compliance" and from all LEAs, even though FERPA does not require "pro-parental notification" and CDE and LEAs have already provided the required assurances and certification of compliance regarding FERPA's requirements. CDE would also be compelled to create and provide new notices and education personnel trainings approved by Defendants, despite CDE already having issued several notices to the field addressing the Department's concerns. It is my understanding that these "corrective actions"—which would be highly burdensome to CDE—are unsupported by any evidence or legal authority.

32. Nonetheless, on February 11, 2026, CDE sent an official letter titled "Further Update Regarding FERPA" to all California district superintendents and charter school administrators, a true and correct copy of which is attached hereto as Exhibit K. In order to address the concerns raised by the Department, this letter again reiterated that "[Assembly Bill] 1955 does not contradict parents' rights to request to inspect and review their students' education records under FERPA, even if they contain information related to a student's sexual orientation, gender identity, or gender expression," and stated that "no other provisions of California law, such as state privacy or antidiscrimination laws, contradict or override the right of parents to request their students' education records subject to FERPA." The letter also reiterated that "[w]hether a support plan (or other education record of a student) is maintained by school officials in a central file or in a separate location to ensure privacy related to third parties (such as

8

other school staff, students, or volunteers), it remains subject to a parental request for inspection and review in accordance with FERPA's provisions."

33. Also on February 11, 2026, CDE sent an official letter responding to the Findings Letter. A true and correct copy of CDE's response is attached hereto as Exhibit L. In this letter, CDE summarized its previous communications with the Department and California LEAs in compliance with the Department's FERPA investigation, and quoted the relevant contents of an online training curriculum for teachers and other certificated employees that started on July 1, 2025, and a communication to LEAs dated October 1, 2025, both of which reiterated that AB 1955 does not prohibit voluntary disclosure of information regarding a student's gender identity to parents, nor does it contradict a parent's right to access their student's education records upon request under FERPA. CDE then responded to the Findings Letter, explaining that none of the letter's findings "reflect a pattern and practice of failing to provide education records related to gender identity or expression to parents who have made FERPA requests," that the Findings Letter "appears to be based on a plainly incorrect assumption that FERPA requires LEAs to affirmatively notify and provide information to parents regarding their student's gender identity and expression," and that "CDE is not aware of any legal authority that requires the CDE to take any of the requested [corrective] actions." CDE then stated that, nonetheless, regarding certain of the requested actions, CDE had earlier that day issued the Further Updated Regarding FERPA in order to further address the Department's concerns and summarized the contents of that letter.

34. Despite CDE's continual efforts to address the Department's concerns about FERPA compliance, including through the issuance of the letter to the field dated February 11, 2026, the threat to our State's federal funding for failure to comply with the unfounded "corrective actions" demanded by the Findings Letter puts at risk $4.9 billion in federal funds received from the Department.

35. Given my experience, California and the LEAs within our State cannot meet their obligations to administer and provide public education to our State's students without the continued and uninterrupted flow of funds from the Department. The impact of a disruption in funds would be devastating, and children in California would suffer irreparably.

9

36.    A disruption in federal funds would severely impair the State's (and LEAs') ability to fulfill its mission of "creat[ing] strong, effective schools that provide a wholesome learning environment through incentives that cause a higher standard of student accomplishment" and supporting the intellectual and personal growth of all young Californians so they can "ensure fulfilling personal lives and careers and contribute to civic and economic progress in our diverse and changing democratic society." *See* California Department of Education, California State Board of Education Vision, Mission, and Goals Statement, https://www.cde.ca.gov/be/ag/ag/vmgoals.asp.

37.    Students and other children in California would suffer lifelong harms to their intellectual and personal development due to the withdrawal of funds.

38.    These harms would only be compounded by the chaos and disruption caused by uncertainty about funding that impacts the ability of LEAs to plan ahead, budget, and rely on the continued existence of various education programs or staffing for such programs, loss of and impairment to school faculty and staff who would be laid off due to severe funding decreases and/or have an increased workload, for example, if student and teacher ratios increase due to layoffs, and fraying of these educational organizations' reputations and ties to the communities they serve.

**Background on California's Educational System**

39.    As the Superintendent of Public Instruction, I provide leadership and oversight to the largest common system of public schools in the nation, which includes nearly 2,000 LEAs, 9,985 schools, and 5,806,221 students. Of these students, approximately 2.6 million are in grades TK-5; approximately 1.3 million are in grades 6-8; and nearly two million are in grades 9-12. In 2024-2025, 48.5 percent of California students were female, and 51.3 percent were male.

40.    All California public schools receive federal funds from the Department. As a result, California public schools are subject to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., Elementary and Secondary Education Act, as amended by the Every Student Succeeds Act ("ESSA"), 23 U.S.C. §§ 6301 et seq., and other federal and state education-related laws.

10

DECLARATION OF TONY THURMOND

41.    CDE is a state agency whose work helps carry out the State's constitutional responsibility to provide Californians with a free public education. Cal. Const. art. IX, §§ 5-6. CDE's mission is to innovate and collaborate with educators, schools, parents, districts, and community partners to ensure that all of California's more than 5.8 million public school students—across more than 9,985 schools—have access to a world-class education. Our aim is to prepare students to live, work, and thrive in a multicultural, multilingual, and highly connected world.

42.    Consistent with federal and state laws, LEAs within the State serve all school-age children, regardless of their race, nationality, ethnic origin, sex, gender, religion, disability, or immigration status. An LEA—such as a school district—is a public authority legally constituted by the State as an administrative agency to provide control of and direction for kindergarten through grade twelve public educational institutions.

**Federal Funding Relied on by CDE**

43.    California relies on federal funding from the Department to provide public education to millions of preschool and school-age children.

44.    The Department provides about $4.9 billion annually in support of California's public education system. This includes funding for Title I to support low-income students and families and IDEA for students with disabilities. This does not take into account additional funds directly disbursed to LEAs by the federal government without passing through the CDE.

ESSA Funding and Programs

45.    California receives federal funds under various parts of the ESSA to support many critical aspects of education programming. Title I funds are formula grants appropriated by Congress and distributed by the Department.

46.    The Department administers funding appropriated under Title I of the Elementary and Secondary Education Act, as amended by the ESSA.

47.    Title I of the ESSA is comprised of three distinct funding programs: Title I, Part A; Title I, Part D, Subpart 2; and Comprehensive Support and Improvement ("CSI"). Title I, Part A funding is designed to ensure that all children have a fair and equal opportunity to obtain a

11

high-quality education and reach, at a minimum, proficiency in the State's content standards and assessments. This funding is intended to meet the educational needs of low-achieving students enrolled in the highest poverty schools. Title I, Part D provides funding to LEAs for programs that serve children and youth who are in locally operated correctional facilities or are attending community day programs for delinquent children and youth, and to provide assistance to children and youth who are neglected or at-risk of dropping out of school. CSI funding is provided to improve student outcomes in schools that have either a graduation rate below 68% and/or are performing in the lowest 5% of Title I eligible schools.

48.    The total amount of Title I, Part A funding allocated to CDE in Fiscal Year ("FY") 2024-2025 year was $2,236,833,545.00 and for FY 2025-2026 year it is $2,269,376,787.00. CDE disburses 93% of the total Title I funding to Title I, Part A and Title I, Part D, Subpart 2. At least 99% of the Title I, Part A and Title I, Part D, Subpart 2 funding is allocated to LEAs according to a formula based on the low-income census count for each school district, and the state free and reduced price meal ("FRPM") rate for charter schools and county offices of education. 7% of the Title I allocation is reserved for CSI. At least 95% of the CSI reservation goes out in local assistance for school improvement activities. Up to 5% percent of the CSI reservation supports CDE's CSI administrative activities.

49.    ESSA Title 1 funding is vital to ensuring that children from low-income households and living in high-poverty communities have the resources needed to overcome barriers to learning and success. Title I funding supports nearly all of the State's almost 2,000 LEAs and provides services to numerous eligible nonpublic schools. In FY 2024-2025, Title I supported educational services to 5,224,000 California students. Any reduction or disruption of Title I funding in FY 2025-2026 would decrease funding to nearly all LEAs statewide, reduce services to numerous eligible nonpublic schools, and affect educational services for millions of California students. Such reductions would also affect numerous Title I program teachers in California who provide educational programming for eligible students. A withdrawal of Title I, Part A funds would be extremely detrimental to students and staff as well as State operations.

50. Without these Title I, Part A funds, the State would be unable to support the 224 schools currently identified to receive CSI, which supports evidence-based school improvement efforts, such as through collaboration with educational partners and conducting needs assessments and related root-cause analyses. These funds are subject to specific timeline and compliance requirements under the Cash Management Improvement Act. LEAs receive initial payments early in the grant period, with subsequent reimbursements tied to expenditure reporting. A disruption in the system would jeopardize efforts to improve performance in the State's lowest-achieving schools, thereby reducing essential resources and services to California's most vulnerable students at critical stages of intellectual and personal development.

51. Title I, Part A also provides the State administrative funding CDE uses to provide technical support to districts for all Title I programming. If not properly administered by the Department, funding for the 224 schools that are currently in school improvement status would also be jeopardized. These funds are needed to support school improvement efforts for the State's lowest performing schools.

52. Under Title I, Part B of the ESSA (State Assessment Formula Grants), California has been apportioned over $27 million for FY 2024-2025 and over $27 million for FY 2025-2026.

53. Funding under Part B allows California to pay the costs of developing State assessments standards adopted under ESSA § 1111(b) and administer those assessments or carry out other assessment activities pursuant to ESSA § 1201. Losing these funds will jeopardize two critical assessment-related contracts with our vendors that the State relies on to develop, administer, score, and report statewide assessments for the over 4 million students in the tested grades across California. And the State lacks sufficient resources to independently carry out these federally mandated assessment activities. Staffing capacity would also be reduced; without these funds, there would be insufficient resources to support the roughly nine staff who support these assessment activities.

54. Title I, Part C of the ESSA, through the Migrant Education Program ("MEP"), provides funding for the children of, and youth working as, agricultural migratory farmworkers

and fishers in California. The MEP relies upon projections and funds from the Department to appropriately serve migratory students, whose families contribute to the U.S. economy by providing labor in the U.S. agriculture, dairy, lumber, and fishing industries.

55. The State has been allocated over $121 million in Title I, Part C funds for the FY 2024-2025 and over $124 million for the FY 2025-2026 to serve over 73,000 MEP students in each year. Part C funding is intended to support high-quality and comprehensive educational programs and services that address the unique needs of migratory children, including helping migratory children overcome education disruption, cultural and language barriers, social isolation, various health-related problems, and other factors that inhibit the ability of such children to succeed in school.

56. MEP funds and services provide supplemental tutoring in math and reading, English lessons, career counseling, support toward high school completion, referrals to other services such as health care and nutrition, and support for inter-state collaboration, among other services for children and youth ages 3 through 21. California collaborates regularly with other states to ensure that MEP students receive a continuum of support as they move between states on their own or with their families.

57. As a result of the transitory nature of seasonal work, children and youth in migratory families commonly incur academic deficits. These children often miss school and start anew with frequent family moves due to work. Migratory children and youth rely upon supplemental supports to recoup learning time in after school and summer programming, such as additional instruction in language arts and mathematics.

58. If Part C funding is delayed or withheld, local MEPs will be unable to plan, staff, or administer these programs directly serving students. Migratory students will not receive the instruction or support necessary to remediate the risks to academic achievement or wellbeing. The academic deficits, deepening year over year, harm children with the potential to become insurmountable without MEP programs.

59. Title II, Part A of the ESSA, referred to as Supporting Effective Instruction, is a federal categorical program that funds supplemental activities that strengthen the quality and

14

DECLARATION OF TONY THURMOND

effectiveness of teachers, principals, and other school leaders to increase student achievement consistent with challenging state academic standards, specifically low income and minority students.

60. These funds support programs that bolster teacher recruitment and retention, including teacher residency, mentoring for new teachers, and career ladders for paraprofessionals; programs supporting instructional leadership, like leadership training for principals and instructional coaches and positions providing job-embedded support for teachers; and statewide teacher and school leader development programs like Teacher Induction, University of California Subject Matter Projects, the 21st Century California School Leadership Academy Program, the Promoting Equitable Access to Teachers Program, and programs to support Equitable Services for private school educators. Funds also support professional development aimed at improving instructional practices and deepening teacher knowledge in English Language Arts and Science, Technology, Engineering, and Mathematics subjects.

61. California has been apportioned more than $232 million to support effective instruction under Title II, Part A during FY 2024-2025 and more than $230 million for FY 2025-2026. As the second largest recipient of the federal support nationwide, California stands to suffer significantly from any reduction or elimination of Title II, Part A funding.

62. The reduction or elimination of Title II, Part A funds would significantly impact students by decreasing their access to high quality, well-supported teachers, principals, and other school leaders. Without these critical resources, schools will struggle to provide the necessary professional development and instructional support that helps educators meet diverse student needs. As a result, students will experience a decline in instructional quality, which would directly hinder their academic growth and overall educational experience and further exacerbate achievement gaps, particularly among low-income students, English learners, and students with disabilities. Without well-prepared and supported teachers, these vulnerable groups face a greater risk of learning loss and diminished opportunities for success. The long-term consequences would be profound, limiting students' academic achievement and future college and career readiness.

63. Such reductions to Title II, Part A funds would also impair schools' ability to attract, retain, and develop the abilities of qualified teachers, principals and other school leaders, particularly in rural and impoverished areas that already face severe teacher shortages. The teachers who remain will face increasing impediments to meeting the needs of their students due to lack of support from principals, instructional coaches, and other support staff whose recruitment, hiring, and training are supported by these funds. Moreover, any reduction in the number of teachers at an LEA, coupled with a fixed or increasing number of students, necessarily results in higher student-teacher ratios and larger classrooms. Increasing student demands for limited teacher time burden students and teachers alike as students receive less individual attention and teachers' responsibilities increase. Moreover, loss of faculty/staff could lead to health and safety issues affecting entire communities.

64. All of these injuries would ultimately contribute to lifelong harm to students, as significant interruptions to their intellectual and personal development at critical early stages often cannot be repaired. And any such harm to students will undermine the mission of California, CDE, and the LEAs to support students, families, and communities within the State.

65. Under Title III, Part A of the ESSA, referred to as English Language Acquisition, Language Enhancement, and Academic Achievement, California has been apportioned more than $157 million for FY 2024-2025 and more than $152 million for FY 2025-2026. This funding supports programming to assist English language learners in acquiring English and meeting grade-level achievement and graduation goals, as well as other multilingual services under Title III.

66. The loss of this funding would significantly harm a large proportion of California's students, including 1.1 million English language learners, 1.2 million students with a home language other than English, and over 70,000 migratory children and youth, by reducing access to critical language instruction programs and academic support that help them succeed in school.

67. Language education in particular becomes increasingly challenging as students grow older; deficits in instruction at a young age generally cannot be mitigated later in life.

16

Failure to develop English language proficiency inhibits the ability of non-English speakers to learn other academic subjects taught in English, causing these students to fall behind their native-speaking peers regardless of their talents or efforts to learn. English learner language instruction programs are designed to support students to attain English proficiency, develop high levels of academic achievement, and meet the same challenging state academic standards as all other students.

68.     If Title III programs were interrupted or funds withheld, it would not be possible to ensure language development services to students are being provided. Without services, students would not have the support to develop the high levels of academic English proficiency necessary to access core content instruction, thus undermining literacy and subject matter learning in English. The absence of services can preclude student access to the full range of academic experience, inhibit readiness for college and career, and put them at risk of not graduating from high school, all leading to irreparable harm.

69.     Title III funds also support positions in CDE's Multilingual Support Division, which provides LEA teachers and administrators with accurate guidance, particularly around federal requirements that are time-bound. Without Title III funding to support these positions, LEAs will lack access to dependable information that may lead to uninformed decision-making that places the students who would benefit from multilingual and English language learner services in peril of losing out on these services.

70.     Title IV, Part A of the ESSA, referred to as the "Student Support and Academic Enrichment Program" is a federal categorical program that provides funds to increase the capacity of LEAs to provide a well-rounded education, improve school conditions for student learning, and improve the use of technology in order to improve the academic achievement and digital literacy of all students. California has been apportioned more than $152 million to meet these goals under Title IV, Part A for FY 2024-2025 and more than $164 million for FY 2025-2026.

71.     Title IV, Part B of the ESSA is referred to as the 21st Century Community Learning Centers ("CCLC"). California has been apportioned more than $146 million under Title IV, Part B for FY 2024-2025 (694 sites) and more than $157 million for FY 2025-2026 (687

17

sites). The program supports sites over three active cohorts, including both 21st CCLC Elementary/Middle and High School (After School Safety and Enrichment for Teens) programs. The loss of Title IV, Part B funds would severely impact expanded learning programs statewide, significantly reducing technical assistance and undermining efforts to maintain high-quality programming for students and families.

72.    Title V, Part B, Subpart 2 of the ESSA is referred to as the Rural and Low-income School Program. California has been apportioned more than $5 million under this program for FY 2024-2025 and more than $5 million for FY 2025-2026.

73.    Under the McKinney-Vento Education for Homeless Children and Youth program, California has been apportioned more than $15 million for FY 2024-2025. These funds are currently supporting 151 grantees in the first year of a three-year grant cycle. Grantees serve approximately 60,000 students experiencing homelessness in the State.

74.    A reduction or disruption of McKinney-Vento funding would severely impact the State's ability to identify, enroll, and support homeless children and youth. Nine percent of the funding is allocated to support State Operations, including the salaries and benefits of six CDE staff members who provide technical assistance to LEAs. Without this funding, an alternate source would be required to maintain those positions.

75.    Furthermore, reduction of or disruption to the McKinney-Vento program would hinder the expedited evaluation of the strengths and needs of homeless children and youth, including determining their eligibility for essential programs and services such as special education, English language development, vocational and technical education, school nutrition programs, and professional development, as required under the ESSA. It would also impact access to critical referral services for medical, dental, mental health, and other healthcare needs, as well as assistance to cover the additional transportation costs for homeless children and youth to attend school. Additionally, it would limit access to developmentally appropriate early education programs for preschool-aged homeless children not otherwise provided through federal, state, or local funding.

DECLARATION OF TONY THURMOND

76.    Loss of such support would reduce the effectiveness of efforts to meet these students' educational needs, as homeless students will have difficulty learning if they are hungry, in need of healthcare, or distressed by lack of stability in their lives.

77.    CDE does not have access to reserve funds to cover the funding deficiencies that would be caused by the revocation of federal funding threatened by the Department. While California has reserve funds set aside for schools and other state functions, they are tightly restricted by the State Constitution. Moreover, due to recent statewide budgetary shortfalls, the statewide fund has been depleted. As a result, schools and the State are unable to quickly respond to sudden and unexpected shortfalls before they cause irreparable harm to schools and students. Therefore, without federal funding, California and the State's LEAs would face a massive unfunded mandate, losing billions of dollars in education funding necessary to comply with their obligations under federal law and to satisfy constitutional and statutory obligations to educate California's youth.

Special Education Funding and Programs

78.    California also receives federal funds from the Department under the IDEA, 20 U.S.C. §§ 1400 et seq., which provides that LEAs are responsible for providing a free, appropriate public education to students with disabilities. 20 U.S.C. § 1412(a). This includes special education and related services. *Id.* This funding includes formula grants to LEAs, supplementing local funding based on the number of students each LEA identified as eligible for services; competitive grants; early childhood grants; and discretionary grants. Loss, reduction, or interruption of these IDEA funds would cause immediate and irreparable harm to students with disabilities by depriving them of time-sensitive, necessary educational services for which there is no adequate remedy at law.

79.    CDE's Special Education Division oversees special education programs and services for students with disabilities in California. Any disruption to this statewide oversight would result in irreparable harm, as failures in supervision and compliance cannot be retroactively remedied once students' educational rights and developmental opportunities are lost.

19

DECLARATION OF TONY THURMOND

80.     Funding for special education is meant to cover the additional costs associated with educating students with disabilities. In California, there are three main sources of special education funding: (1) the federal government, through the IDEA; (2) the State; and (3) school district and charter school LEAs. For the 2024-2025 school year, California received more than $1.47 billion in special education funding from the federal government, supporting over 850,000 students who, because of their disabilities, are eligible to receive an Individualized Education Program ("IEP"). The State allocated $4.8 billion for special education, and LEAs, using unrestricted funds, covered the remaining approximately $8 billion in special education costs. For the 2025-2026 school year, California received more than $1.48 billion in special education funding from the federal government, supporting over 875,000 students who are eligible to receive an IEP. The State allocated $4.7 billion for special education, and LEAs, using unrestricted funds, covered the remaining special education costs. Removal of federal IDEA funding would destabilize this funding structure, causing an immediate breakdown in services and resulting in irreparable harm to students whose loss of educational progress cannot later be recovered.

81.     If California were to lose the funding described herein, which has been appropriated by Congress and obligated to California, California would be unable to replace federal funding administered by the Department. The resulting shortfall would force service reductions that would cause immediate and irreparable harm to students with disabilities by interrupting needed educational and therapeutic interventions.

82.     CDE receives funding under three provisions of the IDEA: Part B, § 611 (Grants to States Program); Part B, § 619 (Preschool Grants Program); and Part C (Grants for Infants and Families Program). Approximately $34 million of the IDEA, Part B, § 619, Federal Preschool Grant funding for 2024-2025, and $34 million for the 2025-26 school year, is specifically allocated for special education and services to children with disabilities for preschool children ages three, four, and five. Because early childhood services are uniquely developmentally sensitive, loss of these funds would cause irreparable harm that cannot be remedied through later intervention or compensatory services.

20

83.     Students with disabilities would not receive the supports and services to which they are entitled under the IDEA, thereby deteriorating progress for both cognitive and physical supports and increasing the already large number of cases in litigation. Currently CDE also contracts over $20 million per year for administrative law judges and mediation services to respond to IDEA legal filings by parents against LEAs. Denial of both substantive services and procedural safeguards constitutes irreparable harm, as students permanently lose educational benefits during critical stages of development.

84.     Further, withholding IDEA funds will severely impair the delivery of special education services provided to students with disabilities (such as physical therapy, speech therapy, occupational therapy, and specialized services for deaf, blind students or students with Autism). A loss of services would result in irreparable harm to all students, especially for preschoolers who require early intervention services critical to helping identify and address developmental delays or disabilities at the earliest age possible, when the brain is most adaptable. As a result of early intervention services, improved outcomes are seen in brain plasticity, improved skills in communication, movement, social interaction, self-help, feeding, problem solving and cognition. Early support can greatly improve a child's development and reduce the need for more intensive services later in life. Missed early intervention opportunities cause permanent developmental loss, resulting in irreparable harm that cannot be undone once critical neurological windows close.

85.     The financial burden of maintaining special education services will shift to state and local entities that are often already under-resourced. Many families would be forced to seek and pay for private services, therapies, and accommodations out of pocket—which would be unaffordable for many. Children will therefore receive fewer services, make fewer developmental gains, and require more intensive support services for possibly a lifetime. These cascading educational and developmental losses constitute irreparable harm, as subsequent funding cannot restore missed progress or lost independence.

86.     CDE employs 180 staff members whose positions are funded by $1.459 billion in annual IDEA funds. This office supports critical functions, including compliance monitoring, complaint resolution, data collection and reporting, and the administration of grants and contracts

21

to LEAs in nearly 2,000 LEAs and over 250 non-public school placements; provides professional development and technical assistance to school districts; and offers ongoing support and trainings to over 870,000 families of students with disabilities who reside within California. Their work is essential to ensuring statewide compliance with IDEA requirements under 20 U.S.C. §§ 1415, 1416, and 1418. Loss of these functions would cause irreparable harm by preventing the State from adequately meeting the educational needs of students with disabilities.

87. California receives roughly 1,200 complaints for violations of IDEA annually, and elimination of these positions would make it impossible to investigate these complaints. Each of the approximately 170 federally funded positions in the Special Education Division supports nearly 2,000 LEAs and more than 875,000 students with disabilities. Without this funding, CDE would not be able to allocate IDEA funding, monitor grants and contracts, or adequately perform the type of General Supervision it has performed as outlined in 20 U.S.C. § 1412(a)(11) and 34 C.F.R. § 300.149. The resulting inability to enforce compliance would cause irreparable harm by allowing systemic violations to persist unchecked.

88. If IDEA funds are reduced or delayed while California remains a participating recipient under IDEA, Defendants are then forcing California into an untenable situation of being at risk of being found noncompliant by the U.S. Department of Education's Office of Special Education Programs because insufficient federal funding is being provided to comply with the statute. Such a finding could result in sanctions or long-term loss of federal funds, further compounding the harm. These outcomes would cause irreparable harm by permanently weakening California's capacity to deliver appropriate special education services statewide.

89. Loss of IDEA funds could also result in loss of special education teachers or delay in implementation of Individual Education Plans for students with disabilities or special needs. LEAs serving "hard to serve" students would be especially impacted, as regional programs for students with complex or intensive needs, which are not easily addressed in a regular school environment, may be scaled back or eliminated. Critical services like occupational therapy, physical therapy, speech and language therapy, and behavioral support services would also suffer sharp reductions. Rural and under-resourced LEAs, which rely most heavily on outside support,

would be most significantly harmed. Delays in or denials of IEP services inflict irreparable harm by interrupting individualized progress that cannot later be replaced.

90. The impact of funding loss would also extend to early intervention programs for preschoolers and transition services for older students preparing for postsecondary education or employment. Interruptions in these programs would have lifelong effects on the development, independence, and well-being of students with disabilities, as the effectiveness of support for students with disabilities or developmental delays strongly depends on intervening as early as possible in a child's development. Missed early and transitional supports result in irreparable harm because these developmental milestones cannot be regained once lost.

91. For example, many deaf or hard-of-hearing students enter primary school without access to a fully accessible language environment. IDEA funding allows schools to identify disabilities early and implement specialized interventions, curriculum materials, teacher support, professional development, and assistive technology designed to support and enhance language acquisition. Failure to provide timely access to language development causes irreparable harm by permanently limiting communication and educational attainment.

92. Without funding for training, teachers and paraprofessionals may not be adequately prepared to support deaf and hard-of-hearing students, and LEAs would struggle to support families with essential parent education and resources, and they may lack the resources to provide educational materials in accessible formats like sign language. These deficiencies cause irreparable harm by denying meaningful access to instruction during critical language-acquisition periods.

93. The effects of losing IDEA funding to support deaf and hard-of-hearing students would be felt most acutely in rural or underserved areas that cannot afford specialized staff. Students in these areas would have inconsistent or poor-quality access to classroom content, leading to gaps in knowledge and delayed learning. Students in these areas would experience irreparable harm due to inconsistent access to instruction and enduring educational gaps.

94. Lack of support for language learning would cause irreparable harm to deaf and hard-of-hearing students, as language acquisition grows increasingly difficult with age. Further,

23

these students would suffer lasting educational gaps and reduced postsecondary opportunities. These harms are permanent and irreparable, as later remediation cannot compensate for lost access to language and instruction.

95.    General education classrooms would be significantly impacted as special education resources diminish. General education teachers would be expected to meet the needs of students with disabilities, even without adequate training or support. Support for students with special needs is often extremely resource-intensive, and cuts to available staffing and other resources will make it impossible to provide students with the support and interventions that they need. The resulting systemic educational degradation constitutes irreparable harm that cannot be fully remedied after the fact.

96.    IDEA funds also support the development of curricula and instructional materials relied upon by students and educators statewide. CDE's Curriculum Frameworks and Instructional Resources Division operates the Clearinghouse for Specialized Media and Technology ("CSMT") and administers accessible instructional resources, including Braille, large print, audio, multilingual materials, and the American Printing House for the Blind Federal Quota program. Denial of these materials causes irreparable harm by preventing students from accessing curriculum during required instructional periods.

97.    Without federal funding, CSMT would be unable to continue creating accessible versions of curricula for students. Students who are blind, visually impaired, or deaf would lose access to instructional materials and specialized equipment necessary for learning. Moreover, California's more than 6,000 blind and visually impaired students would lose the assistance of the educational aids and special equipment they use to access learning. Loss of real-time access to accessible educational materials results in immediate and irreparable harm because lost instructional opportunities cannot be restored.

**Oversight and Compliance**

98.    Federal funding also ensures that CDE and LEAs are able to monitor and support compliance with federal laws and program requirements.

99.    Federal funding supports 24 full-time equivalent positions in CDE's Educational Data Management Division, which is responsible for Federal Program Monitoring efforts that are both a federal requirement and necessary to ensure that federal funding is used as effectively as possible according to federal directives and the needs of California's students. These staff positions are responsible for obtaining assurances and other critical information from LEAs for compliance purposes.

100.    The positions also implement the Statewide Longitudinal Data System used to assess students, monitor student outcomes, implement federal accountability systems like the ESSA State plan, conduct critical research on student outcomes and progress, and ensure that CDE receives reliable data. The Division also supports LEAs in their data collection, reporting, management, and governance practices, including by responding to over 30,000 requests for technical assistance each year. Loss of funding for these positions would harm CDE's ability to support the effectiveness of education efforts statewide and to monitor compliance with federal requirements.

101.    Roughly a dozen positions in CDE's School Fiscal Services Division are responsible for the distribution of ESSA funds to LEAs. Loss of these personnel would impair payment to LEAs, including for prior fiscal years. Moreover, without these personnel CDE could also not be able to meet federal statutory requirements for fiscal oversight, oversight of Maintenance of Effort, and reporting, as well as supporting LEAs in their efforts.

102.    About 26 full-time equivalent employees in CDE's Professional Learning Support Division also provide essential support for CDE's and LEAs' compliance with federal oversight and reporting requirements. Without these personnel, CDE would also lose the ability to implement, monitor, and evaluate programs like the 21st Century School Leadership Academy and Promoting Equitable Access to Teachers as well as assisting LEAs in building effective Title II, Part A programs.

**Substantial and Irreparable Harm**

25

DECLARATION OF TONY THURMOND

103. The loss of federal funding to California schools threatened by the Findings Letter will cause irreparable harm and jeopardize programs and services that support millions of children and youths across the State.

104. The kind of harm that California, its LEAs, and its students will suffer if the federal funding is suddenly made unavailable is not harm that can be remedied even if the funding were restored at a later date.

105. If California does not receive the federal funding it has relied upon since the 1960s, it will be unable to make up the shortfall with state funds. State funding is allocated through a statewide budget, finalized in July of the prior year, which incorporates federal dollars into state-specific formulas. As non-federal funds are tailored to specific student needs and disbursed regionally, there are no funds readily available to backfill a loss of federal funds, and so the lapse in federally-sourced resources will undermine the overall stability of the education system.

106. As discussed earlier, these harms will fall with particular force on students with disabilities or special needs, non-English speakers, students living in poverty or underserved communities, and other uniquely vulnerable children. For example, CDE would lose the ability to administer the Annual State Library Evaluation, required by section 18122 of the California Education Code, to ensure that school districts maintain facilities, staff, and collections to support digital and print literacy for all of California's K-12 students. This evaluation is of particular value to LEAs with more limited resources, and its cancellation will harm student literacy particularly in school districts that could most benefit from this assistance.

107. A loss or delay of funding will cause a cascade of worsening injuries to the State, CDE, and LEAs. A loss of funding will result in layoffs, payroll delays, and suspension of services to students in need that would disrupt student learning. Funding lapses cannot readily be covered by alternative sources.

108. Without uninterrupted federal funding, CDE will be unable to timely reimburse vendors or LEAs. This will in turn place extra strain on vendors who may have to stop providing services because they cannot afford to do so without payment. For example, we will not be able to

reimburse grantees of the Comprehensive Literacy State Development Grant and the 21st Century School Leadership Programs for already-expended funds.

109. The loss of federal funding will cause chaos and uncertainty for agencies like CDE and LEAs, which for decades have planned and budgeted around relatively stable funding sources. A lapse in funding will force agencies and educators to rapidly reassess priorities and revise budgets, but without any confidence in the availability of future funding. This uncertainty poses a serious threat to long-term projects, such as California's program funded by Education for Homeless Children and Youth grants under the McKinney-Vento Act. This funding directly supports students enrolled on the campuses of 151 grantees including 55 of the 58 county offices of education and 96 school districts. serves over 60,000 children and youth experiencing homeless.

110. The inability to count on historically consistent federal funding in their budget planning process creates chaos and instability for LEAs, their employees, and the students they serve. An LEA's unrestricted general fund will need to fill any funding gap until next year, which could put some LEAs in deep fiscal distress, forcing them to cut other programs and services funded with local or state sources, and potentially not meeting their financial obligations.

111. A loss of federal funds will also result in a loss of funding for indirect costs for LEAs, which will also put further cost pressure on their unrestricted general fund. Indirect costs are agency-wide, general management costs (i.e., activities for the direction and control of the agency as a whole). General management costs consist of administrative activities necessary for the general operation of the agency, such as accounting, budgeting, payroll preparation, personnel services, purchasing, and centralized data processing.

112. Ultimately, losing federal funding on par with the scale threatened under the Findings Letter will cause immediate and irreparable injury to the State's, CDE's, and LEAs' shared mission of educating and supporting students, families, and communities. The loss of critical education programming, reduction in teachers and other personnel, inability to train and support educators and administrators, and damage to learning environments will interfere with the education and development of students. Lapses in education or increasing environmental stress

27

are particularly injurious to young people, whose intellectual and personal development progresses so quickly that any interference simply cannot be remedied later in life.

113.    As schools are increasingly impaired in serving their students, the reputations of schools and educators will suffer, and important bonds between schools and the families and communities they serve will be frayed, extending the harm caused far beyond just schools and their students. CDE's efforts with respect to English language learning, immigrant students, and migrant education are critical to California and nationwide communities, and loss of funding for these efforts would have a reputational impact at a state-wide or national level, further harming relationships between CDE and its partners and constituencies.

114.    California relies on federal funding and resources from the Department to provide public education to millions of preschool and school-age children. If federal funding is delayed or critical supports are discontinued due to the Department's Findings Letter, it will do immeasurable harm to the work of our schools and educators, who rely on funding and resources to provide education and support to millions of children.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 11, 2026, at Sacramento, California.

Tony Thurmond

# EXHIBIT A



UNITED STATES DEPARTMENT OF EDUCATION

STUDENT PRIVACY POLICY OFFICE

March 27, 2025

Honorable Tony Thurmond
Superintendent of Public Instruction
1430 N Street, Suite 5602
Sacramento, California  95814-5901

Via email: tthurmond@cde.ca.gov

Complaint No. 25-0382
Family Educational Rights
and Privacy Act

Dear Superintendent Thurmond:

It has come to the attention of the U.S. Department of Education's (Department) Student Privacy Policy Office (Office or SPPO) that numerous local educational agencies (LEAs) in California may be implementing policies and practices that violate the Family Educational Rights and Privacy Act (FERPA).  20 U.S.C. § 1232g; 34 CFR Part 99.   FERPA provides that parents have a right to inspect and review their children's education records, which are defined as records that are directly related to a student and maintained by an educational agency or institution, or by a party acting for the agency or institution.  20 U.S.C. § 1232g(a)(l)(A); 34 CFR Part 99, Subpart B, and § 99.3 ("Education records").  Once a student reaches 18 years of age or attends a postsecondary institution, all FERPA rights transfer from parents to the student.  34 CFR §§ 99.3 ("Eligible student") and 99.5.  We assume for purposes of this letter that the students in question are not "eligible students" and that the parents retain their right to inspect and review their children's education records under FERPA.

Given the number of LEAs potentially involved, SPPO is concerned that the California Department of Education (CDE) played a role, either directly or indirectly, in the adoption of these practices in supporting the recently enacted California Assembly Bill 1955 ("AB 1955"). Therefore, pursuant to its authority under 34 CFR § 99.60 and 20 U.S.C. §1232g(f), this Office is taking appropriate actions to enforce FERPA by conducting an investigation in accordance with, among others, the procedures outlined in 34 CFR §§ 99.64 and 99.65[1].  These sections state, in summary and relevant part:

---

[1] https://studentprivacy.ed.gov/node/548/.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Honorable Tony Thurmond

- The Office conducts its own investigation, when no complaint has been filed, to determine whether an educational agency or institution or other recipient of Department funds under any program administered by the Secretary has failed to comply with FERPA. 34 CFR § 99.64(b).

- The Office notifies in writing the complainant, if any, and the educational agency or institution, the recipient of Department funds under any program administered by the Secretary, or the third party outside of an educational agency or institution if it initiates an investigation under § 99.64(b).

- The written notification under this section includes the substance of the allegations against the educational agency or institution, other recipient, or third party; and directs that agency or institution, other recipient, or third party to submit a written response and other relevant information, as set forth in § 99.62, within a specified period of time, including information about its policies and practices regarding education records.

This letter serves as the written notification discussed above, and to provide you the opportunity to submit a written response as requested below.

By letter dated January 31, 2025, the California Justice Center (CJC)[2] informed this Office that, on January 1, 2025, California Assembly Bill 1955 ("AB 1955") took effect, and appears to conflict with FERPA as it recognizes "a nonexistent right of privacy in minors from their parents regarding a child's gender identity at school under the California Constitution," as an exemption that currently does not exist under FERPA. Further, as a result "every public school in California has a policy of denying, or effectively preventing, the parents of students who are in attendance at a school the right to inspect and review the education records of their children."

Additionally, as provided by CJC regarding FERPA, the legislative analysis for AB 1955[3] states:

> While parents/legal guardians have the right to review and amend their students' educational records, courts have recognized that outing a minor to their parents or guardians can violate the minor's constitutional right to privacy, even if the minor is out at school or socially (see Cal. Const., art. I, § 1; C.N. v. Wolf (C.D. Cal. 2005) 410 F.Supp.2d 894, 903; see also Sterling v. Borough v. Minersville (3d Cir. 2000) 232 F.3d 190, 196). By prohibiting school policies that require outing a student to their parents or legal guardians, regardless of the circumstances, this bill would reduce instances where teachers and administrators violate students' right to privacy.

Subsequently, in its letter to this Office, CJC notes the following:

> AB 1955 purports to create a confidential relationship between a child and a school district, and a constitutional right to privacy in a child's identity from that child's

---

[2] California Justice Center, APC is a public interest law firm founded to dismantle government barriers to freedom and prosperity in California. See https://www.justiceca.com/

[3] California Senate Committee on Education, May 24, 2024 Bill Analysis for AB 1955, p. 7

Page 3 – Honorable Tony Thurmond

parents— which does not exist in the state or federal constitution. AB 1955 classifies providing education records pertaining to a child's gender dysphoria as "outing" a child to the child's parents. If a school is facilitating and accommodating a child's name and gender change at school, however, those documents must be disclosed to a parent upon request under FERPA. Likewise, a child's school work must be produced in response to a FERPA request, even if it discloses a child's new "gender identity."

AB 1955 purports to exempt records pertaining to a child's gender identity from disclosure under FERPA absent consent of the student. FERPA provides no such exemption, and provides full rights to parents before a child turns 18.

Our preliminary analysis of the information provided by CJC in conjunction of our reading of AB 1955, gives this Office reasonable cause to believe that the LEAs throughout California may be violating FERPA as discussed above.  As noted in *United States v. Miami University, Ohio State University*, 294 F.3d 797 (6th Cir. 2002), Congress provided in FERPA that "no funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records" except as provided in FERPA.  The court explained that legislation, like FERPA, enacted pursuant to the constitutional spending power (art. I, § 8, cl. 1) "is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." 294 F.3d at 808, citing *Pennhurst State School and Hospital*. 451 U.S. 1, 17 (1981) (holding that Congress may fix the terms on which it disburses Federal money to the states, and likening the relationship to a contract where the receipt of Federal monies is conditioned upon a state's compliance with Federal laws).  That is, "Spending clause legislation, when knowingly accepted by a fund recipient, imposes enforceable, affirmative obligations upon the states." 294 F.3d at 808, *citing Wheeler v. Barrera*, 417 U.S. 402, 427 (1974), modified on another ground, 422 U.S. 1004 (1975).  Accordingly, the CDE must ensure that all LEAs comply with FERPA regarding parents' rights to inspect and review any education records maintained by the LEA.

There are a number of enforcement options available to the Department in achieving compliance with FERPA, including withholding further payments, issuing a cease and desist order, and recovering funds.  *See* 34 CFR § 99.67 and 20 U.S.C. § 1234c.  The court of appeals in *Miami University*, *supra*, also concluded that the United States has the inherent power to sue to enforce conditions imposed under FERPA on the recipients of federal grants.  294 F.3d at 808. However, this Office is committed to working with your office and with LEAs to ensure voluntary compliance with FERPA as provided under § 99.66(c)(2) of the regulations.  As part of that effort, please report to me in writing by April 11, 2025, the steps CDE has taken, or will take, including the submission of relevant policy statements or other communications, to ensure that LEAs in California comply with FERPA requirements as described in this letter, or provide a statement and justification explaining why you believe this action is unwarranted.

Page 4 – Honorable Tony Thurmond

In an effort to expedite the processing of this investigation, please email your response to FERPA.ComplaintResponse@ed.gov, including the complaint number in the subject line.  In lieu of sending your response electronically, you may send your written response to the following address:

> Student Privacy Policy Office
> U.S. Department of Education
> 400 Maryland Avenue, SW
> Washington, D.C. 20202 – 8520

You may also forward questions specific to this investigation to FERPA.Complaints@ED.Gov, or contact this Office, referencing your complaint number, via phone at 202-260-3887.  For general information concerning FERPA and the Office's complaint procedures, please visit our website at https://studentprivacy.ed.gov/.

We look forward to working with you to resolve this issue as expeditiously as possible.  Should you have any questions, do not hesitate to contact me directly at the address noted above.

Sincerely,

Frank E. Miller Jr.
Acting Director
Student Privacy Policy Office

# EXHIBIT B



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

March 28, 2025

Dear Educators:

By natural right and moral authority, parents are the primary protectors of their children. Yet many states and school districts have enacted policies that presume children need protection from their parents. Often, such policies evade or misapply the Family Educational Rights and Privacy Act (FERPA), turning the concept of privacy on its head to facilitate ideological indoctrination in a school environment without parental interference or even involvement. Going forward, the Department of Education will insist that schools apply FERPA correctly to uphold, not thwart, parents' rights.

COVID-19 opened parents' eyes to the pervasive indoctrination taking place in many classrooms. Families across the country saw gender ideology and critical race theory taught on-screen at their own kitchen tables. When parents understandably demanded answers and transparency, the Biden Administration treated them like criminals, directing the FBI to surveil school board meetings (one of the few places where parents can call for change in their schools) to intimidate parents. Under President Trump's leadership, my Department will no longer passively accept school officials' hostility to parental involvement. The Department stands with parents in exercising their rights to the full extent of the law.

Congress passed FERPA in 1974 to protect children's privacy in a manner that ensures parents can access their children's school records to gain information and insight necessary to act as proper guardians of their children's well-being. FERPA, as well as the Protection of Pupil Rights Amendment (PPRA), were intended to shelter families from invasion of their privacy—not to insulate schools from transparency and accountability to parents. Parents should not have to navigate a complex process to exercise their rights under FERPA or PPRA. Schools should not treat parents as enemies just for wanting to know about the mental and physical health and safety of their own children. Over the last four years, instead of vigorously enforcing these laws, the Biden Administration neglected the flood of complaints it received. The FERPA and PPRA complaint process is currently so overburdened with reports that parents who care deeply about their children's health and educational futures have had no recourse but to sit and wait. There was no obvious attempt by the Biden Administration to address this substantial backlog, which sent a loud and clear message that parental rights were not a priority. Meanwhile, states have taken advantage of this dereliction of government responsibility and installed policies that specifically instruct teachers and administrators to conceal student's critical information in student records from their parents.

The Trump Administration understands that the immense responsibility of raising children belongs to parents, not to the government. That's why I am announcing a revitalized effort to make FERPA and PPRA the source of proactive, effective checks on schools that try to keep parents in the dark. The Department will prioritize clearing the backlog of FERPA complaints so that parents can be confident that the Department is positioned to act on complaints in a timely manner.

Two weeks ago, I had the privilege of sitting down with a courageous group of detransitioners. They told me about their torturous and truly unfortunate experiences which led them down paths that, in many cases, will require lifelong medical care. A common thread among the stories I heard were the dogged efforts that schools took to promote and enable the transitioning of minor children, regardless of their mental state or their vulnerabilities. I repeatedly heard about the lengths schools would go to in order to hide this information from parents.

As any mother would be, I have been appalled to learn how schools are routinely hiding information about the mental and physical health of their students from parents. The practice of encouraging children down a path with irreversible repercussions—and hiding it from parents—must end. Attempts by school officials to separate children from their parents, convince children to feel unsafe at home, or burden children with the weight of keeping secrets from their loved ones is a direct affront to the family unit. When such conduct violates the law the Department will take swift action.

Attached is a letter from the Department's Student Privacy Policy Office (SPPO). This letter reminds educational institutions receiving federal financial assistance that they are obligated to abide by FERPA and PPRA if they expect federal funding to continue. This letter clarifies issues under FERPA that many states and school districts have intentionally muddied. I intend for SPPO's letter to convey my commitment to vigorously enforce important provisions in FERPA and PPRA for the protection of students and parents.

Sincerely,

Linda E. McMahon

Attachment



UNITED STATES DEPARTMENT OF EDUCATION

STUDENT PRIVACY POLICY OFFICE

March 28, 2025

Dear Chief State School Officers and Superintendents:

We are writing you to provide the notification required by 20 U.S.C. § 1232h(c)(5)(C).  The U.S. Department of Education (Department) through its Student Privacy Policy Office (SPPO) is required to inform State educational agencies (SEAs) and local educational agencies (LEAs), as recipients of funds under programs administered by the Department, of their obligations under the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99) and the Protection of Pupil Rights Amendment (PPRA) (20 U.S.C. § 1232h; 34 CFR Part 98).

FERPA protects the privacy interests and access rights of parents and students in education records maintained by educational agencies and institutions or by persons acting for such agencies or institutions.  PPRA affords parents and students with rights concerning specified marketing activities, the administration or distribution of certain surveys to students, the administration of certain physical examinations or screenings to students, and parental access to certain instructional materials including ones used as part of a student's educational curriculum.

This letter serves as guidance in conjunction with the Department's annual notification, required by 20 U.S.C. § 1232h(c)(5)(C), which has not substantively changed since it was last issued and is available at:  https://studentprivacy.ed.gov/annual-notices.

In addition to notifying you of your legal obligations, we would also like to take this opportunity to point out several priority concerns identified over the last year.  At the direction of Secretary McMahon, SPPO is taking proactive measures to address the following:

**Priority Concerns**

- ***Parental Right to Inspect and Review Education Records.***  It appears many LEAs may have policies and practices that conflict with the inspect and review provisions afforded parents under FERPA.  Further, some of these informal and formal practices may be occurring at the direction, or minimally with the tacit approval, of their SEAs.  For example, schools often create "Gender Plans" for students and assert that these plans are not "education records" under FERPA, and therefore inaccessible to the parent, provided the plan is kept in a separate file and not as part of the student's "official student record." While FERPA does not provide an affirmative obligation for school officials to inform parents about any information, even if that information is contained in a student's education records, FERPA does require that a school provide a parent with an opportunity to inspect and review education records of their child, upon request.  Additionally, under the current regulatory framework, FERPA does not distinguish between a student's "official student record" or "cumulative file."  Rather, all information, with certain

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officers and Superintendents

statutory exceptions, that is directly related to a student and maintained by an educational agency or institution, is part of the student's "education records" to which parents have a right to inspect and review.

- **Safety of Students**.  Additionally, we have received many inquiries from parents concerned about the safety of their children as schools are withholding related information under the auspices of FERPA.  Nothing is more important than the health and safety of our nation's school children.  To that end, schools should not withhold information from parents that identifies other students who have made death threats against their children.  For example, Student A writes a note or school assignment describing an intent, or even a detailed plan, to kill Student B (or multiple other students). To the extent that the education record in question directly relates to both students and the information cannot be segregated and redacted without destroying its meaning, the parents of both students have the right to inspect and review that information.  While the disciplinary sanction imposed on Student A may not be shared with the parents of Student B, unless the sanction directly relates to both students, FERPA does not preclude school officials from communicating to Student B's parents, for example, that responsive action is being taken with respect to a threat assessment or potential disciplinary action.  Nor does FERPA prevent a school from taking actions designed to protect Student B, such as a classroom reassignment to avoid interaction with Student A.  Certain measures a school might impose to protect student safety that directly affect both students may be disclosed to the parents of both students; for example, an order that specifies that Student A must stay 500 feet away from Student B, is a record that relates to both students.  Our guidance called *Addressing Emergencies on Campus* discusses other provisions in FERPA that permit disclosures of personally identifiable information from a student's education records in order to address safety issues in a manner that complies with FERPA. It is available at: https://studentprivacy.ed.gov/resources/addressing-emergencies-campus.

- **Annual Notification of Rights**.  Many LEAs are not properly notifying parents and eligible students of their rights under FERPA.  A school is not required to notify parents individually but rather is required to provide the notice by any means that are reasonably likely to inform parents of their rights.  These means could include publication in the school activities calendar, newsletter, student handbook, or displayed prominently on the school's website.  *See* 34 CFR § 99.7.

- **Military Recruiters.**  SPPO also administers the military recruiter provisions of the Elementary and Secondary Education Act (ESEA), which contains certain requirements for LEAs that are the recipients of ESEA funds.  These provisions, as well as the Department of Defense companion law, give military recruiters the same access to secondary students as provided to postsecondary institutions or to prospective employers and require that schools provide student information to military recruiters, when requested, unless the parent has opted out of providing such information.  The information schools are required to provide to military recruiters include student names, addresses, electronic mailing addresses, and telephone listings.  *See* Section 8528 of the ESEA, as amended, 20 U.S.C. § 7908 and 10 U.S.C. § 503(c).

Page 3 – Chief State School Officers and Superintendents

- ***Assurance of Compliance.*** As part of SPPO's fulfillment of the Secretary's priority to take proactive action to enforce FERPA, pursuant to the authority under 20 U.S.C. §1232g(f), 34 CFR §§ 99.60 and 99.62, SPPO is requesting that <u>each SEA submit no later than April 30, 2025</u>, documentation such as "reports, information on policies and procedures, annual notifications, training materials or other information necessary" to provide assurance that the SEA and their respective LEAs are complying with the provisions of FERPA and PPRA, specifically with regard to the priority concerns previously discussed.  In an effort to expedite the processing of this information, please email your response to my attention at <u>SAOP@ed.gov</u>, including the name of the SEA in the subject line.  In lieu of sending your response electronically, you may send your written response to the following address:

> Student Privacy Policy Office
> U.S. Department of Education
> 400 Maryland Avenue, SW
> Washington, D.C. 20202 – 8520

SPPO is available to assist you with your questions about FERPA, PPRA, and student privacy.  We encourage you to sign up for our monthly student privacy newsletter or submit your questions directly to our student privacy help desk by visiting the "Contact" tab at https://studentprivacy.ed.gov/.

Thank you for the vital work you do every day to safeguard student privacy and create safe and effective learning environments for our students nationwide.

> Sincerely,
>
> Frank E. Miller Jr.
> Acting Director
> Student Privacy Policy Office

# EXHIBIT C



Home  /  Newsroom  /  Letters  /  Letters

**California Department of Education**
**Official Letter**

April 1, 2025

Dear County and District Superintendents and Charter School Administrators:

# Facts to Consider Regarding FERPA and AB 1955

On March 27, 2025, the California Department of Education (CDE) received a letter from the United States Department of Education (ED) Student Privacy Policy Office informing us of an investigation regarding compliance with the Family Educational Rights and Privacy Act (FERPA) in relation to California Assembly Bill (AB) 1955. On March 28, 2025, ED sent an additional communication to all Chief State Schools Officers and all Superintendents of Local Educational Agencies (LEAs) regarding obligations under FERPA.

CDE will respond to these communications on behalf of the California TK-12 public education system as requested by ED. In the meantime, there is an important set of facts that we want to make sure all LEAs are aware of regarding AB 1955 and FERPA.

**AB 1955 does not mandate nondisclosure**. AB 1955 prohibits LEAs from mandating that staff disclose a student's sexual orientation, gender identity, or gender expression to another person without student consent, unless otherwise required by state or federal law. AB 1955 does **not** prohibit LEA staff from sharing any information with parents. Based on the plain language of both laws, there is no conflict between AB 1955 and FERPA, which permits parental access to their student's education records upon request.

Thank you for your hard work on behalf of all students in the State of California. As we at CDE continue to focus on moving the needle for student achievement, I commend all California educators and school staff who are maintaining a local focus on the all-important task of serving our students.

If your LEA or school community is experiencing any interruption of services or impact on educational resources as a result of federal action, please reach out to the relevant program office at the CDE. Our team is here to support you.

Sincerely,

Tony Thurmond

State Superintendent of Public Instruction

Last Reviewed: Tuesday, April 1, 2025

# EXHIBIT D

*California* DEPARTMENT OF
**EDUCATION**

Home  /  Newsroom  /  Responses to 2025 Federal Actions & Communications

**California Department of Education
Official Letter**

April 11, 2025

Frank E. Miller, Jr.
Acting Director
Student Privacy Policy Office
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202-8520
Via email to: FERPA.ComplaintResponse@ed.gov

# RE: Complaint No. 25-0382

Dear Mr. Miller:

I am responding to your letter dated March 27, 2025, to State Superintendent of Public Instruction Tony Thurmond to confirm that there is no conflict between the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and Assembly Bill No.1955, 2024 Cal. Stat. ch.95 (AB1955). And, in fact, AB 1955 expressly acknowledges that if federal law required something that conflicted with AB 1955, then federal law would take precedence.

AB1955, known as the "Support Academic Futures and Equality for Today's Youth (SAFETY) Act," became effective on January 1, 2025. AB 1955 added sections220.3(a) and 220.5(a) to the California Education Code, which state, respectively:

An employee or a contractor of a school district, county office of education, charter school, or state special school for the blind or the deaf shall not be required to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent ***unless otherwise required by state or federal law.***

\* \* \*

A school district, county office of education, charter school, state special school for the blind or the deaf, or a member of the governing board of a school district or county office of education or a member of the governing body of a charter school, shall not enact or enforce any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent, ***unless otherwise required by state or federal law.***

Cal. Educ. Code §§ 220.3(a), 220.5(a) (2025) (emphases added).

The inclusion of express language requiring compliance with state and federal laws necessarily includes compliance with FERPA. Moreover, AB 1955 does not prohibit disclosure about students; it only prohibits schools and school districts from compelling staff to affirmatively disclose without a student's consent. As you acknowledge in your March 28, 2025 letter to Chief State School Officers and Superintendents (https://studentprivacy.ed.gov/sites/default/files/resource_document/file/Secretary_Comb_SPPO_DCL_Annual%20Notice_0.pdf, attached here to as Exhibit 1), FERPA does not impose an affirmative duty on schools to disclose information about a student to parents. There is thus no conflict between the provisions of AB1955 and a parent's right to inspect and review their children's education records, as defined in 20U.S.C. §1232g(a)(4), under FERPA.

As to your request for information on steps the California Department of Education (CDE) has taken or will take related to FERPA compliance, below are samples of relevant guidance and notices CDE has provided to ensure that local educational agencies understand that they can comply with both FERPA and AB 1955:

- CDE has posted guidance about FERPA at https://www.cde.ca.gov/ds/ed/dataprivacyferpa.asp (attached hereto as Exhibit 2), which includes information regarding compliance with FERPA's annual parental notification requirements.

- On January 2, 2025, as a result of AB 1955 going into effect, CDE posted guidance at https://www.cde.ca.gov/ci/pl/ab-1955-sum-of-prov.asp (attached hereto as Exhibit 3). CDE noted in the guidance that AB 1955 does not mandate nondisclosure.

- On April1, 2025, CDE sent a notice to superintendents and administrators (available at https://www.cde.ca.gov/nr/el/le/yr25ltr0401.asp, and attached hereto as Exhibit 4), reminding them that AB1955 prohibits mandatory disclosure, but "does **not** prohibit [local educational agency] staff from sharing any information with parents."  The notice also explained that "there is no conflict between AB1955 and FERPA, which permits parental access to their student's education records upon request."

In sum, there is no conflict between AB1955 and FERPA. AB1955 does not mandate nondisclosure of information, and AB1955's prohibition on mandating disclosure absent student consent is expressly limited by the phrase "unless otherwise required by state or federal law." AB1955 does not contradict parents' rights to request to inspect and review their students' education records under FERPA, even if they contain information related to a student's sexual orientation, gender identity, or gender expression. And CDE's guidance and notices reinforce these points.

Sincerely,

*Signed by*

Len Garfinkel
General Counsel
California Department of Education

cc:

Secretary Brooke L. Rollins
United States Secretary of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

Last Reviewed: Friday, April 11, 2025

# EXHIBIT E



Home / Newsroom / Responses to 2025 Federal Actions & Communications

**California Department of Education**
**Official Letter**

April 11, 2025

Dear County and District Superintendents and Charter School Administrators:

# Further Update Regarding FERPA and AB 1955

The purpose of this letter is to share relevant updates to a communication that we shared with you on April 1, 2025.

As discussed in the California Department of Education (CDE) letter April 1, 2025, "Facts to Consider Regarding FERPA and AB 1955," the U.S. Department of Education (ED) requested a response regarding any potential conflict between FERPA and AB 1955.

Today, the CDE has provided our response to ED, which includes that:

- Based on the plain text of both laws, there is no conflict between FERPA and AB 1955.
- Specifically, there is no conflict between the provisions of AB 1955 and a parent's right to inspect and review their children's education records, as defined in 20 U.S.C. § 1232g(a)(4), under FERPA.
- In addition, AB 1955 includes language requiring compliance with state and federal laws.

A copy of our response is attached, which includes additional resources and guidance that CDE has previously provided to all local educational agencies (LEAs) regarding compliance with both AB 1955 and FERPA. We will be following up separately with you regarding the CDE response to the ED March 28, 2025, additional communication to all Chief State Schools Officers and LEA superintendents regarding compliance with FERPA and the Protection of Pupil Rights Amendment.

We recognize that the frequency and volume of federal actions related to education is disruptive to our schools at this critical time of year for our students. Again, we want to applaud all educators and school staff for their focus on moving the needle for student achievement, as well as for everything that you do to support our students, families, and

school communities. We will continue to keep the field apprised of the CDE responses to federal action. An ongoing list of the CDE 2025 responses to federal actions is maintained on this web page: https://www.cde.ca.gov/nr/fa.

If your LEA or school community experiences disruption or other direct impacts to educational services for students as a result of federal action, please continue to reach out to EdReliefFunds@cde.ca.gov.

Sincerely,

David Schapira
Chief Deputy Superintendent
Chief of Staff
California Department of Education

Last Reviewed: Friday, April 11, 2025

# EXHIBIT F



Home / Newsroom / Responses to 2025 Federal Actions & Communications

**California Department of Education**
**Official Letter**

April 11, 2025

Dear County and District Superintendents and Charter School Administrators:

# Further Update Regarding FERPA and AB 1955

The purpose of this letter is to share relevant updates to a communication that we shared with you on April 1, 2025.

As discussed in the California Department of Education (CDE) letter April 1, 2025, "Facts to Consider Regarding FERPA and AB 1955," the U.S. Department of Education (ED) requested a response regarding any potential conflict between FERPA and AB 1955.

Today, the CDE has provided our response to ED, which includes that:

- Based on the plain text of both laws, there is no conflict between FERPA and AB 1955.
- Specifically, there is no conflict between the provisions of AB 1955 and a parent's right to inspect and review their children's education records, as defined in 20 U.S.C. § 1232g(a)(4), under FERPA.
- In addition, AB 1955 includes language requiring compliance with state and federal laws.

A copy of our response is attached, which includes additional resources and guidance that CDE has previously provided to all local educational agencies (LEAs) regarding compliance with both AB 1955 and FERPA. We will be following up separately with you regarding the CDE response to the ED March 28, 2025, additional communication to all Chief State Schools Officers and LEA superintendents regarding compliance with FERPA and the Protection of Pupil Rights Amendment.

We recognize that the frequency and volume of federal actions related to education is disruptive to our schools at this critical time of year for our students. Again, we want to applaud all educators and school staff for their focus on moving the needle for student achievement, as well as for everything that you do to support our students, families, and

school communities. We will continue to keep the field apprised of the CDE responses to federal action. An ongoing list of the CDE 2025 responses to federal actions is maintained on this web page: https://www.cde.ca.gov/nr/fa.

If your LEA or school community experiences disruption or other direct impacts to educational services for students as a result of federal action, please continue to reach out to EdReliefFunds@cde.ca.gov.

Sincerely,

David Schapira
Chief Deputy Superintendent
Chief of Staff
California Department of Education

Last Reviewed: Friday, April 11, 2025



**California Department of Education**
**Official Letter**

April 24, 2025

*Via Email*

Frank E. Miller, Jr., Acting Director
Student Privacy Policy Office
U.S. Department of Education
400 Maryland Ave., S.W.
Washington, D.C. 20202-8520
Email: SAOP@ed.gov

# Re: The March 28, 2025 Letter to Chief State School Officers re: FERPA

Dear Mr. Miller:

On March 28, 2025, the U.S. Department of Education (ED) sent a letter to Chief State School Officers and Superintendents requesting that each state educational agency (SEA) submit "reports, information on policies and procedures, annual notifications, training materials, or other information necessary" to provide assurance that the SEA and their respective local educational agencies (LEA) are complying with the provisions of FERPA [Family Education Rights and Privacy Act] and PPRA [Protection of Pupil Rights Amendment], specifically with respect to the priority concerns previously discussed . . . [in that letter]." Those priority concerns included: (1) the parental right to inspect and review education records; (2) student safety; (3) annual notification of rights by LEAs to parents; and (4) access for military recruiters. The California Department of Education (CDE) now provides the following information in response to that request.

First and foremost, all LEAs in California, in order to receive federal funding, make the following assurance to the state:

Each grantee receiving funds under this Act understands the importance of privacy protections for students and is aware of the responsibilities of the grantee under section 444 of the General Education Provisions Act (20 USC 1232g) (commonly known as the "Family Education Rights and Privacy Act of 1974"). (20 USC §7928; PL 114-95, §8548). (See Assurance #9 at https://www.cde.ca.gov/Fg/aa/co/ca24assuranceleaplan.asp.)

The CDE has been and continues to be an active partner with ED to assist LEAs with compliance with all state and federal student privacy laws. Examples of this collaboration include our dedicated CDE Data Privacy webpage[1] that features resources for educators, administrators, families, and more. Note that ED's video Student Privacy 101: FERPA for Parents and Students[2] is the first resource listed in the section on resources for families. The CDE website also features a FERPA Summary Page[3] with more detailed information about parental and student rights and available resources.

In addition to information featured on the CDE website, the CDE has been an active participant in ED's own Privacy Technical Assistance Center's (PTAC) Chief Privacy Officer (CPO) Network, ensuring that CDE staff are regularly updated on student data privacy laws and best practices. This information is shared with CDE staff and

vendors through both facilitated Data Privacy Trainings4 and self-guided online trainings.

CDE's collaboration with PTAC at the national level includes

the May 2024 Education Management Information Collaborative (EIMAC) presentation PTAC's CPO Network: Leveraging Partners to Bolster & Sustain Privacy5 that was given collaboratively by CDE staff and PTAC staff.

Examples of the CDE's collaboration with PTAC at the state level to assist LEAs with compliance with FERPA include but are not limited to:

- CDE's monthly participation in PTAC-facilitated Chief Privacy Officer Network activities to remain current on student privacy laws, guidance, and best practices while collaborating with staff in other states;
- Annual attendance of PTAC-sponsored FERPA webinars;
- Annual invitations for PTAC staff to participate in the California IT Educators Conference to present on various FERPA-related topics throughout the conference. This invitation also includes a "Privacy Office Hours" table prominently placed for PTAC staff in the vendor hall so that LEAs can stop by to ask questions and learn about FERPA resources;
- Annual presentations to CDE staff that include discussion of parental rights and school official obligations under FERPA;
- A January 2025 Training on privacy policies, laws (e.g., FERPA, SOPIPA), and best practices given to field representatives from the CDE's Multilingual Support Division6 and a September 2024 training on privacy policies, laws (e.g., FERPA, SOPIPA), and best practices given for educators in the San Joaquin Delta region of California7;
- A Psychology of a Scam8 presentation co-presented by CDE staff and PTAC staff at the 2023 California IT Educators Conference to equip educators with resources to comply with law and avoid scams. Participants were provided with tips and tools they could use to empower others in their school community (students, families, other educators) to avoid scams, know their privacy rights, and comply with law;
- A presentation at the 2020 Computer Using Educators Conference helping California educators understand how to select and use technology in compliance with student privacy laws;9 and
- A May 2018 Data Breach Simulation Exercise for LEAs in the Gold Country region of California using a template created by PTAC to help educators create a Breach Response Plan as they walk through the steps of a simulated data breach.10

In addition to collaborating with PTAC to ensure compliance with FERPA-related issues, CDE staff have been active participants in privacy-related professional learning communities such as the State Education Technology Directors Association,11 Cybersecurity & Privacy Collaborative, Computer Using Educators,12 the Future of Privacy Forum's Student Privacy Compass13 efforts, and the National Center for Education Statistics14 which has included attending and occasionally presenting at the summer Stats-DC Conferences.

Between training and presentations, CDE's staff monitors and maintains the privacy@cde.ca.gov email box where constituents (both LEAs and families) can submit
privacy and FERPA-related inquiries. The @cdeprivacy Instagram account15 is also used for sharing FERPA updates and resources. Special Agent Justin Lee of the Sacramento FBI Office has provided periodic presentations to CDE staff to ensure they are current on cybersecurity trends/best practices and laws such as FERPA. Per CDE policy, inclusion of privacy-related laws is a fixture of all new contract reviews, survey reviews, project intake meetings, and Contract Monitor Trainings.

As for the four priority areas listed in your March 28, 2025 letter, as mentioned above, CDE has posted guidance about FERPA at https://www.cde.ca.gov/ds/ed/dataprivacyferpa.asp, which in turn links to ED's Protecting Student Privacy resources at https://studentprivacy.ed.gov, which in turn address each of these priority areas:

1. Parent rights to inspect and review records, see https://studentprivacy.ed.gov/legal-basics.

2. Safety of students, see https://studentprivacy.ed.gov/resources/addressing-emergencies-campus.

3. Annual notification of rights, see https://studentprivacy.ed.gov/annual- notices.

4. Military recruiters, see https://studentprivacy.ed.gov/faq/what-are- requirements-access-military-recruiters-high-school-students.

As for the first priority area -- the parental right to inspect and review education records we have previously discussed this topic in detail in our April 11, 2025 response to your letter dated March 27, 2025 to State Superintendent of Public Instruction Tony Thurmond. In brief, the CDE has informed LEAs that:

- Assembly Bill (AB) 1955 does not mandate nondisclosure of a student's gender identity;
- AB 1955 does not prohibit LEA staff from sharing any student information with parents; and
- There is no conflict between AB 1955 and parents' rights to request to inspect and review their students' education records under FERPA, even if such education records contain information related to a student's sexual orientation, gender identity or gender expression.[16] This lack of any conflict between AB 1955 and parental rights to inspect and review education records was confirmed recently by a federal district court.[17]

In further support of priority areas 1 and 3, the ED-produced FERPA 101 video mentioned above (which is featured on the CDE Data Privacy Web page and in trainings provided by the CDE) explains parental rights to inspect and correct education records and details the annual notification requirements. These rights and requirements are further discussed on the CDE's FERPA Summary Web page, along with discussion of FERPA exceptions such as emergency situations highlighted by priority area 2. As to priority area 4, the CDE offers the Armed Services Vocational Aptitude Battery (ASVAB)[18] to LEAs in compliance with the State Board of Education's (SBE's) directive to expand college and career readiness opportunities. California Education Code Sections 49603(a) codifies requirements that military recruiters receive physical on- campus access.

The CDE continues to cultivate and maintain a robust, multi-pronged approach to supporting compliance with FERPA and other state and federal student privacy laws. The CDE looks forward to continuing to collaborate with ED to support FERPA compliance and safeguard student privacy.

Sincerely,

*Signed by*

Len Garfinkel, General Counsel
California Department of Education

LG:tm

---

1 https://www.cde.ca.gov/ds/ed/dataprivacy.asp

2 https://www.youtube.com/watch?v=nhlDkS8hvMU

3 https://www.cde.ca.gov/ds/ed/dataprivacyferpa.asp

4 https://docs.google.com/presentation/d/1w0KHzKon6CLGu72igcdoGuIpK7i2Mbz4/edit?slide=id.g265de0d89eb_1_10#slide=id.g265de0d89eb_1_10

5 https://docs.google.com/presentation/d/12_q2Ktv2TxXinh7oVVfDSg2OeM40JcztnkPFk8alWXg/edit?usp=sharing

6 https://docs.google.com/presentation/d/1y9tr--9aEbIF0Eew9TnRH-U3gwRqU3DG/edit?slide=id.p1&slide=id.p1

7 https://docs.google.com/presentation/d/1iNMDzC5vipMPf-9BWZb_aoqLU8QRhkg7/edit?slide=id.g265de0d89eb_1_10#slide=id.g265de0d89eb_1_10

8 https://docs.google.com/presentation/d/1sJXIwplnxoREMwvBMl6JEoicS5VXWViK/edit?slide=id.p1#slide=id.p1

9 https://docs.google.com/presentation/d/1g1aLOqQrMhwkAho1M9USXZSb9GjJJjCUElGIvcD6y38/edit#slide=id.p1

10 https://docs.google.com/presentation/d/1MHSaFNk05KMsnMKXR9fMBmcRZpVHNP3yWSWKmjZ80yE/edit#slide=id.p

11 https://www.setda.org

12 https://cue.org/

13 https://studentprivacycompass.org/about/

14 https://nces.ed.gov/programs/slds/edci.asp

15 https://www.instagram.com/cdeprivacy/

16 See, e.g., https://www.cde.ca.gov/nr/fa/

17 *Chino Valley Unified School District v. Newsom*, 2025 WL 1151004 at *7 (E.D. Cal.)

18 See, e.g., https://www.cde.ca.gov/ds/sp/cl/asvabtestfaq.asp.

Last Reviewed: Thursday, April 24, 2025

# EXHIBIT G



Home / Newsroom / Responses to 2025 Federal Actions & Communications

**California Department of Education**
**Official Letter**

April 24, 2025

Dear County and District Superintendents and Charter School Administrators:

# Third Update Regarding FERPA

The purpose of this letter is to share additional updates to communications that we shared with you on April 1, 2025, and April 11, 2025.

On March 28, 2025, the U.S. Department of Education (ED) sent a letter to Chief State School Officers and Superintendents requesting that each state educational agency (SEA) submit "reports, information on policies and procedures, annual notifications, training materials or other information necessary" to provide assurance that the SEA and their respective local educational agencies (LEAs) are complying with the provisions of the Family Education Rights and Privacy Act (FERPA) and the Protection of Pupil Rights Amendment.

This week, we have sent a letter to ED detailing how all LEAs in California make assurances to the state of compliance, as well as information about the active CDE engagement to assist LEAs in complying with all state and federal student privacy laws and best practices.

A copy of our response is attached. We will continue to keep the field apprised of the CDE responses to federal actions. An ongoing list of the CDE 2025 responses to federal actions is maintained on this web page: https://www.cde.ca.gov/nr/fa.

Thank you for your continued hard work on behalf of all students in the State of California. As we at CDE continue to focus on moving the needle for student achievement, we again commend all California school staff who are maintaining a local focus on the all-important task of serving our students.

If your LEA or school community experiences disruption or other direct impacts to educational services for students as a result of federal action, please continue to reach out to EdReliefFunds@cde.ca.gov.

Sincerely,

*Signed by*

David Schapira
Chief Deputy Superintendent
Chief of Staff
California Department of Education

Last Reviewed: Thursday, April 24, 2025

# EXHIBIT H



UNITED STATES DEPARTMENT OF EDUCATION

STUDENT PRIVACY POLICY OFFICE

June 3, 2025

Honorable Tony Thurmond
Superintendent of Public Instruction
1430 N Street, Suite 5602
Sacramento, California 95814-5901

Via email: tthurmond@cde.ca.gov

Complaint No. 25-0382
Family Educational Rights
and Privacy Act

Dear Superintendent Thurmond:

On March 27, 2025, the U.S. Department of Education's (Department) Student Privacy Policy Office (Office or SPPO) provided you written notification that an investigation was being initiated to ascertain whether numerous local educational agencies (LEAs) in California may be implementing policies and practices that violate the Family Educational Rights and Privacy Act (FERPA).  20 U.S.C. § 1232g; 34 CFR Part 99.  As stated in that notification, of specific concern was that, given the number of LEAs potentially involved, did the California Department of Education (CDE) play a role, either directly or indirectly, in the adoption of these practices in supporting the recently enacted California Assembly Bill 1955 ("AB 1955").  Accordingly, we requested CDE report to SPPO in writing by April 11, 2025, the steps CDE has taken, or will take, including the submission of relevant policy statements or other communications, to ensure that LEAs in California comply with FERPA requirements as described in our March 27, 2025, letter, or provide a statement and justification explaining why you believe this action is unwarranted.

Subsequently, Mr. Len Garfinkel, General Counsel (Counsel), responded on your behalf via letter dated April 11, 2025.  In that response, Counsel asserted the following, in relevant part:

> There is no conflict between AB 1955 and FERPA.  AB 1955 does not mandate nondisclosure of information, and AB 1955's prohibition on mandating disclosure absent student consent is expressly limited by the phrase "unless otherwise required by state or federal law."  AB 1955 does not contradict parents' rights to request to inspect and review their students' education records under FERPA, even if they contain information related to a student's sexual orientation, gender identity, or gender expression.

Further, Counsel provided the following examples of guidance and notices CDE has issued in clarifying this position:

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Superintendent Tony Thurmond

CDE has posted guidance about FERPA at www.cde.ca.gov/ds/ed/dataprivacyferpa.asp, which includes information regarding compliance with FERPA's annual parental notification requirements.

On January 2, 2025, as a result of AB 1955 going into effect, CDE posted guidance at www.cde.ca.gov/ci/pl/ab-1955-sum-of-prov.asp.  CDE noted in the guidance that AB 1955 does not mandate nondisclosure.

On April 1, 2025, CDE sent a notice to superintendents and administrators (available at https://www.cde.ca.gov/nr/el/le/yr25ltr0401.asp), reminding them that AB 1955 prohibits mandatory disclosure, but "does **not** prohibit [local educational agency] staff from sharing any information with parents."  The notice also explained that "there is no conflict between AB 1955 and FERPA, which permits parental access to their student's education records upon request."

SPPO acknowledges and appreciates the timely response to our initiation letter, including your April 1, 2025, memorandum.  However, in reviewing these references, there appears to be no specific reference to "gender support plans."  Our Office is aware that parental advocacy groups, such as the "Moms for Liberty," have expressed concern that school districts in California continue to develop these types of plans without parental awareness.  For example, this group has stated: "Across 6 districts serving nearly 158,000 total students that provided data from the 2023-2024 school year, more than 300 children were placed on 'gender support plans' or had their names or pronouns modified in school systems."   While we have not independently validated this data, we have had conversations that led to us to have similar concerns regarding how "gender support plans" are shared with parents at the district level.

In determining whether the facts of a case indicate that a violation of FERPA occurred, this Office considers all documentation acquired through the investigatory process, in conjunction with the relevant statutory and regulatory requirements and the Department's interpretation of those requirements.  That said, to better inform that determination, consistent with the provisions at of 34 CFR § 99.66(a), I am requesting the submission of further written information to address concerns regarding gender support plans.  Specifically, CDE is requested to provide the following:

1) An additional notice to superintendents and administrators, like the one issued on April 1, 2025, reminding them that "gender support plans" are typically education records under FERPA, and therefore also subject to review and inspection by parents of students, and

2) A plan of action demonstrating how CDE will ensure LEAs are complying with the provisions of FERPA as related to the issues discussed in the two notices discussed in 1) above given the context of AB 1955.

Page 3 – Superintendent Tony Thurmond

To expedite the processing of this investigation, please respond in writing by close of business June 9, 2025, including documentation addressing these two issues or provide a statement with justification explaining why you believe this action is unwarranted.  You may email your response to FERPA.ComplaintResponse@ed.gov, including the complaint number in the subject line. In lieu of sending your response electronically, you may send your written response to the following address:

> Student Privacy Policy Office
> U.S. Department of Education
> 400 Maryland Avenue, SW
> Washington, D.C. 20202 – 8520

Please forward any questions to my attention at FERPA.Complaints@ED.Gov.  We look forward to our continued partnership as we work to resolve the investigation as quickly possible.

Sincerely,

Frank E. Miller Jr.
Acting Director
Student Privacy Policy Office

# EXHIBIT I



# CALIFORNIA DEPARTMENT
# OF EDUCATION

**TONY THURMOND**
STATE SUPERINTENDENT OF
PUBLIC INSTRUCTION

1430 N STREET, SACRAMENTO, CA 95814-5901 • 916-319-0800 • WWW.CDE.CA.GOV

June 9, 2025

*Via email*

Frank E. Miller, Jr.
Acting Director
Student Privacy Policy Office
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202-8520
FERPA.ComplaintResponse@ed.gov

RE: Complaint No. 25-0382

Dear Mr. Miller:

I am responding to your letter dated June 3, 2025, to State Superintendent of Public Instruction Tony Thurmond, in which you stated that "there appears to be no specific reference to 'gender support plans'" in the California Department of Education's (CDE) recent communications to local educational agencies (LEA) about the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and Assembly Bill No. 1955, 2024 Cal. Stat. ch. 95 (AB 1955). You requested that the CDE, by today's date: (1) notify LEAs that "gender support plans are typically education records under FERPA," and (2) provide a "plan of action" as to how the CDE will ensure that LEAs comply with FERPA in relation to issues of gender identity disclosure, or provide a justification as to why these two actions are unwarranted.  As explained herein, the CDE chooses the latter.

As noted below, the CDE has previously responded to both your March 27, 2025, complaint investigation letter and, separately, to your March 28, 2025, letter to all chief state school officers, which identified written "gender plans" as an area of interest/concern.

As to the first request, the CDE's April 11, 2025, response letter acknowledged your concerns about FERPA and gender support plans as demonstrated by the three examples of CDE communications that help ensure that LEAs understand that they can comply with both FERPA and AB 1955. These included general guidance regarding rights and obligations under FERPA at https://www.cde.ca.gov/ds/ed/dataprivacyferpa.asp; guidance summarizing AB 1955 dated January 2, 2025, at https://www.cde.ca.gov/ci/pl/ab-1955-sum-of-prov.asp; and guidance regarding the interaction of AB 1955 with FERPA dated

Frank E. Miller, Jr.
June 9, 2025
Page 2

April 1, 2025, at https://www.cde.ca.gov/nr/el/le/yr25ltr0401.asp.  In its April 1, 2025 guidance document, the CDE specifically instructs that "AB 1955 does not mandate nondisclosure [of student records]" and that "AB 1955 does not prohibit LEA staff from sharing any information with parents" regarding their student's gender identity or sexual orientation. To that same end, the CDE noted in its April 11, 2025, letter that: "AB 1955 does not contradict parents' rights to request to inspect and review their students' education records under FERPA, *even if they contain information related to a student's sexual orientation, gender identity, or gender expression."*  (Emphasis in italics supplied.) Also on April 11, 2025, the CDE sent a cover letter to all of California's LEAs, which attached a copy of that April 11, 2025 letter. The CDE's cover letter to LEAs, and the attachment, are posted at www.cde.ca.gov/nr/fa.

On April 24, 2025, in response to your March 28, 2025, letter to all chief state school officers, we sent you further detailed information about how the CDE supports LEAs in complying with FERPA. We noted that nothing in FERPA requires a state educational agency such as the CDE to provide LEAs with guidance or technical assistance or otherwise oversee LEA compliance with FERPA, but that nevertheless all California LEAs, to receive federal funding, make the following assurance to the state:

> Each grantee receiving funds under this Act understands the importance of privacy protections for students and is aware of the responsibilities of the grantee under section 444 of the General Education Provisions Act (20 USC 1232g) (commonly known as the "Family Education Rights and Privacy Act of 1974"). (20 USC §7928; PL 114-95, §8548). (See Assurance #9 at www.cde.ca.gov/Fg/aa/co/ca24assuranceleaplan.asp.)

In our April 24, 2025, letter, responsive to issues raised, including with respect to "gender plans," we informed you that the CDE has informed California's LEAs that "There is no conflict between AB 1955 and parents' rights to request and review their students' education records under FERPA, even if such education records contain information related to a student's sexual orientation, gender identity, or gender expression."  In that letter, we also noted that a federal district court recently held that there is no conflict between FERPA and AB 1955. See *Chino Valley Unified School District v. Newsom*, 2025 WL 1151004 at *7 (E.D. Cal., Apr. 17, 2025). Also on April 24, 2025, the CDE sent a cover letter to all of California's LEAs, which attached a copy of that April 24, 2025 letter. The CDE's cover letter to LEAs, and the attachment, are posted at www.cde.ca.gov/nr/fa.

The CDE is not aware of any legal authority that tasks a state educational agency under FERPA with issuing legal opinions to LEAs as to how to apply FERPA to particular factual situations, such as determining whether a particular document constitutes an "educational record" (as defined in FERPA) in a particular circumstance.  The guidance and communications we have issued to LEAs in response to your previous requests encompassing this topic sufficiently apprise them of their obligations under FERPA.

Frank E. Miller, Jr.
June 9, 2025
Page 3

As to the second request, the CDE is likewise unaware of any legal authority that tasks a state educational agency with developing a state plan relating to FERPA compliance. As such, the request that the CDE develop such a plan in relation to issues of gender identity disclosure, specifically, is without authority.

Nevertheless, the CDE continues to support LEA compliance with FERPA. The CDE notes that the examples set forth in its April 11, 2025, and April 24, 2025, letters showing how CDE assists LEAs with FERPA compliance, as well as the CDE's sharing of the April 11, 2025, and April 24, 2025 letters with California's LEAs, demonstrate the CDE's support of FERPA compliance by LEAs.

Sincerely,


/s/ Len Garfinkel
LEN GARFINKEL, General Counsel

# EXHIBIT J



UNITED STATES DEPARTMENT OF EDUCATION

STUDENT PRIVACY POLICY OFFICE

January 28, 2026

Honorable Tony Thurmond
Superintendent of Public Instruction
1430 N Street, Suite 5602
Sacramento, CA 95814-5901

Via email: tthurmond@cde.ca.gov

Complaint No. 25-0382
Family Educational
Rights and Privacy Act

Dear Superintendent Thurmond:

This letter is to inform you of the outcome of the investigation conducted by the U.S. Department of Education (Department), Student Privacy Policy Office (Office or SPPO), into the California Department of Education (CDE). On March 27, 2025, SPPO provided you written notification that an investigation was being initiated to ascertain whether numerous local educational agencies (LEAs) in California may be violating the Family Educational Rights and Privacy Act (FERPA or Act). 20 U.S.C. § 1232g; 34 C.F.R. Part 99. As stated in that notification, there is reason to believe the CDE facilitated and promoted the adoption of policies and practices that violate FERPA.

FERPA is a Federal law that protects the privacy of students' education records. FERPA affords parents the right to have access to their children's education records, the right to seek to have the records amended or corrected, and the right to control the disclosure of information from the records subject to FERPA's exceptions. Under FERPA, a school must generally provide a parent with an opportunity to inspect and review his or her child's education records within 45 days of the receipt of a request. Recipients of Federal financial assistance from the Department are subject to these laws and regulations and to the Secretary's enforcement authority.

In our investigation, SPPO examined whether the CDE's relevant policies, guidance, and other actions permit, direct, instruct, or require LEAs to violate FERPA, ultimately leading to the intentional and unlawful suppression of student records from parents.

SPPO has concluded that certain CDE policies and practices, which are discussed below, considered in their totality, create powerful state-directed pressure for LEAs to adopt practices that are likely to lead to—and have led to—FERPA noncompliance. Our office has concluded that, if the CDE continues on this course, FERPA violations will continue to occur and the statewide

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Superintendent Tony Thurmond

hostility toward transparent communication with parents will be reinforced under the recently enacted 2024 California Assembly Bill 1955 ("AB 1955"), further emboldening school officials to hide student records from parents regardless of Federal law.

Our Office concludes that the policies and practices outlined in more detail below have systematically fostered a legal environment where schools maintain, or feel obligated by law to maintain, information about a student's "gender identity" and "gender expression" that is actively withheld from parents. In many cases LEAs do so by maintaining documentation, such as "gender support plans," not as part of the cumulative record open to inspection by parents, but as "unofficial records" to which the school may not provide access upon a parent's request. This practice violates the federally recognized right of parents to inspect and review all education records related to their minor children.

In our correspondence during SPPO's investigation, the CDE has tried to dodge compliance with FERPA, coerced LEAs to violate FERPA, and refused to take the necessary steps to confirm compliance with its LEAs. Therefore, SPPO finds the CDE to be non-compliant with FERPA. As further explained below, the CDE is the primary administrator of a majority of Federal education funds to the State's LEAs; it is the duty of the CDE to ensure the LEAs are not in violation of Federal laws.

## I.    Legal Background

Congress passed the Family Educational Rights and Privacy Act in 1974 "to assure parents of students access to their educational records." *Frazier v. Fairhaven Sch. Comm*, 276 F.3d 52, 67 (1st Cir. 2002) (alteration and citation omitted); *see also Manco v. St. Joseph's Univ.*, 350 F.R.D. 62, 68 (E.D. Pa. 2025) (noting that FERPA was enacted "for the purpose of ensuring parents' access to their children's educational records"). FERPA achieves that goal through conditioning Federal funding on certain requirements. In particular,

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children.

20 U.S.C. § 1232g(a)(1)(A). FERPA also requires educational agencies and institutions to "effectively inform[] the parents of students … of the rights accorded them by this section." *Id.* § 1232g(e).

FERPA defines "education records" as, with certain narrow exceptions, "those records, documents, and other materials which[] contain information directly related to a student," and "are maintained by an educational agency or institution or by a person acting for such agency or institution." *Id.* § 1232g(a)(4)(A); *accord* 34 C.F.R. § 99.3(a); *Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 429 (2002). The "plain meaning" of this provision "reveals that Congress intended for the definition to be broad in scope." *Belanger v. Nashua Sch. Dist.*, 856 F. Supp. 40, 48 (D.N.H. 1994). In other words, "Congress made no content-based judgments with regard to its

Page 3 – Superintendent Tony Thurmond

'education records' definition." *United States v. Miami Univ.*, 294 F.3d 797, 812 (6th Cir. 2002). For that reason, "FERPA does not exempt from its disclosure obligation education records that deal with preferred names and pronouns." *Ricard v. USD 475 Geary Cnty.*, 2022 WL 1471372, at *7 (D. Kan. May 9, 2022).

FERPA provides that the Secretary of Education "shall take appropriate actions to enforce this section and to deal with violations of this section, in accordance with this Act." 20 U.S.C.. § 1232g(f). The Act authorizes the Secretary to "terminate assistance" when she "finds there has been a failure to comply with this section" and she "has determined that compliance cannot be secured by voluntary means." *Id.*

The CDE is currently, and has been for many years, a recipient of Federal financial assistance from the Department. Approximately $4.8 billion remains available for drawdown by the CDE, including both discretionary grants and formula grants. In turn, the CDE distributes Federal funding to the LEAs in the State.

## II.    Findings

### A) There is a Pattern and Practice of California Schools Withholding Education Records from Parents

California's LEAs receive Federal funds through the CDE and are "educational agenc[ies]" and "institution[s]" under FERPA. 20 U.S.C. §1232g(a)(1)(A). Accordingly, they are prohibited from having a "policy of denying" or "effectively prevent[ing]" parents from "inspect[ing] and review[ing] the education records of their children." *Id.* SPPO's investigation has revealed that multiple LEAs have failed to comply with that requirement.

### 1.    Districts across California have policies or practices designed to withhold "gender support plans" and similar documents from parents.

SPPO's investigation revealed a long history across the state where districts and schools have attempted to withhold or hide information from parents. In particular, districts and schools appear to take great pains to withhold so-called "gender support plans" and similar documents from parents. "Gender support plans" are forms (oftentimes based off a universal form provided by the organization "Gender Spectrum") that students fill out with school administrators to lay out a plan on how to "transition" and maintain the "new identity" of the student within the school system, with or without parental knowledge or consent.

The persistent efforts by schools across the state to hide such matters from parents cannot be squared with FERPA. From the beginning, these "gender support plans" are shrouded in secrecy, with the aim of excluding parents from involvement or even knowledge. A recent article highlights how Freedom of Information Act (FOIA) requests of California districts show at least 300 children were placed on gender support plans, many without parental knowledge.[1] Those

---

[1] https://dailycaller.com/2025/04/15/exclusive-blue-state-schools-facing-trump-admin-investigation-helped-hundreds-of-kids-change-their-gender-last-year/

Page 4 – Superintendent Tony Thurmond

numbers are borne out by the numerous lawsuits brought by parents alleging that their children were pressured to "transition" by school officials absent any parental awareness. *See, e.g.*, *Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025) (Chico Unified School District's policy); *Konen v. Caldeira*, No. 5:22-cv-5195 (N.D. Cal. filed Sept. 12, 2022) (Spreckels Union School District's policy).

Certain schools' formal materials in fact evince a plan for preventing parents from accessing their children's education records, if those records involve their children's "gender identity." For instance, in Mt. Diablo Unified School District, the gender support plan document permits the student to specify that the plan be stored either in the student's cumulative file, a locked cabinet or elsewhere. Suggestively, the form indicates that only the cumulative file is accessible to parents.[2] For another, Mountain View-Los Altos High School District's Gender Identity and Access Administrative Regulation Policy states that "[i]n the event that a student identifies as transgender, but is unable to obtain consent from a parent or legal guardian, a school administrator shall meet with the student to discuss how the student would like to be addressed at school and implement a plan to ensure that the student's privacy is protected."[3] Berkeley Unified School District's "Gender Support Plan" includes questions asking if parents are aware and supportive of the student's gender status, and, "If not, what considerations must be accounted for in implementing this plan?" It subsequently asks, "Can the student's name/gender marker be reflected in the SIS [Student Information Software]?,"[4] suggesting that certain name and "gender identity" changes would be hidden from parental access and not placed in the student's educational records.

The recent case of *Mirabelli v. Olson*, 691 F. Supp. 3d 1197 (S.D. Cal. 2023), illustrates the lengths school districts in California will go to conceal information from parents. In that case, two teachers in the Escondido Unified School District challenged a school policy under which "a teacher ordinarily may not disclose to a parent the fact that a student identifies as a new gender, or wants to be addressed by a new name or new pronouns during the school day." *Id.* at 1203. The litigation revealed letters from the district's attorneys which indicated that the school's policy "require[s] [teachers] to not share a student's gender identity status with their parent or guardian without the student's permission"—even if a "parent directly asks [the teachers] to reveal a student's gender identity." *Id.* at 1206. One teacher stated in her declaration to the court that the State has mandated teachers to withhold information or mislead parents regarding a student's "gender identity," which she views as a violation of her religious faith. She states, "I understand that California requires me and all other school staff to accept a student's statement of their gender identity and immediately begin treating them as a member of the opposite-sex, regardless of whether their parents consent or even know. And, if the child tells me that he does not want his parents to know about this, then I must keep it from them. As a requirement for employment by the California school system, this is a severe burden on my religious beliefs."

The picture is similarly bleak off the page and in practice. For instance, a leaked video from a training session in Claremont Unified School District showed the Director of Educational

---

[2] https://drive.google.com/file/d/12J6Vq_jluKakLsPlqGSeykkJRywGG8H6/view
[3] https://docs.google.com/document/d/1YBUoYVtfLfJ1w0cgA_zNoPwkY-j8oFOT/edit?tab=t.0
[4] https://www.berkeleyschools.net/wp-content/uploads/2017/11/Gender-Support-Plan-and-Gender-Transition-Plan-from-Gender-Spectrum.pdf

Page 5 – Superintendent Tony Thurmond

Services instructing teachers to actively hide students' "gender identities" from parents.[5] In particular, the Director states that "[a]ll students have the right to privacy," and "the right to keep their gender status private, even from their parents"—such that the school "cannot disclose information without the student's explicit permission."[6] Similarly, at a video training session hosted by Transforming Family Spotlight Q&A, the Assistant Superintendent of Glendale Unified School District instructed school staff watching the video to keep "gender support plans" in a separate desk drawer in order to keep parents from discovering it.[7]

Our investigation also revealed how numerous schools have used their data management software system (Aeries) to conceal information from parents. A 2024 public records request fulfillment from Roseville Joint Union High School District exposed a number of email exchanges dating back to 2022 between teachers, counselors, registrars, and principals throughout the district. These emails discussed whether software systems could be used to change names of students without the parents knowing and when to use different student names in front of parents.[8] In one of these email exchanges, from Oakmont High School, a guidance counselor directed staff to refer to a student with a different name than the name used in the current Aeries system and with parents. Teachers discussed hiding the student's name change from the student's parents—even though some faculty expressed concern that they were being directed to communicate dishonestly with parents about students' "gender identity." The emails further discussed whether it would be possible to change students' names and "genders" in the Aeries system without that change becoming visible to the parents.[9]

Our investigation also uncovered numerous posts between 2021 and 2024 on Aeries' online chat portal from school software administrators on various campuses asking Aeries to create features to hide student name changes and pronoun changes from parents. Over the years, California educators and administrators from districts around the state endorsed these requests, agreeing that Aeries should provide additional capabilities to hide student email addresses from parents, as well as methods for overriding the Parent Portal and modifying what parents can see. They also suggested that informing parents of a student's "gender identity" could violate State law. As one administrator explained: "With AB1266 and transgender student privacy, we are running into issues with confidentiality in Aeries. For example, a female transgender student wants to go by their preferred name and not share with a legal parent/guardian. However, when the preferred name is entered in Aeries as well as the legal name, the preferred name is showing up on all parent communication and parent portal. Can we find a way to have the preferred name [not] listed on all?"[10]

---

[5] https://x.com/libsoftiktok/status/1829600615980495073
[6] *Id.*
[7] https://www.youtube.com/watch?v=LEc0m02QgG4
[8] California Public Records Request response, Batch 1 4864-4166-0369. Relevant to request sent May 20, 2024 by Lozana Smith Attorneys at Law.
[9] *Id.*
[10] https://archive.ph/07iSQ

Page 6 – Superintendent Tony Thurmond

In a 2024 Chula Vista Elementary School District Board meeting, a district representative expressed concern that when a school changes a student's "gender identity" in the online system and a parent goes into that system to register them for classes, the parent would see the alternative "gender" for their child. The representative also mentioned that multiple other districts shared these fears. Assistant Superintendent Sharon Casey responded: "In our system, when there is a student who self-identifies with a different name, there's a code that's put on that file so that parents don't have access. And so it's coded a separate way for us in our system."[11]

By far the most prevalent strategy schools have used to hide information from parents is to keep bifurcated records—an "official" record that will be disclosed upon request, and an "unofficial" record that the school will go to great lengths to keep hidden. As recently as September 2025, the CDE championed polices such as the Lake Tahoe Unified School District "Right to Privacy" policy that provided a roadmap for concealing information from parents.[12] That policy provided that appropriate strategies for preventing "unauthorized disclosure of a students' private information" may include "keeping a student's unofficial record separate from the official record" and stated that while a student's "official record" requires legal documentation for name changes and parental authorization for "gender changes," the student's "unofficial record" may be changed without such documentation or authorization.[13] Unsurprisingly, many schools in California continue to maintain similar polices:

- The San Francisco Unified School District's Administrative Regulation 5145.4 lists "keeping a student's unofficial record separate from the official record" as a "strateg[y]" for keeping "[a] student's intersex, nonbinary, transgender or gender-nonconforming status" private.[14]

- Mt. Diablo Unified School District provides children the option of deciding where to store their gender support plans. According to the form, only the cumulative file is accessible to parents.[15]

- Alameda Unified School District directs its personnel that they "should not disclose information that may reveal a student's transgender status or gender nonconforming presentation to others, including parents and other school personnel, unless legally required to do so or unless the student has authorized

---

[11]See "4/17/2024 – English - Chula Vista Elementary School District Board Meeting," 6:01:00-6:02:40, https://www.youtube.com/live/SI5XqncWV6Y?si=aFaWgSq0FCoa57bW&t=21663
[12] https://web.archive.org/web/20250905074014/https://www.cde.ca.gov/ci//pl/c1h.asp
[13] Lake Tahoe Unified School District Board Policy Manual. Regulation 5145.3: Nondiscrimination/Harassment states: "However, when proper documentation or authorization, as applicable, is not submitted with a request to change a student's legal name or gender, any change to the student's record shall be limited to the student's unofficial records such as attendance sheets, report cards, and school identification." on June 1, 2025, Lake Tahoe USD amended its policy as documented in CSBA meeting notes:
https://simbli.eboardsolutions.com/Meetings/Attachment.aspx?S=36030287&AID=1216715&MID=44542
https://simbli.eboardsolutions.com/Policy/ViewPolicy.aspx?S=36030287&revid=J8a1zXjE9WQmWgplusThqlqplusw%3d%3d&PG=6&st=5145.3&mt=Exact
[14]https://www.sfusd.edu/know-your-rights/discrimination-your-school/administrative-regulation-nondiscriminationharassment-intersex-nonbinary-transgender-and-gender
[15] https://drive.google.com/file/d/12J6Vq_jluKakLsPlqGSeykkJRywGG8H6/view

Page 7 – Superintendent Tony Thurmond

such disclosure."[16] To that end, the district "maintain[s] a mandatory permanent pupil record ('official record') that includes a student's legal name and legal gender," but that may differ from "other school records or documents."[17]

- Berkeley Unified School District "maintain[s] a mandatory permanent pupil record ('official record') that includes a student's legal name and legal gender." But it specifically notes in its policy that it "is not required to use a student's legal name and gender on other school records or documents."[18]

- Sacramento City Unified School District emphasizes a "distinction between school records and legal documents" as a tool to protect "privacy for transgender and gender non-conforming students." According to district policy, "[t]ransgender and gender non-conforming students have the right to have their lived name and/or gender marker and/or gender pronouns reflected on all (non-legal) school physical records and documents."[19]

- In trainings provided to educators around the State of California, Ventura County Associate Superintendent and Las Virgenes Unified School District indicated that schools' "obligation regarding whether and when to change a student's name and/or gender in their records depends on the type of record it is under state law, not federal law." For that reason, the trainings "focus[ed] on the categories of records described in state law, not FERPA."[20]

### 2. There is no carve-out from FERPA for "gender support plans" and similar documents.

These practices cannot be reconciled with FERPA. As mentioned above, FERPA makes "no content-based judgments with regard to its 'education records' definition." *Miami Univ.*, 294 F.3d at 812. With few exceptions, FERPA defines an education record as "records, files, and documents" that "(i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4). A school document or record that chronicles a student's name change or gender confusion necessarily contains "information directly related" to the student. *Id.* And if the school "keep[s]" or "preserve[s]" those records, whether in a "filing cabinet" or a "permanent secure database," then the school "maintain[s]" it. *Owasso Indep. Sch. Dist. No. I-001*, 534 U.S. at 432-

---

[16] See "Privacy" subsection of Student Rights and Protections" section, https://www.alamedaunified.org/departments/student-support-services/ausd-lgbtq-round-table.

[17]*Ibid.* See "Official Records" subsection of "Student Rights and Protections" section.
[18]https://www.berkeleyschools.net/wp-content/uploads/2024/11/BUSD-Transgender-and-Gender-Nonconforming-Students-BP-5159-1.pdf
[19]https://simbli.eboardsolutions.com/Policy/ViewPolicy.aspx?S=36030403&revid=LmvTpyVHyrhxBWEAtBRzRw==&ptid=amIgTZiB9plushNjl6WXhfiOQ==&secid=9slshUHzTHxaaYMVf6zKpJz3Q==&PG=6&IRP=0&isPndg=false
[20] https://www.sbcselpa.org/wp-content/uploads/2022/02/12-6-21_JPA_Agenda.pdf

Page 8 – Superintendent Tony Thurmond

33; *see also Ricard*, 2022 WL 1471372, at *7 ("FERPA does not exempt from its disclosure obligations education records that deal with preferred names and pronouns.").

Labeling some records "official" and other records "unofficial" does not take any such records outside the FERPA obligation. Whether information "directly relates" to a student or is "maintained" by an educational institution does not turn on how the school decides to label the record after the fact, or on how formal those records are.

That FERPA has no "unofficial records" exception is confirmed by the fact that FERPA contains express categories of records that fall outside its "education records" definition. In particular, FERPA specifies that "education records" does not include:

(i)    records of instructional, supervisory, and administrative personnel and educational personnel ancillary thereto which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute;

(ii)   records maintained by a law enforcement unit of the educational agency or institution that were created by that law enforcement unit for the purpose of law enforcement;

(iii)  in the case of persons who are employed by an educational agency or institution but who are not in attendance at such agency or institution, records made and maintained in the normal course of business which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose; or

(iv)   records on a student who is eighteen years of age or older, or is attending an institution of postsecondary education, which are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in his professional or paraprofessional capacity, or assisting in that capacity, and which are made, maintained, or used only in connection with the provision of treatment to the student, and are not available to anyone other than persons providing such treatment, except that such records can be personally reviewed by a physician or other appropriate professional of the student's choice.

20 U.S.C. § 1232g(a)(4)(B). In other words, Congress knew how to make exceptions from its "broad" definition of "education records." *Clark Cnty. Sch. Dist.*, 564 P.3d at 866. There is thus no room to read an additional one into FERPA's plain text. *See Persian Broad. Serv. Global, Inc. v. Walsh*, 75 F.4th 1108, 1113 (9th Cir. 2023) ("When a provision contains express exceptions, the familiar judicial maxim *expression unius eest exclusion alterius* counsels against finding additional, implied, exceptions."); *Belanger*, 856 F. Supp. at 48 (refusing to "imply any exclusions to 'education records'").

To the extent any of the above schools' policies require that "education records" be withheld from parents—or "effectively prevent[]" parents from accessing such records—they are in violation of FERPA's obligations. 20 U.S.C. § 1232g(a)(1)(A).

Page 9 – Superintendent Tony Thurmond

**B) The Department Finds the California Department of Education is Noncompliant With FERPA and its Implementing Regulations**

California and the CDE are not bystanders in these schools' failure to comply with FERPA. To the contrary, California's laws, guidance, and actions have created an environment where schools in the state are effectively forced to conceal education records from parents, for fear of reprisal from the State. For that reason, the Department finds that the CDE has caused schools in the state to violate FERPA.

**1. FERPA requires California to withhold Federal funds from its educational agencies or institutions that violate FERPA's record and review requirements.**

California and the CDE receive Federal funds from the United States and then divvies those funds to applicable educational agencies or institutions. California, by making available Federal funds to districts violating FERPA record requirements, itself violates FERPA.

FERPA is clear: "*No funds shall* be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children." 20 U.S.C. § 1232g(a)(1)(A) (emphasis added); *accord id.* § 1232g(a)(1)(B) (similar). Yet California is making the applicable Federal funds available to institutions that are violating FERPA's record and review requirements.

**2. California's coercion of school districts to violate FERPA's record requirements itself violates FERPA.**

**a.    California's guidance and communications to schools are in tension with FERPA.**

FERPA has been the law of the land since 1974. And, at bottom, "FERPA is a law that specifically *empowers* parents to receive information about their minor students." *Ricard*, 2022 WL 1471372, at *7. It "mandates [school districts] to make education records available to parents upon request—whether the child wants their parents to have the records or not." *Id.*

California's communications to schools have long contradicted FERPA's clear commands. These communications often come in the form of guidance, setting out a putative interpretation of State law that warns schools not to share information with parents. These State laws include:

- the California State Constitution, which provides for an "inalienable right[]" to "enjoy[] … privacy." Calif. Const. art. I, § 1.

- Education Code Section 220, which provides that "[n]o person shall be subjected to discrimination on the basis of … gender, gender identity, gender expression," or "sexual orientation." Calif. Edu. Code § 220.

- AB 1266, which provides, among other things, that "[a] pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records." Calif. Edu. Code § 221.5(f).

Page 10 – Superintendent Tony Thurmond

- AB 1955, which provides, among other things, that "[a]n employee or a contractor of a school district, county office of education, charter school, or state special school for the blind or the deaf shall not be required to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law." Calif. Education Code § 220.3. In enacting AB 1955, the California legislature specified that the new provision "does not constitute a change in, but is declaratory of, existing law." *Id.*

In expounding on those sources of law, California's guidance and communications to schools have consistently discouraged schools from sharing information about students' "gender identity" with parents absent the student's consent, without any seeming exception for FERPA compliance. For example, in a recent legal alert, the California Attorney General indicated that "[f]orced disclosure policies" violate "students' California constitutional right to privacy with respect to how and when to disclose their gender identity."[21] That legal alert also declared that "[f]orced disclosure policies also run afoul of Education Code section 220's and Government Code section 11135, subdivisions (a)'s and (c)'s express commands not to discriminate on the basis of gender identity and gender expression."[22] The California Attorney General also continues to post a notice on his website declaring that "[y]our school, whether public or private, doesn't have the right to 'out' you as LGBTQ+ to anyone without your permission, including your parents. Under the California and U.S. constitutions, you have a protected right to privacy, which includes the right to keep your sexual orientation, gender identity or that you are transgender private…. This means that even if you are 'out' about your sexual orientation or gender identity at school, if you're not 'out' to your parents at home … then school staff can't tell your family that you are LGBTQ+ without your permission."[23] This comes from the AG's page called "Know Your Rights" that only admitted there are "some limited circumstances your school can tell your parents something about your sexual orientation or gender identity"—and "only if they have a very good reason for doing so." That page leaves out any mention of Federal requirements.[24]

The CDE's longstanding guidance accompanying AB 1266 was even more direct. For eight years (and at least until December 2024), the CDE's website included frequently asked questions and answers on the topic of disclosures to parents:

- In response to whether "a student's gender identity [may] be shared with the student's parents," the CDE said that "[t]he right of transgender students to keep their transgender status private is grounded in California's antidiscrimination laws as well as federal and state laws."[25] "Disclosing that a student is transgender without the student's permission may violate California's antidiscrimination law by increasing the student's vulnerability to harassment and may violate the student's right to privacy."[26]

---

[21] https://oag.ca.gov/system/files/attachments/press-docs/Legal%20Alert%20re%20Forced%20Outing%20Policies.1.10.24_0.pdf

[22] *Id.*

[23] https://oag.ca.gov/lgbtq/rights

[24] *Id.*

[25] https://web.archive.org/web/20221231104806/https://www.cde.ca.gov/re/di/eo/faqs.asp#accordionfaq

[26] *Id.*

Page 11 – Superintendent Tony Thurmond

- In response to "[w]hat steps should a school or school district take to protect a transgender or gender nonconforming student's right to privacy," the CDE "strongly recommended" that schools "keep records that reflect a transgender student's birth name and assigned sex … apart from the student's school records." The CDE also recommended "placing physical documents in a locked file cabinet in the principal's or nurse's office." And "[p]ursuant to the above protections," the CDE indicated that "schools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family. With rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents."[27]

The CDE has claimed that these questions and answers have been replaced with updated guidance for AB 1955, such that they no longer contribute to schools ignoring their FERPA obligations.[28] But there are several reasons to doubt the CDE on that score. For one, it appears that the CDE continues to use its previous AB 1266 FAQ guidance. Effective July 1, 2025, the CDE implemented PRISM, which is a mandatory LGBTQ+ competency training for teachers and other certificated employees.[29] Filings in litigation indicate that the PRISM training includes language that "closely tracks the prior FAQ page" guidance to AB 1266.[30]

School employees continue to operate with the understanding that the AB 1266 guidance has not been rescinded and that school employees are required to follow the guidance or risk their jobs. In litigation, a middle school teacher gave testimony describing guidance, training, and legal pressure from the CDE that led her to feel forced to mislead parents regarding students' "gender identities" in order to keep her job. She said, "While I understand that the CDE has removed the legal advisory and FAQ page from their website, I also understand that the CDE continues to assert that they accurately described the law that school districts must follow.... So I still feel bound by the training and instruction I received from school leadership, and under threat to abide by these policies or 'find a different job.'"

For another, it is our understanding is that the CDE has never affirmatively disavowed the guidance or publicly acknowledged the guidance violated Federal law. AB 1266 is still law in California, presumably with all associated guidance.[31] And the CDE's guidance was never directly predicated on AB 1266, but rather was "grounded in California's antidiscrimination laws," which have not materially changed since the CDE "updated" the guidance.[32] Neither those laws nor AB 1266 were amended by AB 1955—to the contrary, AB 1955 expressly disclaimed that it was a "change" in existing law. Calif. Edu. Code § 220.3. There is no reason to think that the CDE's views have changed since the passage of AB 1955. Nor have schools taken that position. Quite the opposite: Oakland Unified School District's gender support plan, for example, continues to include

---

[27] *Id.*

[28] https://www.cde.ca.gov/ci/pl/ab-1955-sum-of-prov.asp

[29] https://www.cde.ca.gov/ci//pl/prism.asp

[30] *Mirabelli v. Olsen,* Case No.: 3:23-cv-0768-BEN-VET Plaintiffs' Ex Parte Application for an Order to Show Cause re: Sanctions in the U.S. District Court in the Southern District of California, pg. 6

[31] *Mirabelli v. Olson,* Case No.: 3:23-cv-0768-BEN-VET Plaintiffs' Ex Parte Application for an Order to Show Cause re: Sanctions in the U.S. District Court in the Southern District of California

[32] https://web.archive.org/web/20221231104806/https://www.cde.ca.gov/re/di/eo/faqs.asp#accordionfaq

Page 12 – Superintendent Tony Thurmond

a disclaimer that it "should not be placed in the student's file to maintain privacy," citing AB 1266—a clear reference to the CDE's previous FAQs.[33]

If anything, AB 1955 *reaffirms* the CDE's earlier FAQs, which clearly violate FERPA. When AB 1955 was introduced, the findings and declarations included that "it can be harmful to force young people to share their full identities before they are ready," even with "[p]arents and families."[34] And schools have read AB 1955 in the same way. Irvine Unified School District, for example, cites AB 1955 to justify its directive to school administrators to "[r]espect student's individual choice to be 'out' and be themselves at school, and seek their permission of when and to whom staff can discuss their LGBTQ+ identity."[35] Similarly, in a deposition, the superintendent of Escondido United School District agreed that, even after AB 1955's passage, "no document from the Attorney General's office or the CDE" says "anything different than what they've previously said."[36] The "consistent message" is that "a student gets to determine, based on their constitutional right to privacy, who finds out about their transgender status."[37] It is implausible that AB 1955's passage *cured* the tension between California's policies and FERPA's requirements.

In sum, California's guidance is an unbroken string of communications directing schools to hide "gender identity" information from parents contrary to Federal law. Although that guidance may have undergone incremental changes over the years, California has never backed down from the position that, outside of very limited (and hardly defined) circumstances, parents need their children's consent to access their education records, even though Federal law requires the opposite.

> **b.    California's laws, guidance, and other actions have effectively coerced school districts to violate FERPA.**

The views California has expressed through guidance are not merely abstract. California has shown a willingness to target schools, whether by letter or by litigation, when it feels those schools unjustifiably share "gender identity" information with parents. And these actions have had their intended effect. California's efforts have directly caused schools to violate FERPA, by policy or by practice.

California has persistently targeted schools that do not comply with its guidance on concealing students' "gender identity" from parents. Its campaign against the Chino Valley Unified School District illustrates the point. On July 20, 2023, the school board voted to adopt a parental notification policy that would require educators to inform parents within three days of a student requesting to change name, pronouns, or use a facility that did not align with the sex listed on their official record.[38] The State's reaction was swift; Superintendent Thurmond attended the board meeting to protest the policy,[39] later posting on social media that the parental notification policy

---

[33] https://cdn01.dailycaller.com/wp-content/uploads/2025/05/Gender-Support-Plan_Redacted.pdf

[34] See AB 1955 Section 2(d). https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240AB1955

[35] See "List of Student Rights." https://iusd.org/students-and-parents/parent-and-family-engagement/lgbtq-community

[36] Deposition of Luis Rankins-Ibarra at 70:23-71:16, *Mirabelli*, No. 3:23-cv-0768-BEN-VET, Doc. 247-19 (S.D. Cal. July 16, 2025).

[37] *Id.*

[38] https://libertyjusticecenter.org/wp-content/uploads/Chino-Valley-Unified-School-District-Parental-Notification-Policy.pdf

[39] *See* "CVUSD Meeting of the Board of Education – July 20th, 2023" 1:23:48-1:27:07 https://www.youtube.com/live/PE6cH15Goy0?si=qG2s4j7LWk4fxSLx&t=5027

Page 13 – Superintendent Tony Thurmond

threatens students' safety.[40] The California Attorney General's response was similarly unequivocal. He sent a letter to the board, accusing the board of "contradict[ing]" the CDE's "guidance in almost every respect" and expressing "serious concern" over the "significant harms that transgender students may suffer from being 'outed' to their parents against their will."[41] Finally, the California Attorney General issued a threat: his office had "a substantial interest in protecting the legal rights of children in California schools and protecting such children from trauma and exposure to violence."[42] As such, he would "not hesitate to take action as appropriate to vigorously protect students' civil rights."[43] And California followed through on its threat. On August 28, 2023, the Attorney General filed a complaint for declaratory and injunctive relief in State court,[44] in which he approvingly noted that "[m]any California districts … have incorporated [the CDE's] guidance into binding Administrative Regulations."[45] That complaint alleged that—by adopting the parental notification policy—Chino Valley Unified School District violated the California Constitution and State antidiscrimination law.[46]

This was not an isolated incident. Later that year, the Dry Creek Joint Elementary School Board voted to adopt a parental notification policy similar to Chino Valley's. That prompted a letter from the Attorney General accusing that board of instituting a "forced 'outing' policy" and pointing to the suit against Chino Valley as evidence that, under such a policy, "significant harm to students was likely to occur."[47] The AG's letter parroted the CDE's guidance that "schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents," subject to "rare exceptions."[48] Along the same lines, the AG endorsed the CDE's recommendation that "disclosure of a student's status to parents" take place "only" when there is a "specific and compelling 'need to know.'"[49] The letter goes further to admit there are instances when parents *can* be informed: "[s]chools can inform parents with a student's consent; schools can inform parents where there is a specific and compelling need to protect the student; students can inform parents when they are ready, in the time and manner chosen by the family; schools can encourage students to inform their parents; and schools can help students initiate these conversations with parents through counseling and other support services."[50] Not one mentioned parental rights under FERPA. And the letter closed—again—with a threat: the Attorney General would "not hesitate to take action as appropriate to vigorously protect students' civil rights."[51]

---

[40] https://x.com/TonyThurmond/status/1682240216491520000?s=20
[41] https://oag.ca.gov/system/files/attachments/press-docs/7.20.23_Item%20II.A.1%20on%20July%2020%2C%202023%20Agenda%20--%20%E2%80%9CNew%20Board%20Policy%205020.1%20%E2%80%93%20Parental%20Notification%E2%80%9Ddocx%20%282%29.pdf
[42] *Id.*
[43] *Id.*
[44] https://edsource.org/wp-content/uploads/2023/08/082723.Complaint.pdf
[45] *Id.*
[46] *Id.*
[47] https://oag.ca.gov/system/files/attachments/press-docs/9.14.23_Dry%20Creek%20Parental%20Notification%20Policy%20letter.FINAL_.pdf
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*

Page 14 – Superintendent Tony Thurmond

Rocklin Unified School District encountered similar resistance when it passed a parental notification policy of its own in September 2023.[52] A few short months later, the CDE's Education Equity UCP Office launched an investigation into the district per a complaint that the policy violated the state's anti-discrimination policy and ultimately found that the policy violated State law.[53] When the district appealed those findings, the CDE responded: "A student retains a reasonable expectation of privacy in their gender identity with respect to non-disclosure to their parents at home, even if open about their gender identity at school."[54] And on April 10, 2024, the CDE filed a lawsuit to challenge the district's policy.[55]

Even short of instituting its own lawsuit, California has been eager to join litigation to discourage schools from informing parents of their children's "gender identity." In *Mae M. v. Komrosky*, a coalition of students, parents, teachers, and a local teacher's union sued Temecula Valley Unified School District to enjoin the implementation of the school board's parental notification policy.[56] Less than two weeks after the plaintiffs sought a preliminary injunction, the Attorney General filed an amicus brief arguing that the parental notification policy violates the California State Constitution's Equal Protection Clause by unlawfully discriminating against and "singling out transgender and gender-nonconforming students," violates the Education Code and Government Code's antidiscrimination provisions, and "violates the California Constitutional Right to Privacy."[57]

California's activism has had its intended effect. As noted earlier, "[m]any California districts … have incorporated [the CDE's] guidance into binding Administrative Regulations."[58] When faced with the choice of complying with FERPA or following California's demands, schools often choose the latter. Irvine Unified School District noted on its FAQ page for "Gender Changes" that "[t]here is ambiguity in the law as to the extent that a parent/guardian controls a student's educational records."[59] In particular, while FERPA "dictate[s] that only the parent/guardian can request changes to the student's record," the "California Department of Education has issued guidance in this area, which highlights the critical necessity in protecting a student's privacy interest if they cannot express their gender identity at home."[60] Given "these two conflicting areas of law," the district concluded: "we recommend *but do not require* parent/guardian approval."[61]

---

[52] https://www.cbsnews.com/sacramento/news/big-turnout-as-rocklin-unified-meets-to-vote-on-controversial-change-to-policy-on-transgender-students/

[53] *See California Department of Education v. Rocklin Unified School District,* "Petition for Writ of Mandate," Exhibit C, page 21. https://libertyjusticecenter.org/wp-content/uploads/CDE-vs-RUSD.pdf

[54] *See California Department of Education v. Rocklin Unified School District,* "Petition for Writ of Mandate," Exhibit D, page 34. https://libertyjusticecenter.org/wp-content/uploads/CDE-vs-RUSD.pdf

[55] *California Department of Education v. Rocklin Unified School District,* https://libertyjusticecenter.org/wp-content/uploads/CDE-vs-RUSD.pdf

[56] https://publiccounsel.org/wp-content/uploads/2023/07/TVUSD-MPA-as-filed.pdf

[57] *See Mae M. et al. v. Joseph Komrosky et al.,* "Attorney General's Ex Parte Application to File Brief of Amicus Curiae," pg. 7, Section I; pg. 8, Section A.1; pg. 12, Sections B and C. https://oag.ca.gov/system/files/attachments/press-docs/1.%20Ex%20Parte%20Application-RJN%20%2B%20Proposed%20Amicus%20Brief.pdf

[58] https://edsource.org/wp-content/uploads/2023/08/082723.Complaint.pdf

[59] See "Why Do We Recommend Parent/Guardian Approval For This Process?" subsection of section "FAQ Name/Gender Changes." https://iusd.org/students-and-parents/parent-and-family-engagement/lgbtq-community

[60] *Id.*

[61] *Id.* (emphasis added).

Page 15 – Superintendent Tony Thurmond

And, of course, the prospects of lengthy litigation proceedings chill schools from attempting to choose FERPA over California's contrary guidance. Chino Valley Unified School District may be the perfect example. In response to SPPO's request for information, the district indicated that "the state's guidance creates a countermand to FERPA's parental right of access to records," and that "[i]f the state did not create this conflict, the general professional and legal obligation would be to maintain comprehensive, official records, which would be accessible to parents under FERPA."[62] According to Chino Valley, "the state's guidance is the primary impetus" for maintaining filing systems hidden from parents, and "[b]ut for the state's guidance, policies, and other actions…. staff would be significantly less likely to evade compliance" with FERPA.[63]

### c.    California's guidance and actions are contrary to FERPA.

The cumulative effect of California's guidance and actions is to pressure schools to disregard FERPA's requirements.

FERPA provides that "the parents of students" have "the right to inspect and review the education records of their children." 20 U.S.C. § 1232g(a)(1)(A). Regulations confirm the same. Except for when a single record implicates multiple students, "a parent … *must* be given the opportunity to inspect and review the student's education records." 34 C.F.R. § 99.10(a) (emphasis added). Because this right of inspection and review of minor students' records belongs to the parents, FERPA necessarily contemplates scenarios in which the parent can review education records without the minor student's consent.

Indeed, FERPA "mandates" schools receiving Federal funds "to make education records available to parents upon request—whether the child wants their parents to have the records or not." *Ricard*, 2022 WL 1471372, at *7; *accord Gregory*, 350 F.R.D. at 68 (purpose of FERPA was to "ensur[e] parents' access to their children's educational records"). California's guidance, which describes telling parents of their children's "gender identity" without their consent as "forced outing" and a violation of State law, discourages schools from complying with FERPA.[64] And California's follow-up letters, suits, and threats give teeth to that guidance. In effect, because of California's policies and actions, federally funded schools in the State violate FERPA.

It is not as though California is unaware of FERPA. For instance, in *Chino Valley Unified School District v. Newsom*, California attempted to argue that its actions are consistent with

---

[62]Statement from Superintendent Norm Enfield on December 10, 2025 in response to SPPO's request for information regarding the investigation for potential FERPA violations by Chino Valley Unified School District.
[63] *Id.*
[64] We also doubt that FERPA can be evaded by telling schools to avoid creating any records at all. The point of FERPA was to "assure parents of students … access to their education records." 120 Cong. Rec. 39,862 (Dec. 13, 1974) (joint statement in explanation of amendment to FERPA). Directing schools not to create education records purely to avoid having to disclose them to parents would circumvent FERPA. *See, e.g.*, *Pugin v. Garland*, 599 U.S. 600, 607 (2023) ("'We should not lightly conclude that Congress enacted a self-defeating statute.'"); *The Emily*, 22 U.S. 381, 388 (1824) ("In construing a statute, penal as well as others, we must look to the object in view, and never adopt an interpretation that will defeat its own purpose, if it will admit of any other reasonable construction."). That is especially so given that FERPA "protect[s]" the "constitutional right of parents to direct their child's education." *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1211 (S.D. Cal. 2023); *see also id.* at 1211-12 ("FERPA speaks to the Congressional elevation of the importance of parents being involved in their child's education…. The privacy right of a child, according to FERPA, takes second place to his or her parents' right to know.").

Page 16 – Superintendent Tony Thurmond

FERPA.[65] In that litigation and in response to the current investigation, California has made several arguments to take itself outside of a FERPA violation. First, California argued that AB 1955 is consistent with FERPA because it is "expressly limited by the phrase 'unless otherwise required by state and federal law.'"[66] Second, California argued that, while FERPA requires that parents have a right to access education records upon "request" 20 U.S.C. § 1232g(a)(1)(A), it does not require schools to proactively disclose information to parents.[67] And third, California argues that it has no obligation to ensure that local schools comply with FERPA.

None of those arguments is convincing.

To start, most of California's guidance was tied not to AB 1955, but rather to general State constitutional and antidiscrimination law. In discouraging schools from sharing "gender identity" information with parents, the CDE said that "[d]isclosing that a student is transgender without the student's permission may violate *California's antidiscrimination law* by increasing the student's vulnerability to harassment and may violate the student's right to privacy."[68] Even if California is right that the "unless otherwise required by state and federal law" clause creates a carve-out from AB 1955 for a Spending Clause statute like FERPA, that argument does nothing to expunge the threats California has made to schools under the California Constitution or California's other antidiscrimination laws.

Further, in more than one instance, California's AG provided legal guidance to districts that omit any mention of FERPA or Federal law requirements when discussing potential exceptions to State laws and policies. For instance, the Attorney General's 2024 legal alert document claimed to identify "numerous feasible and effective alternatives to forced disclosure policies"—but the only ones it listed absent student consent was "where there is a compelling need to do so to protect the student's well-being."[69] The Attorney General's letter referenced above to the board of Dry Creek Joint Elementary School District took a similar tack, only countenancing disclosure without student consent "where there is a specific and compelling need to protect the student."[70] The consistent message has been that, when it comes to disclosure, it is students' rights that matter—not parents'.

California's distinction between an affirmative duty to disclose (which California has sought to ban) and a duty to disclose upon request (which FERPA requires) is also unpersuasive. Each of California's legal theories—enunciated in guidance, threatened in letter, and litigated in court—applies equally to both scenarios. In California's view, disclosing a child's "gender identity" revealed in school to the parent without the child's consent violates the child's right to privacy and safety. If that is true, it does not make a difference whether that "gender identity" is in an education record, or whether the parent requested it. There is no escaping the fact that California views FERPA compliance as inconsistent with its constitutional and antidiscrimination

---

[65] No. 2:24-cv-1941 (E.D. Cal. Oct. 7, 2024), ECF No. 22.
[66] *Id.* at 24.
[67] *Id.* at 23.
[68] https://web.archive.org/web/20221231104806/https://www.cde.ca.gov/re/di/eo/faqs.asp#accordionfaq
[69] https://oag.ca.gov/system/files/attachments/press-docs/Legal%20Alert%20re%20Forced%20Outing%20Policies.1.10.24_0.pdf
[70] https://oag.ca.gov/system/files/attachments/press-docs/9.14.23_Dry%20Creek%20Parental%20Notification%20Policy%20letter.FINAL_.pdf

Page 17 – Superintendent Tony Thurmond

law. And schools have read California's guidance and interpreted California's enforcement actions in just that way.[71]

Finally, it does no good for California to disclaim any FERPA obligations when it is authorized to direct and control these schools and is the *driving force* for schools across the state disregarding Federal law. As Chino Valley's response to our investigation indicates, but for California's guidance, threats, and legal actions, schools would comply with FERPA. California has caused "educational agenc[ies] [and] institution[s]" to adopt "polic[ies] of denying" or "effectively prevent[ing]" parents from exercising "the right to inspect and review the education records of their children." 20 U.S.C. § 1232g(a)(1)(A). That is a violation of FERPA.

In any event, California's attempted disclaimer of any FERPA obligations contradicts other representations it has made to the United States. As a condition of receiving Federal financial assistance from the Department, the CDE has submitted to the Department a Grant Certification dated October 08, 2025, applicable to all Federal funding stating in part:

> As the duly authorized representative of the Department of Education California, I certify that Department of Education California: Will comply with the U.S. Constitution, all Federal laws, and relevant Executive guidance … in the administration of federally-funded programs. (See national policy requirements and 2 C.F.R 200.303 Internal controls) …. Will comply with all applicable requirements of all other Federal laws, executive orders, regulations, and public policies governing financial assistance awards and any Federal financial assistance project covered by this certification document ....

The CDE also signs grant agreements with the Department stating the money will be administered to programs that are in accordance with Federal law. As stated in the Federal grant agreement language, under Internal Control requirements under 2 C.F.R. § 200.303, grantees must: "Establish, document, and maintain effective internal control over the Federal award that provides reasonable assurance that the recipient or subrecipient is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award." Grantees must also: "Comply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award. Evaluate and monitor the recipient's or subrecipient's compliance with statutes, regulations, and the terms and conditions of Federal awards. Take prompt action when instances of noncompliance are identified." 2 C.F.R. § 200.303.

Simply put, California and the CDE knows it must ensure Federal funds it receives or further allocates are being used in accordance with Federal law. That includes FERPA.

---

[71] Statement from Superintendent Norm Enfield on December 10, 2025 in response to SPPO's request for information regarding the investigation for potential FERPA violations by Chino Valley Unified School District.

Page 18 – Superintendent Tony Thurmond

**C) Requirements for the California Department of Education to Come into Compliance with FERPA**

In our June 3, 2025 letter, SPPO provided the CDE with an opportunity to issue additional clarification that would have alleviated our concern as stated above. In the absence of such clarification, compounded with the State's previous legal actions taken against districts who attempted to be more transparent with parents about their children's "gender identities," we find that the CDE is pressuring schools across the State into noncompliance with parental rights under FERPA to inspect and review all student education records.

Upon closer inspection of district policies throughout SPPO's investigation, we have concluded that simply specifying to your LEAs that "gender support plans" are considered education records under FERPA and are therefore also subject to review and inspection by parents of students, would not be sufficient in addressing the issues laid out in this section.

Accordingly, to resolve this investigation, we are now requiring that the CDE take the following corrective actions:

1) Publicize a clear definition of "official" and "unofficial" education records and then specify that under Federal law all forms of education records that do not otherwise see an exception under FERPA are subject to parental inspection upon request. This includes "gender support plans," any gender-related modifications to student documents, forms, and other internal files or records related to these changes. (This would require SPPO's review and approval prior to statewide issuance.)

2) Issue a new notice to superintendents and administrators informing them: that AB 1955, as well as all other CA education laws, regulations, and policies, should not be interpreted to undermine or contradict Federal law; that "gender support plans" or other related documentation that is directly related to a student and is maintained by the district or school, whether in official or unofficial files, are considered education records under FERPA, and are thus subject to review and inspection by the student's parents; and that violations of FERPA risk loss of Federal financial assistance. (This would require SPPO's review and approval prior to statewide issuance.)

3) Have LEAs submit certifications that they understand and are in compliance with corrective actions (1 and 2). Submit a report to this Office confirming which LEAs have certified and provide a list of those that have not.

4) Provide written assurance to this Office that CDE will allow LEAs to enforce FERPA regarding "gender identity" and pro-parental notification approaches in a manner that aligns with the needs of the districts to ensure compliance.

5) Provide written assurance to this Office, that CDE will incorporate into its established compliance monitoring program[72] LEA compliance with FERPA,

---

[72] https://www.cde.ca.gov/ta/cr/

Page 19 – Superintendent Tony Thurmond

including the specific provisions of FERPA as related to the issues addressed in this complaint, and

6) As part of the newly mandated training established on July 1, 2025, that satisfies the California Education Code (EC) Section 218.3(b)(1)'s (LGBTQ) cultural competency training for teachers and other certificated employees, the CDE must add FERPA training content that is approved by SPPO. Further, any other teacher trainings that reference privacy, "gender identity," discrimination/harassment or other similar topics will also be required to include the same FERPA training content approved by SPPO.

III.    **Conclusion**

SPPO continued to correspond with the CDE with the hope of ensuring the CDE's compliance with FERPA, that California's LEAs had clarity regarding the law, and that the CDE understood their role in ensuring LEA compliance. Our Office requested a written report from the CDE by April 11, 2025, detailing steps taken, or planned, to ensure that LEAs in California comply with FERPA requirements as described in the March 27, 2025 Investigation Letter, including the submission of relevant policy statements or other communications. In the absence of such a production, SPPO requested a letter explaining why CDE believes this request is unwarranted.

Mr. Len Garfinkel, General Counsel (Counsel), responded on your behalf via a letter dated April 11, 2025, which SPPO found unsatisfactory. Because there is evidence in California of districts keeping "gender support plans" separate from education records as "unofficial records" in order to hide them from parents, SPPO responded with a letter on June 3, 2025, explaining the lack of sufficient communication to California's LEAs regarding "gender support plans" and their obligations under FERPA. The Department's March 28, 2025 Dear Colleague Letter and June 3, 2025 letter have also made abundantly clear the importance of clarifying to your LEAs what exactly constitutes "student records" under FERPA in that they include "gender support plans" and the like.

SPPO noted in the June 3, 2025 letter that parental advocacy groups, such as Interfaith Statewide Coalition, identified that school districts in California continue to develop "gender support plans," some without parental awareness.[73] As an example, the group stated: "Across 6 districts serving nearly 158,000 total students that provided data from the 2023-2024 school year, more than 300 children were placed on 'gender support plans' or had their names or pronouns modified in school systems." SPPO continues to have concerns regarding how "gender support plans" are shared with, or hidden from, parents at the district level. Therefore, in the June 3, 2025 letter, SPPO informed CDE that consistent with 34 C.F.R. § 99.66(a),[74] we were requesting the submission of further written information to address our unresolved concerns regarding "gender support plans." Specifically, SPPO requested CDE provide the following:

---

[73]https://dailycaller.com/2025/04/15/exclusive-blue-state-schools-facing-trump-admin-investigation-helped-hundreds-of-kids-change-their-gender-last-year/
[74] https://www.ecfr.gov/current/title-34/subtitle-A/part-99/subpart-E/section-99.66

Page 20 – Superintendent Tony Thurmond

1)      An additional notice to superintendents and administrators, reminding them that "gender support plans" are typically education records under FERPA, and therefore also subject to review and inspection by parents of students, and

2)      A plan of action demonstrating how CDE will ensure LEAs are complying with the provisions of FERPA as related to the issues discussed in the two notices discussed in 1) above given the context of AB 1955.

Subsequently, on June 9, 2025, Counsel responded on behalf of the CDE stating the following:

> The CDE is not aware of any legal authority that tasks a state educational agency under FERPA with issuing legal opinions to LEAs as to how to apply FERPA to particular factual situations, such as determining whether a particular document constitutes an "educational record" (as defined in FERPA) in a particular circumstance. The guidance and communications we have issued to LEAs in response to your previous requests encompassing this topic sufficiently apprise them of their obligations under FERPA.
>
> As to the second request, the CDE is likewise unaware of any legal authority that tasks a state educational agency with developing a state plan relating to FERPA compliance. As such, the request that the CDE develop such a plan in relation to issues of gender identity disclosure, specifically, is without authority.

As explained above, it is clear to this Department that the State of California has gone out of its way to ensure districts, schools, and individual staff feel obligated to violate FERPA when faced with the decision of turning over records to parents. Furthermore, the legal actions taken against districts like Chino Valley,[75] Temecula Valley,[76] and Rocklin Unified School District[77] demonstrate a coordinated statewide effort to curtail district or school-level efforts to afford parents the right to fully access their child's education records as required under FERPA.

To expedite the processing of this investigation, please respond in writing by close of business February 11, 2026. You may email your response to FERPA.ComplaintResponse@ed.gov, including the complaint number in the subject line. In lieu of sending your response electronically, you may send your written response to the following address:

Student Privacy Policy Office
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202-8520

---

[75] https://libertyjusticecenter.org/cases/california-v-chino-valley-unified-school-district/
[76] https://publiccounsel.org/wp-content/uploads/2023/07/TVUSD-MPA-as-filed.pdf
[77] https://libertyjusticecenter.org/cases/california-department-of-education-v-rocklin-unified-school-district/

Page 21 – Superintendent Tony Thurmond

       Please forward any questions to my attention at [PrivacyTA@ed.gov](mailto:PrivacyTA@ed.gov). We look forward to our continued partnership as we work to resolve the investigation as quickly possible.

                         Sincerely,

                         Frank E. Miller Jr.
                         Director
                         Student Privacy Policy Office

# EXHIBIT K

**CALIFORNIA DEPARTMENT**
**OF EDUCATION**

**TONY THURMOND**
STATE SUPERINTENDENT OF
PUBLIC INSTRUCTION

1430 N STREET, SACRAMENTO, CA 95814-5901 • 916-319-0800 • WWW.CDE.CA.GOV

February 11, 2026

Dear County and District Superintendents and Charter School Administrators:

# Further Update Regarding FERPA

Questions have arisen as to whether a support plan that includes information regarding a student's gender identity and is maintained separately from a student's cumulative file is subject to inspection and review by parents, upon request, under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g.

Under FERPA, parents of students under eighteen years of age have the right to inspect and review the education records of their children, upon request.  20 U.S.C. 1232g(a)(1)(A); 34 C.F.R § 99.5(a)(1).  Under FERPA, education records are those materials that contain information directly related to a student and are maintained by the educational agency.  20 U.S.C. 1232g(a)(4).  Education records excluded from FERPA are:

- records made by school personnel "which are in the sole possession of the maker thereof and not accessible or revealed to any other person except a substitute," *id.* at subd. (a)(4)(B)(i);

- records maintained by law enforcement units of the educational agency or institution created for law enforcement purposes, *id.* at subd. (a)(4)(B)(ii);

- employee records "which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose," *id.* at subd. (a)(4)(B)(iii); and

- records "made or maintained by" a medical or mental health professional "in connection with the provision of treatment to the student" for students "eighteen years of age or older" that "are not available to anyone other than persons providing such treatment," *id.* at subd. (a)(4)(B)(iv).

As we have noted in previous communications to you about FERPA, "[Assembly Bill] 1955 does not contradict parents' rights to request to inspect and review their students' education records under FERPA, even if they contain information related to a student's sexual orientation, gender identity, or gender expression."  (See *Facts to Consider Regarding FERPA and AB 1955*, dated April 1, 2025, at

February 11, 2026
Page 2

https://www.cde.ca.gov/nr/el/le/yr25ltr0401.asp; *Further Update Regarding FERPA and AB 1955*, dated April 11, 2025, at https://www.cde.ca.gov/nr/fa/yr25cosoltr0411a.asp; and *Third Update Regarding FERPA*, dated April 24, 2025 at https://www.cde.ca.gov/nr/fa/yr25cosoltr0424.asp.)

Moreover, no other provisions of California law, such as state privacy or antidiscrimination laws, contradict or override the right of parents to request their students' education records subject to FERPA.

Whether a support plan (or other education record of a student) is maintained by school officials in a central file or in a separate location to ensure privacy related to third parties (such as other school staff, students, or volunteers), it remains subject to a parental request for inspection and review in accordance with  FERPA's provisions.

For further information regarding FERPA, please visit the FERPA summary web page at https://www.cde.ca.gov/ds/ed/dataprivacyferpa.asp.

Sincerely,

David Schapira
Chief Deputy Superintendent
Chief of Staff

Ingrid Roberson
Chief Deputy Superintendent
California Department of Education

# EXHIBIT L



# CALIFORNIA DEPARTMENT
# OF EDUCATION

**TONY THURMOND**
STATE SUPERINTENDENT OF
PUBLIC INSTRUCTION

1430 N STREET, SACRAMENTO, CA 95814-5901 • 916-319-0800 • WWW.CDE.CA.GOV

February 11, 2026

*Via email*

Frank E. Miller, Jr., Director
Student Privacy Policy Office
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202-2110
PrivacyTA@ed.gov

Re: Complaint No. 25-0382

Dear Mr. Miller:

I am writing in response to your Letter of Findings, dated January 28, 2026, Compl. No. 25-0382 (hereinafter Findings Letter).

As we have demonstrated in previous communications summarized below, the California Department of Education (CDE) does not have a "policy or practice" of preventing local educational agencies (LEAs) from permitting parents to inspect and review their children's written educational records upon request. 20 U.S.C. § 1232g(a)(1)(A). And, as we have demonstrated in previous communications summarized below, California's Assembly Bill (AB) 1955 is not in conflict with the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g. *See also Chino Valley Unified School District v. Newsom*, 2025 WL 1151004 at *7 (E.D. Cal. April 17, 2025) (FERPA and AB 1955 are not in conflict because AB 1955 has an explicit carveout relating to federal law). Nor does any other provision of California law purport or operate to override FERPA.

On January 2, 2025, the CDE informed LEAs that it had posted guidance on AB 1955, which became effective on January 1, 2025, and that it replaced previous guidance. The new guidance noted that AB 1955 added Education Code Section 220.3(a), which states that school employees shall not be required to disclose information about a student's sexual orientation or gender identity to any other person without student consent unless otherwise required by state or federal law. The new guidance noted that "AB 1955 does not mandate non-disclosure."

On April 1, 2025, the CDE informed LEAs as follows:

> AB 1955 does not mandate nondisclosure. AB 1955 prohibits LEAs from mandating that staff disclose a student's sexual orientation, gender identity, or gender expression to another person without student consent, unless otherwise

Frank E. Miller, Jr.
February 11, 2026
Page 2

required by state or federal law. AB 1955 does not prohibit LEA staff from sharing any information with parents. Based on the plain language of both laws, there is no conflict between AB 1955 and FERPA, which permits parental access to their student's education records upon request.

On April 11, 2025, the CDE wrote to you as follows:

The inclusion of express language requiring compliance with state and federal laws necessarily includes compliance with FERPA. Moreover, AB 1955 does not prohibit disclosure about students; it only prohibits schools and school districts from compelling staff to affirmatively disclose without a student's consent. As you acknowledge in your March 28, 2025 letter to Chief State School Officers,[1] FERPA does not impose an affirmative duty on schools to disclose information about a student to parents. There is thus no conflict between the provisions of AB1955 and a parent's right to inspect and review their children's education records, as defined in 20 U.S.C. §1232g(a)(4), under FERPA.

In that April 11, 2025 letter, the CDE provided copies of its January 2, 2025 and April 1, 2025 communications to LEAs referenced above. The CDE concluded:

In sum, there is no conflict between AB1955 and FERPA. AB1955 does not mandate nondisclosure of information, and AB1955's prohibition on mandating disclosure absent student consent is expressly limited by the phrase "unless otherwise required by state or federal law." AB1955 does not contradict parents' rights to request to inspect and review their students' education records under FERPA, *even if they contain information related to a student's sexual orientation, gender identity, or gender expression*. And CDE's guidance and notices reinforce these points. (Emphasis in italics supplied)

Also on April 11, 2025, the CDE notified LEAs of its communication to you that day, highlighting the following:

Based on the plain text of both laws, there is no conflict between FERPA and AB 1955.

---

[1] Your March 28, 2025 letter states, "*While FERPA does not provide an affirmative obligation for school officials to inform parents about any information, even if that information is contained in a student's education records*, FERPA does require that a school provide a parent with an opportunity to inspect and review education records of their child, upon request." (Emphasis in italics supplied.)  The letter was previously available on your website at https://studentprivacy.ed.gov/sites/default/files/resource_document/file/Secretary_Comb_SPPO_DCL-Annual%20Notice_0.pdf, but appears to have been removed.  A copy of the letter is attached for your reference.

Frank E. Miller, Jr.
February 11, 2026
Page 3

> Specifically, there is no conflict between the provisions of AB 1955 and a parent's right to inspect and review their children's education records, as defined in 20 U.S.C. § 1232g(a)(4), under FERPA.
>
> In addition, AB 1955 includes language requiring compliance with state and federal laws.

On April 24, 2025, we wrote to you detailing how all LEAs in California make assurances to the state of their compliance with FERPA, and providing information about the active CDE engagement to assist LEAs in complying with all state and federal student privacy laws and best practices, including relating to the parental right to inspect and view records on request. That same day, we provided LEAs with a copy of our letter to you.

On June 9, 2025, we wrote to you in response to your request to (1) notify LEAs that "gender support plans are typically education records under FERPA," and (2) provide a "plan of action" as to how the CDE will ensure that LEAs comply with FERPA in relation to issues of gender identity disclosure, or provide a justification as to why these two actions are unwarranted. We referenced our prior April 11, 2025 and April 24, 2025 communications to you, and our related communications to the field. We also noted, in response to (1), that:

> The CDE is not aware of any legal authority that tasks a state educational agency under FERPA with issuing legal opinions to LEAs as to how to apply FERPA to particular factual situations, such as determining whether a particular document constitutes an "educational record" (as defined in FERPA) in a particular circumstance. The guidance and communications we have issued to LEAs in response to your previous requests encompassing this topic sufficiently apprise them of their obligations under FERPA.

We further noted, in response to (2), that:

> [T]he CDE is likewise unaware of any legal authority that tasks a state educational agency with developing a state plan relating to FERPA compliance. As such, the request that the CDE develop such a plan in relation to issues of gender identity disclosure, specifically, is without authority.

After we sent our June 9, 2025 response, we did not hear from you again regarding this matter until January 28, 2026, when you sent the Findings Letter. We can note two additional points in the interim.

As of July 1, 2025, there is an online training curriculum to support LGBTQ cultural competency training for teachers and other certificated employees. Education Code 218.3(a)(1). The training states all of the following:[2]

---

[2] *Mirabelli v. Olson*, Case No. 3:23-cv-00768, Docket No. 299-1, para. 10 and Exhibit 1.

Frank E. Miller, Jr.
February 11, 2026
Page 4

> • Effective January 1, 2025, the bill [AB 1955] prohibits schools from requiring staff to disclose a student's gender identity or sexual orientation without the student's consent, unless otherwise required by state or federal law.
>
> • AB 1955 does not prohibit staff from voluntarily disclosing a student's gender identity to parents.
>
> • Note that AB 1955 does not contradict a parent's right to inspect and review their student's educational records under FERPA, *even if they contain information related to a student's sexual orientation, gender identity or gender expression.* (Emphasis in italics supplied)

And in an October 1, 2025 communication to LEAs, the CDE stated:

> As we noted in prior communications on the issue of FERPA and AB 1955 it is important to note that AB 1955 does not mandate nondisclosure. AB 1955 prohibits LEAs from mandating that staff disclose a student's sexual orientation, gender identity or gender expression to another person without student consent unless otherwise required by state or federal law. AB 1955 does not prohibit LEA staff from sharing information with parents. Based on the plain language of both statutes, there is no conflict between AB 1955 and FERPA, and both permit parental access to their student's education records upon request.

We have now received your recent Findings Letter, and have reviewed the findings of alleged LEA noncompliance with FERPA set forth on pages 3 through 7. None of them reflect a pattern and practice of failing to provide education records related to gender identity or expression to parents who have made FERPA requests. For example, your allegation that certain LEAs have policies or practices to withhold "gender support plans" from parents in violation of FERPA is not supported by the evidence cited. See Findings Letter at 3–7 & n. 2–7, 12–20. As a preliminary matter, there is no requirement under FERPA that parents must be affirmatively notified of or involved in the process of creating a gender support plan. *See infra* p. 6. FERPA says nothing at all about gender support plans. Moreover, based on our review, none of the LEAs' gender support plans or related polices you identity provide that the completed support plan should not be disclosed to parents in response to a valid request for records under FERPA, whether it is kept in a student's central file or in a separate location. The Findings Letter assumes that simply placing certain confidential documents, such as gender support plans, in a separate location from the student's central file, is an attempt to evade FERPA requests—but that assumption is unsupported. As discussed further below, *see infra* p. 8, regardless of whether a support plan (or other education record of a student) is maintained by school officials in a central file or in a separate location to ensure privacy related to third parties (such as other school staff, students, or volunteers), it remains subject to a parental request for inspection and review in accordance with FERPA's provisions.

As another example, your Findings Letter cites the ongoing litigation in *Mirabelli v. Olson*, 691 F. Supp. 3d 1197 (S.D. Cal. 2023), in which several teachers contend that Escondido Union School District prevented them from disclosing information about a

Frank E. Miller, Jr.
February 11, 2026
Page 5

student's gender identity, "even if a 'parent directly asks [the teachers] to reveal a student's gender identity.'" Findings Letter at 4 (alteration in original) (citing *id.* at 1206). However, "directly ask[ing]" about a student's gender identity would not constitute a request for records under FERPA, and the Findings Letter offers no evidence that the district has withheld, or would withhold, any record responsive to a FERPA request.

Most significantly, your Findings Letter does not identify any instance where parents have requested their students' records from their school district under FERPA, and the district refused or failed to provide them documents that would otherwise qualify as "education records" not subject to any statutory exception, on the ground that they contain information related to gender identity or expression.

In addition, SPPO's findings that the CDE is noncompliant with FERPA and its regulations (*see* Findings Letter at 8–16) do not identify any CDE policy or guidance that actually directs or requires LEAs to violate FERPA's requirement to provide, pursuant to a parental *request* under FERPA, "education records" as defined under the statue and regulations and subject to its exceptions. 20 U.S.C. § 1232g(a)(1); *id.* § 1232g(a)(4); 34 C.F.R. § 99.3.[3]  Instead, as discussed above, the CDE's letters to LEAs dated April 1, 2025, April 11, 2025, April 24, 2025, and October 1, 2025, confirm that LEAs must comply with FERPA requests for education records, even if the records contain information related to a student's sexual orientation, gender identity or gender expression.

---

[3] Under FERPA, parents must be afforded "the right to inspect and review" their child's "education records." 20 U.S.C. § 1232g(a)(1)(A). Districts must "establish appropriate procedures for the granting of a request by parents for access to the education records of their children." *Id*. A "record" includes "any information recorded in any way, including, but not limited to, handwriting, print, computer media, video or audio tape, film, microfilm, and microfiche." 34 C.F.R. § 99.3. FERPA defines "education records" to be all records that "contain information directly related to a student" that are "maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). FERPA expressly excludes from the definition of "education records":

- records made by school personnel "which are in the sole possession of the maker thereof and not accessible or revealed to any other person except a substitute," *id.* at subd. (a)(4)(B)(i).
- records maintained by law enforcement units of the educational agency or institution created for law enforcement purposes, *id.* at subd. (a)(4)(B)(ii).
- employee records "which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose," *id.* at subd. (a)(4)(B)(iii); and
- records "made or maintained by" a medical or mental health professional "in connection with the provision of treatment to the student" for students "eighteen years of age or older" that "are not available to anyone other than persons providing such treatment," *id.* at subd. (a)(4)(B)(iv).

Frank E. Miller, Jr.
February 11, 2026
Page 6

The Findings Letter appears to be based on a plainly incorrect assumption that FERPA requires LEAs to affirmatively notify and provide information to parents regarding their student's gender identity and expression, and thus that LEAs should adopt policies requiring notification to parents of such information. But FERPA simply *does not* require an LEA to affirmatively disclose *any* records about a student to that student's parents *prior to* a parental request for written education records; it also does not require disclosure of information not contained in written records maintained by the education entity.

The Findings Letter asks that CDE do all of the following:

1)      Publicize a clear definition of "official" and "unofficial" education records and then specify that under Federal law all forms of education records that do not otherwise see an exception under FERPA are subject to parental inspection upon request. This includes "gender support plans," any gender-related modifications to student documents, forms, and other internal files or records related to these changes. (This would require SPPO's review and approval prior to statewide issuance.)

2)      Issue a new notice to superintendents and administrators informing them: that AB 1955, as well as all other CA education laws, regulations, and policies, should not be interpreted to undermine or contradict Federal law; that "gender support plans" or other related documentation that is directly related to a student and is maintained by the district or school, whether in official or unofficial files, are considered education records under FERPA, and are thus subject to review and inspection by the student's parents; and that violations of FERPA risk loss of Federal financial assistance. (This would require SPPO's review and approval prior to statewide issuance.)

3)      Have LEAs submit certifications that they understand and are in compliance with corrective actions (1 and 2). Submit a report to this Office confirming which LEAs have certified and provide a list of those that have not.

4)      Provide written assurance to this Office that CDE will allow LEAs to enforce FERPA regarding "gender identity" and pro-parental notification approaches in a manner that aligns with the needs of the districts to ensure compliance.

5)      Provide written assurance to this Office, that CDE will incorporate into its established compliance monitoring program LEA compliance with FERPA, including the specific provisions of FERPA as related to the issues addressed in this complaint, and

6)      As part of the newly mandated training established on July 1, 2025 that satisfies the California Education Code (EC) Section 218.3(b)(1)'s (LGBTQ) cultural competency training for teachers and other certificated employees, the CDE must add FERPA training content that is approved by SPPO. Further, any other teacher trainings that reference privacy, "gender identity,"

Frank E. Miller, Jr.
February 11, 2026
Page 7

> discrimination/harassment or other similar topics will also be required to include the same FERPA training content approved by SPPO.

The CDE is not aware of any legal authority that requires the CDE to take any of the requested actions. We are confident that the CDE's efforts to date are legally sufficient. As previously stated, the CDE continues to cultivate and maintain a robust, multi-pronged approach to supporting LEAs' compliance with FERPA and other state and federal student privacy laws.

Nonetheless, with respect to the first two requested actions, earlier today the CDE issued the attached Further Update Regarding FERPA to County and District Superintendents and Charter School Administrators. (See attached Further Update Regarding FERPA, dated February 11, 2026.)

The CDE's update letter squarely addresses your concern that LEAs be informed that a support plan that includes information regarding a student's gender identity and is maintained separately from a student's central file is subject to inspection and review by parents, upon request, under FERPA. The letter explains, once again, that Assembly Bill 1955 "does not contradict parents' rights to request to inspect and review their students' education records under FERPA, even if they contain information related to a student's sexual orientation, gender identity, or gender expression." The letter further confirms that "no other provisions of California law, such as state privacy or antidiscrimination laws, contradict or override the right of parents to request their students' education records subject to FERPA."

The CDE's letter also specifically states:  "Whether a support plan (or other education record of a student) is maintained by school officials in a central file or in a separate location to ensure privacy related to third parties (such as other school staff, students, or volunteers), it remains subject to a parental request for inspection and review in accordance with FERPA's provisions."

While you request that the CDE include a definition of "official" and "unofficial" education records in its communication to LEAs, the CDE's only mention of "unofficial" records appeared in nonbinding former FAQs re: AB 1266 that CDE withdrew and replaced with new guidance on January 1, 2025. The new guidance does not mention any distinction between official and unofficial records, thus there is no reason to now define the terms. Instead, the CDE has made clear that FERPA's requirements apply to documents that fall within FERPA's definition of "education record" (and are not subject to a FERPA exception),  even if they are maintained in a location other than the central file to ensure privacy related to third parties.

With regard to the remaining requests for action (3 through 6), the CDE is not aware of any legal authority that requires it to take any of those requested actions, nor have you pointed to any. Specifically, CDE is not aware of any legal authority to support requiring LEAs to submit certifications to CDE regarding compliance, especially as your Findings Letter does not identify any instance where parents have requested their students' records from their school district under FERPA, and the school district refused to provide them documents that would otherwise qualify as "education records" not subject

Frank E. Miller, Jr.
February 11, 2026
Page 8

to any statutory exception, on the ground that they contain information related to gender identity or expression.

Nor is CDE aware of any legal requirement that it change its monitoring program to specifically include LEA compliance with FERPA as it relates to education records that contain information regarding students' gender identity or expression.

You also have not cited any legal authority to support requiring the CDE to "allow LEAs to enforce FERPA regarding 'gender identity' and pro-parental notification approaches in a manner that aligns with the needs of the districts to ensure compliance."   (Request No. 4.)  Moreover, CDE has repeatedly informed LEAs that they must comply with FERPA's requirement that parents be afforded the right to inspect and review their child's education records upon request, as set forth and defined in 20 U.S.C. sections 1232g(a)(1)(A) and (a)(4), including with respect to education records that contain information related to a student's gender identity. But requiring the CDE to allow LEAs to enforce "pro-parental notification" approaches far exceeds the bounds of FERPA and the SPPO's authority related to FERPA compliance. As previously acknowledged in your March 28, 2025 letter, attached hereto, "FERPA does not provide an affirmative obligation for school officials to inform parents about any information, even if that information is contained in a student's education records."  Thus, as discussed above, FERPA imposes no requirement for LEAs to affirmatively notify and disclose to parents information or documents regarding their student's gender identity. The requested action improperly directs the CDE and LEAs to interpret FERPA in a manner that far exceeds the scope of the statute.

Finally, regarding your request that the CDE add "FERPA training content that is approved by SPPO" in its LGBTQ cultural competency training for teachers and other certificated employees (Request No. 6), we are not aware of any authority that confers upon SPPO the power to design the content of state educational agency trainings, nor have you cited any. Instead, doing so would constitute federal "direction, supervision, or control" of the "program of instruction," "curriculum," "personnel," or "administration" of the LEAs in violation of 20 U.S.C. § 1232a.

In any event, as discussed above, the CDE's online LGBTQ cultural competency training curriculum already informs employees that "AB 1955 does not contradict a parent's right to inspect and review their student's educational records under FERPA, *even if they contain information related to a student's sexual orientation, gender identity or gender expression.*" (Emphasis in italics supplied).

Frank E. Miller, Jr.
February 11, 2026
Page 9

In sum, the CDE does not have a "policy or practice" of preventing LEAs from permitting parents access to their children's education records upon request, and it will continue to support FERPA compliance and safeguard student privacy.

Sincerely,


/s/ Len Garfinkel_____
LEN GARFINKEL
General Counsel
California Department of Education


Attachments:
Attachment 1:  March 28, 2025 USDOE letter
Attachment 2:  February 11, 2026 CDE letter

# Attachment 1



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

March 28, 2025

Dear Educators:

By natural right and moral authority, parents are the primary protectors of their children. Yet many states and school districts have enacted policies that presume children need protection from their parents. Often, such policies evade or misapply the Family Educational Rights and Privacy Act (FERPA), turning the concept of privacy on its head to facilitate ideological indoctrination in a school environment without parental interference or even involvement. Going forward, the Department of Education will insist that schools apply FERPA correctly to uphold, not thwart, parents' rights.

COVID-19 opened parents' eyes to the pervasive indoctrination taking place in many classrooms. Families across the country saw gender ideology and critical race theory taught on-screen at their own kitchen tables. When parents understandably demanded answers and transparency, the Biden Administration treated them like criminals, directing the FBI to surveil school board meetings (one of the few places where parents can call for change in their schools) to intimidate parents. Under President Trump's leadership, my Department will no longer passively accept school officials' hostility to parental involvement. The Department stands with parents in exercising their rights to the full extent of the law.

Congress passed FERPA in 1974 to protect children's privacy in a manner that ensures parents can access their children's school records to gain information and insight necessary to act as proper guardians of their children's well-being. FERPA, as well as the Protection of Pupil Rights Amendment (PPRA), were intended to shelter families from invasion of their privacy—not to insulate schools from transparency and accountability to parents. Parents should not have to navigate a complex process to exercise their rights under FERPA or PPRA. Schools should not treat parents as enemies just for wanting to know about the mental and physical health and safety of their own children. Over the last four years, instead of vigorously enforcing these laws, the Biden Administration neglected the flood of complaints it received. The FERPA and PPRA complaint process is currently so overburdened with reports that parents who care deeply about their children's health and educational futures have had no recourse but to sit and wait. There was no obvious attempt by the Biden Administration to address this substantial backlog, which sent a loud and clear message that parental rights were not a priority. Meanwhile, states have taken advantage of this dereliction of government responsibility and installed policies that specifically instruct teachers and administrators to conceal student's critical information in student records from their parents.

The Trump Administration understands that the immense responsibility of raising children belongs to parents, not to the government. That's why I am announcing a revitalized effort to make FERPA and PPRA the source of proactive, effective checks on schools that try to keep parents in the dark. The Department will prioritize clearing the backlog of FERPA complaints so that parents can be confident that the Department is positioned to act on complaints in a timely manner.

Two weeks ago, I had the privilege of sitting down with a courageous group of detransitioners. They told me about their torturous and truly unfortunate experiences which led them down paths that, in many cases, will require lifelong medical care. A common thread among the stories I heard were the dogged efforts that schools took to promote and enable the transitioning of minor children, regardless of their mental state or their vulnerabilities. I repeatedly heard about the lengths schools would go to in order to hide this information from parents.

As any mother would be, I have been appalled to learn how schools are routinely hiding information about the mental and physical health of their students from parents. The practice of encouraging children down a path with irreversible repercussions—and hiding it from parents—must end. Attempts by school officials to separate children from their parents, convince children to feel unsafe at home, or burden children with the weight of keeping secrets from their loved ones is a direct affront to the family unit. When such conduct violates the law the Department will take swift action.

Attached is a letter from the Department's Student Privacy Policy Office (SPPO). This letter reminds educational institutions receiving federal financial assistance that they are obligated to abide by FERPA and PPRA if they expect federal funding to continue. This letter clarifies issues under FERPA that many states and school districts have intentionally muddied. I intend for SPPO's letter to convey my commitment to vigorously enforce important provisions in FERPA and PPRA for the protection of students and parents.

Sincerely,

Linda E. McMahon

Attachment



UNITED STATES DEPARTMENT OF EDUCATION

STUDENT PRIVACY POLICY OFFICE

March 28, 2025

Dear Chief State School Officers and Superintendents:

We are writing you to provide the notification required by 20 U.S.C. § 1232h(c)(5)(C).  The U.S. Department of Education (Department) through its Student Privacy Policy Office (SPPO) is required to inform State educational agencies (SEAs) and local educational agencies (LEAs), as recipients of funds under programs administered by the Department, of their obligations under the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99) and the Protection of Pupil Rights Amendment (PPRA) (20 U.S.C. § 1232h; 34 CFR Part 98).

FERPA protects the privacy interests and access rights of parents and students in education records maintained by educational agencies and institutions or by persons acting for such agencies or institutions.  PPRA affords parents and students with rights concerning specified marketing activities, the administration or distribution of certain surveys to students, the administration of certain physical examinations or screenings to students, and parental access to certain instructional materials including ones used as part of a student's educational curriculum.

This letter serves as guidance in conjunction with the Department's annual notification, required by 20 U.S.C. § 1232h(c)(5)(C), which has not substantively changed since it was last issued and is available at:  https://studentprivacy.ed.gov/annual-notices.

In addition to notifying you of your legal obligations, we would also like to take this opportunity to point out several priority concerns identified over the last year.  At the direction of Secretary McMahon, SPPO is taking proactive measures to address the following:

**Priority Concerns**

- ***Parental Right to Inspect and Review Education Records.***  It appears many LEAs may have policies and practices that conflict with the inspect and review provisions afforded parents under FERPA.  Further, some of these informal and formal practices may be occurring at the direction, or minimally with the tacit approval, of their SEAs.  For example, schools often create "Gender Plans" for students and assert that these plans are not "education records" under FERPA, and therefore inaccessible to the parent, provided the plan is kept in a separate file and not as part of the student's "official student record." While FERPA does not provide an affirmative obligation for school officials to inform parents about any information, even if that information is contained in a student's education records, FERPA does require that a school provide a parent with an opportunity to inspect and review education records of their child, upon request.  Additionally, under the current regulatory framework, FERPA does not distinguish between a student's "official student record" or "cumulative file."  Rather, all information, with certain

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officers and Superintendents

statutory exceptions, that is directly related to a student and maintained by an educational agency or institution, is part of the student's "education records" to which parents have a right to inspect and review.

- ***Safety of Students***.  Additionally, we have received many inquiries from parents concerned about the safety of their children as schools are withholding related information under the auspices of FERPA.  Nothing is more important than the health and safety of our nation's school children.  To that end, schools should not withhold information from parents that identifies other students who have made death threats against their children.  For example, Student A writes a note or school assignment describing an intent, or even a detailed plan, to kill Student B (or multiple other students). To the extent that the education record in question directly relates to both students and the information cannot be segregated and redacted without destroying its meaning, the parents of both students have the right to inspect and review that information.  While the disciplinary sanction imposed on Student A may not be shared with the parents of Student B, unless the sanction directly relates to both students, FERPA does not preclude school officials from communicating to Student B's parents, for example, that responsive action is being taken with respect to a threat assessment or potential disciplinary action.  Nor does FERPA prevent a school from taking actions designed to protect Student B, such as a classroom reassignment to avoid interaction with Student A.  Certain measures a school might impose to protect student safety that directly affect both students may be disclosed to the parents of both students; for example, an order that specifies that Student A must stay 500 feet away from Student B, is a record that relates to both students.  Our guidance called *Addressing Emergencies on Campus* discusses other provisions in FERPA that permit disclosures of personally identifiable information from a student's education records in order to address safety issues in a manner that complies with FERPA. It is available at: https://studentprivacy.ed.gov/resources/addressing-emergencies-campus.

- ***Annual Notification of Rights***.  Many LEAs are not properly notifying parents and eligible students of their rights under FERPA.  A school is not required to notify parents individually but rather is required to provide the notice by any means that are reasonably likely to inform parents of their rights.  These means could include publication in the school activities calendar, newsletter, student handbook, or displayed prominently on the school's website.  *See* 34 CFR § 99.7.

- ***Military Recruiters.***  SPPO also administers the military recruiter provisions of the Elementary and Secondary Education Act (ESEA), which contains certain requirements for LEAs that are the recipients of ESEA funds.  These provisions, as well as the Department of Defense companion law, give military recruiters the same access to secondary students as provided to postsecondary institutions or to prospective employers and require that schools provide student information to military recruiters, when requested, unless the parent has opted out of providing such information.  The information schools are required to provide to military recruiters include student names, addresses, electronic mailing addresses, and telephone listings.  *See* Section 8528 of the ESEA, as amended, 20 U.S.C. § 7908 and 10 U.S.C. § 503(c).

Page 3 – Chief State School Officers and Superintendents

- ***Assurance of Compliance.*** As part of SPPO's fulfillment of the Secretary's priority to take proactive action to enforce FERPA, pursuant to the authority under 20 U.S.C. §1232g(f), 34 CFR §§ 99.60 and 99.62, SPPO is requesting that <u>each SEA submit no later than April 30, 2025</u>, documentation such as "reports, information on policies and procedures, annual notifications, training materials or other information necessary" to provide assurance that the SEA and their respective LEAs are complying with the provisions of FERPA and PPRA, specifically with regard to the priority concerns previously discussed.  In an effort to expedite the processing of this information, please email your response to my attention at <u>SAOP@ed.gov</u>, including the name of the SEA in the subject line.  In lieu of sending your response electronically, you may send your written response to the following address:

  > Student Privacy Policy Office
  > U.S. Department of Education
  > 400 Maryland Avenue, SW
  > Washington, D.C. 20202 – 8520

SPPO is available to assist you with your questions about FERPA, PPRA, and student privacy.  We encourage you to sign up for our monthly student privacy newsletter or submit your questions directly to our student privacy help desk by visiting the "Contact" tab at https://studentprivacy.ed.gov/.

Thank you for the vital work you do every day to safeguard student privacy and create safe and effective learning environments for our students nationwide.

Sincerely,

Frank E. Miller Jr.
Acting Director
Student Privacy Policy Office

# Attachment 2



# CALIFORNIA DEPARTMENT
## OF EDUCATION

**TONY THURMOND**
STATE SUPERINTENDENT OF
PUBLIC INSTRUCTION

1430 N STREET, SACRAMENTO, CA 95814-5901 • 916-319-0800 • WWW.CDE.CA.GOV

February 11, 2026

Dear County and District Superintendents and Charter School Administrators:

## Further Update Regarding FERPA

Questions have arisen as to whether a support plan that includes information regarding a student's gender identity and is maintained separately from a student's cumulative file is subject to inspection and review by parents, upon request, under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g.

Under FERPA, parents of students under eighteen years of age have the right to inspect and review the education records of their children, upon request. 20 U.S.C. 1232g(a)(1)(A); 34 C.F.R § 99.5(a)(1). Under FERPA, education records are those materials that contain information directly related to a student and are maintained by the educational agency. 20 U.S.C. 1232g(a)(4). Education records excluded from FERPA are:

- records made by school personnel "which are in the sole possession of the maker thereof and not accessible or revealed to any other person except a substitute," *id.* at subd. (a)(4)(B)(i);

- records maintained by law enforcement units of the educational agency or institution created for law enforcement purposes, *id.* at subd. (a)(4)(B)(ii);

- employee records "which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose," *id.* at subd. (a)(4)(B)(iii); and

- records "made or maintained by" a medical or mental health professional "in connection with the provision of treatment to the student" for students "eighteen years of age or older" that "are not available to anyone other than persons providing such treatment," *id.* at subd. (a)(4)(B)(iv).

As we have noted in previous communications to you about FERPA, "[Assembly Bill] 1955 does not contradict parents' rights to request to inspect and review their students' education records under FERPA, even if they contain information related to a student's sexual orientation, gender identity, or gender expression." (See *Facts to Consider Regarding FERPA and AB 1955*, dated April 1, 2025, at

February 11, 2026
Page 2

https://www.cde.ca.gov/nr/el/le/yr25ltr0401.asp; *Further Update Regarding FERPA and AB 1955*, dated April 11, 2025, at https://www.cde.ca.gov/nr/fa/yr25cosoltr0411a.asp; and *Third Update Regarding FERPA*, dated April 24, 2025 at https://www.cde.ca.gov/nr/fa/yr25cosoltr0424.asp.)

Moreover, no other provisions of California law, such as state privacy or antidiscrimination laws, contradict or override the right of parents to request their students' education records subject to FERPA.

Whether a support plan (or other education record of a student) is maintained by school officials in a central file or in a separate location to ensure privacy related to third parties (such as other school staff, students, or volunteers), it remains subject to a parental request for inspection and review in accordance with  FERPA's provisions.

For further information regarding FERPA, please visit the FERPA summary web page at https://www.cde.ca.gov/ds/ed/dataprivacyferpa.asp.

Sincerely,

David Schapira
Chief Deputy Superintendent
Chief of Staff

Ingrid Roberson
Chief Deputy Superintendent
California Department of Education